IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| **KRISTEN BEHRENS, ESQ.,** as Administratrix, et al. <br><br> v. <br><br> **ARCONIC, INC.,** et al. | **CIVIL ACTION** <br><br> **NO. 19-2664** |
|---|---|

**Baylson, J.**                                                                                  **December 20, 2019**

## MEMORANDUM ON DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12

**I.     Introduction**

This action arises out of the Grenfell Tower tragedy, which claimed the lives of seventy-two people and injured many more when a fire spread through a high-rise apartment building in London on June 14, 2017. Plaintiffs include Kristen Behrens, who serves as the Administratix of the Estates of sixty-nine of the Grenfell Tower fire victims ("Behrens");[1] individuals who experienced injuries caused by the fire;[2] and individuals whose spouses lost their lives in the fire (the "Consortium Plaintiffs")[3] (collectively, "Plaintiffs"). Plaintiffs assert various theories of strict products liability against Arconic, Inc., Arconic Architectural Products, LLC, Saint-Gobain Corporation, and Whirlpool Corporation (collectively, "Defendants")[4] for the roles these

---

[1] The names of the individuals whose estates Behrens has been appointed to administer are listed in paragraph 27 of the Complaint. Exhibit A to the Complaint consists of the letters of administration appointing Behrens as the Administratix of the estates of the sixty-nine individuals listed in paragraph 27.
[2] The names of these plaintiffs are listed in paragraphs 385–556 of the Complaint.
[3] The names of the Consortium Plaintiffs are listed in paragraph 557 of the Complaint.
[4] Plaintiffs also name as Defendants "John Does (1-99)," who are "current and former officers, directors, agents, employees of defendants, their subsidiaries, parent companies, sister companies, successor companies, predecessor companies, and/or otherwise related entities who made decisions related to the conduct described in th[e] Complaint," (ECF 1, Ex. 1, Compl. Compl. ¶ 194); "ABC Corporations (1-99)" which are "designers, manufacturers, distributors, sellers, suppliers, [and] marketers … [who] were [involved] in the designing, manufacturing, distributing,

1

companies allegedly played in supplying defective products that exacerbated the conflagration. Specifically, the Complaint (ECF 1, Ex. 1) alleges 143 counts[5]:

- **Count I**: Products Liability, by Plaintiffs against the Arconic Defendants;[6]

- **Count II**: Products Liability, by Plaintiffs against Whirlpool Corporation;

- **Count III**: Products Liability, by Plaintiffs against Saint-Gobain Corporation;

- **Counts IV through CXLI**: Claims brought by Behrens on behalf of the estates she represents for violations of the Wrongful Death Act, 42 Pa. Stat. and Const. Stat. Ann. § 8301 pursuant to Pa. R. Civ. P. 2202, and violations of the Survival Act, 42 Pa. Stat. and Const. Stat. Ann. § 8302, against Defendants;[7]

- **Count CXLII**: Loss of Consortium, by the Consortium Plaintiffs against Defendants; and

- **Count CXLIII**: Punitive Damages, by Plaintiffs against Defendants.

Presently before the Court is Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12. (ECF 49.) For the reasons that follow, Defendants' Motion is **DENIED**.[8]

---

selling, supplying, and/or marketing hierarchy of control for the subject products," (Compl. ¶ 195); and "XYZ Corporations (1-99)" which are "the subsidiaries, parent companies, sister companies, successor companies, predecessor companies and/or otherwise related entities . . . who were involved in the design, manufacturing, or creation of the products," (Compl. ¶ 196).

[5] In each count, Plaintiffs seek compensatory damages, punitive damages, delay damages, interest, and allowable costs of suit.

[6] Plaintiffs name as defendants three entities that are associated with the Arconic enterprise: Arconic, Inc., Alcoa Inc., and Arconic Architectural Products, LLC. Plaintiffs collectively refer to these defendants as the "Arconic Defendants." Although Plaintiffs sue three Arconic entities in name, Plaintiffs define the Arconic Defendants broadly to include not only Arconic, Inc., Alcoa, Inc., and Arconic Architectural Products, LLC, but also "their subsidiaries, sister corporations, predecessor entities, and/or successor entities." (Compl. ¶¶ 9, 162.)

[7] The numbering of the Wrongful Death Act and Survival Act Counts corresponds to the estates that Behrens administers. For example, Count IV is the Wrongful Death Act claim brought on behalf of decedent Gloria Trevisan and Count V is the Survival Act claim brought on behalf of decedent Gloria Trevisan. Counts VI and VII continue the pattern for decedent Fatemeh Afrasehabi. This numbering sequence is repeated for all sixty-nine of the estates that Behrens is administering.

[8] No party should construe anything in this Memorandum to mean that the Court has a view on the merits of this case or on the proper disposition of Defendants' pending Motion to Dismiss for *Forum Non Conveniens*.

## II. Facts

At this stage, the Court "accept[s] all factual allegations as true, [and] construe[s] the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).[9] As set out in the Complaint, the factual background is as follows.

a. The 2017 Grenfell Tower Fire

Grenfell Tower, a high-rise apartment building in London, suffered a devastating fire in 2017. (Compl. ¶ 1.) The fire, which started within one apartment and quickly spread to the combustible cladding covering the entire tower, killed seventy-two people and caused severe harm to many more. (Compl. ¶¶ 1, 5–8.) That cladding had been installed as part of a larger refurbishment of Grenfell Tower that took place from 2012 to 2016. (Compl. ¶¶ 252–53, 255, 257–58).

There has been subsequent investigation into the fire's causes. (Compl. ¶¶ 21, 222, 233–34, 281.) Now, Plaintiffs allege that the fire can be traced back to three conglomerates' products, as follows.

---

[9] Defendants have asked the Court to take judicial notice of various facts that are contained in SEC filings or attachments to such filings, documents that are purportedly integral to Plaintiffs' Complaint, or in other sources. (ECF 71, Defs.' Resp. to the Ct.'s Oct. 15, 2019 Order at 2–8.) As Defendants acknowledge, see id. at 2, at most the Court "may" consider such facts. And "[w]hile the Court may take notice of such documents for what they state, the Court must be cautious not to take notice of the truth of any matters that can be reasonably contested." Vrakas v. U.S. Steel Corp., Civil Action No. 17-579, 2018 WL 4680314, at *5 (W.D. Pa. Sept. 29, 2018) (citing In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002) and S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 427 n.7 (3d Cir. 1999)). Here, many of the facts Defendants ask the Court to take notice of are not only reasonably contested, but central to Plaintiffs' theories of liability. The Court, therefore, will not draw the factual conclusions recommended by Defendants.

b. <u>Whirlpool Corporation</u>

According to the Complaint, the fire at Grenfell Tower was started by a fridge-freezer manufactured and sold by Indesit Company under the brand-name "Hotpoint." (Compl. ¶¶ 6, 181, 220, 228.) A wire in the fridge-freezer's compressor relay compartment was defective, which caused the appliance to "short circuit" and catch fire. (Compl. ¶¶ 233–234, 243–245.) The Hotpoint fridge-freezer's rear casing was constructed with a highly flammable plastic material, which allowed the fire to quickly escape the relay compartment and spread throughout Grenfell Tower. (Compl. ¶¶ 230, 247–249.)

In 2014, Defendant Whirlpool Corporation ("Whirlpool") acquired Indesit Company, along with its assets and liabilities. (Compl. ¶¶ 181–182.) After acquiring Indesit Company, Whirlpool continued to sell the Hotpoint fridge-freezer. (Compl. ¶¶ 193, 363.) Whirlpool knew—or should have known through the exercise of due diligence—of prior incidents in which the Hotpoint fridge-freezer caused fires, but Whirlpool did not correct the fridge-freezer's defective conditions or warn customers of its dangers. (Compl. ¶¶ 183–185, 369–73, 376, 581.)

Whirlpool was registered to do business in Pennsylvania during the time these acts or omissions occurred. (Compl. ¶ 216.) To the extent Whirlpool itself did not commit the purportedly tortious acts, it was acting through its "agents, servants, and/or employees, who were acting within the course and scope of their agency," or the actions were taken by affiliated companies "at the direction and command of, and under the supervision of, Defendant Whirlpool." (Compl. ¶¶ 188, 191.)

c. The Arconic Defendants

According to the Complaint, the Arconic Defendants were responsible for "designing, manufacturing,[10] assembling, marketing, distributing and selling the Reynobond PE cladding" that was used in Grenfell Tower. (Compl. ¶ 153.) Reynobond PE cladding should not be used in buildings that exceed 40 feet because if "a fire break[s] out and ignite[s] the highly flammable polyethylene core and insulation . . . the maximum reach of a firefighter's fully extended ladder is approximately 40 feet." (Compl. ¶ 310.) Despite this guideline and the Arconic Defendants' knowledge that Grenfell Tower stood at over 200 feet—far in excess of the 40-foot maximum—the Arconic Defendants supplied their "unfit" product to Grenfell Tower. (Compl. ¶¶ 312–313, 314.)

Notwithstanding their knowledge of the hazard that Reynobond PE cladding posed to Grenfell Tower and its residents, the Arconic Defendants designed and sold this defective product and failed to adequately advise of the dangers associated with its use. (Compl. ¶¶ 562–563.)

To the extent that the Arconic Defendants themselves did not commit the purportedly tortious acts, they were acting through their "agents, servants, and/or employees, who were acting within the course and scope of their agency and/or employment," or the actions were taken by affiliated companies "at the direction and command of, and under the supervision of, the American-based Arconic Defendants." (Compl. ¶¶ 151, 155, 159, 165.)

---

[10] Defendants contend the Reynobond PE cladding that was used in the Grenfell Tower was manufactured by Arconic Architectural Products, SAS ("AAP SAS")—Arconic, Inc.'s French subsidiary. (ECF 54, Defs.' Resp. to Pls.' Mot. Compel Disc. at 9.) AAP SAS is not a named defendant in this litigation.

d. <u>Saint-Gobain Corporation d/b/a Saint-Gobain North American and/or d/b/a Celotex</u>

Finally, according to the Complaint, Grenfell Tower's exterior cladding included "RS5000 PIR insulation." (Compl. ¶ 281.) Much as with Arconic's Reynobond PE, the RS5000 insulation's combustibility caused the fire to spread faster and burn hotter, (Compl. ¶¶ 7–8, 16, 283, 285, 287, 297–99).

Celotex Corporation designed and manufactured the RS5000 PIR insulation used in Grenfell Tower's exterior cladding. (Compl. ¶ 17.) Celotex "knew that its insulation was highly combustible and was not fit or suitable for use in external cladding for buildings," particularly buildings taller than forty feet, "but knowingly sold and supplied it to the Tower anyway." (Compl. ¶¶ 18, 342.) Celotex also "knew that its RS5000 PIR Insulation would emit toxic [cyanide] fumes if burned." (Compl. ¶¶ 341, 355.) Celotex, moreover, "knowingly falsified and doctored testing performed on its RS5000 PIR Insulation in order to falsely claim that the Insulation was more fire resistant than it actually was." (Compl. ¶¶ 19, 343.) The result was insulation that did not comply with applicable regulations and was unfit for use at Grenfell Tower. (Compl. ¶¶ 340, 348–349.) Nonetheless, Celotex supplied RS5000 PIR insulation for use at Grenfell Tower without warning anyone of its dangerous nature. (Compl. ¶¶ 303, 307, 356–359.)

Saint-Gobain Corporation (individually or with Saint-Gobain North American, "Saint-Gobain"),[11] a multi-national construction company headquartered in Malvern, Pennsylvania, purchased Celotex in 2012. (Compl. ¶¶ 171, 174.) Saint-Gobain "continues to operate under the Celotex brand name and oversee and/or orchestrate the design, engineering, marketing, distribution, and sale of Celotex products," including SR5000 PIR. (Compl. ¶ 171–172.)

---

[11] In the Complaint, these entities, along with Celotex, are collectively referred to as "Celotex."

To the extent that Saint-Gobain itself did not commit the purportedly tortious acts, it was acting through its "agents, servants, and/or employees, who were acting within the course and scope of their agency and/or employment," or the actions were taken by affiliated companies "at the direction and command of, and under the supervision of" Saint-Gobain. (Compl. ¶¶ 175, 178.)

### III.    Procedural History

Plaintiffs filed their Complaint in the Court of Common Pleas of Philadelphia County on June 6, 2019. (ECF 1, Ex. 1 at 417.) Defendants removed the suit to this Court shortly thereafter, on June 19. (ECF 1.) Saint-Gobain filed an answer and affirmative defenses the same day. (ECF 2.) To date, no other Defendants have answered the Complaint.

On August 29, Defendants filed two motions: a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12 (the "Rule 12 Motion"), (ECF 49), and a Motion to Dismiss for *Forum Non Conveniens*, (ECF 50). Defendants filed a joint appendix in support of both motions containing fifty-two exhibits. (ECF 51.) Plaintiffs filed a memorandum in opposition to the Rule 12 Motion on September 30. (ECF 56.) On October 22, Defendants replied. (ECF 69.) Plaintiffs have not yet filed a memorandum in opposition to Motion to Dismiss for *Forum Non Conveniens*.

On October 25, the Court ordered additional briefing on personal jurisdiction over Whirlpool. (ECF 72.) Plaintiffs filed a memorandum on November 4, (ECF 77), and Whirlpool responded on November 22, (ECF 91).

Some discovery took place in the meantime. On September 13, 2019, Plaintiffs moved to compel discovery. (ECF 52.) Defendants responded on September 20, (ECF 54), and Plaintiffs replied on September 27, (ECF 55). By that point, Plaintiffs' only discovery disputes were with the Arconic Defendants. (ECF 55 at 1.) On October 2, the Court ordered Plaintiffs and the Arconic Defendants to continue to meet and confer. (ECF 58, 59.) The parties have since continued to confer and update the Court concerning discovery. (E.g., ECF 65, 67, 70, 75.)

7

On November 25, the Court heard argument on the Rule 12 Motion and addressed discovery and scheduling issues. (ECF 79, 90, 92.) Following the hearing, on December 3, the Court issued an order which, in relevant part, requested clarification from Plaintiffs as to their indirect liability theories and set a schedule for the parties' post-hearing supplemental briefing. (ECF 95.) Pursuant to that order, Plaintiffs provided the Court supplemental briefing on the Rule 12 Motion on December 13, (ECF 100), and Defendants responded on December 19, (ECF 103).

## IV. Legal Standard

### a. Rule 12(b)(6): Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court in Iqbal explained that, although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. Iqbal, 556 U.S. at 678, 684. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555); see also Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556 n.3) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests."). Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

b. Rule 12(b)(7): Failure to Join Necessary and Indispensable Parties

In considering a motion to dismiss under Rule 12(b)(7), a court must first determine whether a party is "necessary" under Rule 19(a) and, next, whether the party is "indispensable" under Rule 19(b). Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306, 312 (3d Cir. 2007). A district court need not conduct a Rule 19(b) analysis concerning a party that is not necessary under Rule 19(a). Id. at 312–13. Rule 19(a) states in relevant part:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).

c. Rule 12(b)(2): Lack of Personal Jurisdiction

When a defendant files a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff must establish the Court's jurisdiction over the moving defendant through "affidavits or other competent evidence." Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009) (quoting Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir. 1996)). When, as here, the court does not hold an evidentiary hearing, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002) and Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992)).

## V. **Discussion**

   a. Choice of Law

The parties dispute whether Pennsylvania law or English law governs the substance of this case. It would be premature to undertake this analysis at this stage. See In re Domestic Drywall Antitrust Litig., Civil Action 15-cv-1712, 2016 WL 3769680, at *5 (E.D. Pa. July 13, 2016) (Baylson, J.) (deferring a choice-of-law analysis until after discovery). The Defendants agree that, insofar as the Court concludes the Plaintiffs have stated a claim under Pennsylvania law, it should forestall the choice-of-law analysis until the issue is fully briefed. (ECF 103, Defs.' Supp. Mem. at 18.) Because Plaintiffs' Complaint raises claims under Pennsylvania law, the Court will assume for the purposes of deciding Defendants' Rule 12 Motion that Pennsylvania law applies.

   b. Rule 12(b)(6): Failure to State a Claim

Plaintiffs' claims sound in strict products liability. Pennsylvania follows Section 402A of the Restatement (Second) of Torts for claims of strict products liability. Tincher v. Omega Flex, Inc., 104 A.3d 328, 399 (Pa. 2014). The elements of a claim under Section 402A are "that: (1) 'the product was defective;' (2) 'the defect was a proximate cause of the plaintiff's injuries;' and (3) 'the defect causing the injury existed at the time the product left the seller's hands.'" Bruesewitz v. Wyeth Inc., 561 F.3d 233, 255 (3d Cir. 2009) (quoting Berkbile v. Brantly Helicopter Corp., 337 A.2d 893, 899 (Pa. 1975)), aff'd 562 U.S. 223 (2011)).

Aside from the question of whether Plaintiffs have sufficiently alleged that tortious conduct giving rise to strict products liability occurred, the Court must decide whether Plaintiffs have sufficiently alleged that that conduct is attributable to Defendants. Here, Plaintiffs have three theories of how the Court could attribute strict products liability to Defendants.

First, Plaintiffs claim that Defendants themselves undertook certain tortious actions.

Second, Plaintiffs claim that certain Defendants acquired certain liabilities through the doctrine of successor liability. The doctrine of successor liability provides in relevant part that when a company purchases all the assets of another company, the purchasing company can become responsible for the liabilities of the selling company if "the purchaser expressly or implicitly agree[s] to assume" the selling company's liabilities. Cont'l Ins. Co. v. Schneider, Inc., 873 A.2d 1286, 1291 (Pa. 2005) (citing Hill v. Trailmobile, Inc., 603 A.2d 602, 605 (Pa. Super. 1992) and 15 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 7122 (perm. ed., rev. vol.2004)).

Third and finally, Plaintiffs claim that certain Defendants were in a principal-agent relationship[12] with agents not party to this suit. Establishing agency liability under Pennsylvania law requires proof of three elements: "[1] the manifestation by the principal that the agent shall act for him, [2] the agent's acceptance of the undertaking and [3] the understanding of the parties that the principal is to be in control of the undertaking." Basile v. H&R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000) (quoting Scott v. Purcell, 415 A.2d 56, 60 (Pa. 1980)). An agency relationship "results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary." Id. (quoting Smalich v. Westfall, 269 A.2d 476, 480 (Pa. 1970)).

---

[12] The Complaint suggested that Plaintiffs also sought to impose indirect liability on some or all Defendants based on alter-ego and/or veil piercing theories. However, in response to an inquiry from the Court, Plaintiffs advised that they "are not pursuing any vicarious liability theories based on veil-piercing or alter ego theories with regard to any unnamed parties or foreign subsidiaries." (ECF 100, Pls.' Supp. Mem. at 3.) Therefore principal-agent is the only theory of indirect liability that remains.

Plaintiffs do acknowledge that if they win a judgment, they may still seek collection under a veil-piercing theory. (Id. at 3–4.) Defendants characterize this admission as Plaintiffs proceeding under a veil-piercing theory. (Defs.' Supp. Mem. at 14–15.) However, the question for pleading purposes, as well as joinder, is not how Plaintiffs might collect a theoretical judgment, but how Plaintiffs seek to impute liability to Defendants.

The bar to plead agency is not high. At the pleadings stage, a plaintiff seeking to have liability attributed under an agency theory "must allege facts sufficient to allow such a relationship to be proven at trial,[13] but it is not required to have extensive proof . . . ." Jurimex Kommerz Transit G.M.B.H. v. Case Corp., 65 Fed. App'x 803, 808 (3d Cir. 2003) (citing In re Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989)). This is because "plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." In re Craftmatic Sec. Litig., 890 F.2d at 645 (citing Wool v. Tandem Computs., Inc., 818 F.3d 1433, 1439 (9th Cir. 1987) and Charles Wright & Alan Miller, 5 Federal Practice and Procedure § 1298, at 416 (1969)).

With these standards in mind, the Court concludes that Plaintiffs have stated Pennsylvania-law claims that Defendants are directly or vicariously liable.

Plaintiffs have adequately alleged that Whirlpool is directly liable under a Pennsylvania products liability cause of action because Whirlpool knew or should have known of incidents in which the Hotpoint fridge-freezer caused fires, but failed to correct the problem or warn customers of the fridge-freezer's dangers. (Compl. ¶¶ 183–85, 369–73, 376, 581.) Plaintiffs' allegations of Whirlpool's indirect liability relate to its acquisition of Indesit Company. Because Plaintiffs allege that Whirlpool "took over Indesit Company's . . . liabilities, including product liabilities," (Compl. ¶ 182), Plaintiffs have plausibly pleaded that Whirlpool could be liable as a successor for Indesit Company's sale of the Hotpoint fridge-freezer involved in the Grenfell Tower fire.

Plaintiffs have adequately alleged that the Arconic Defendants are directly liable under Pennsylvania products liability principles because Arconic, Inc. knew or should have known of the risks of the manufacture of Reynobond PE cladding and its sale for use in the Grenfell

---

[13] Such allegations must, of course, be "plausible on [their] face[s]." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). The Court finds the relevant allegations in Plaintiffs' Complaint plausible for the purposes of this Motion.

Tower. (Compl. ¶ 571–572.) Plaintiffs have pleaded sufficient facts to support direct or vicarious liability because they allege that Arconic, Inc. designed the defective Reynobond PE cladding, and that it sold the cladding or directed the sale of the cladding for use in Grenfell Tower. (Compl. ¶¶ 151, 155, 159, 562–568.)

Plaintiffs have adequately alleged that Saint-Gobain is directly or vicariously liable for the role that RS5000 PIR insulation played in the fire. According to the Complaint, Celotex interfered with fire safety testing for RS5000 PIR insulation, knew that the RS5000 PIR insulation was particularly dangerous when used in buildings taller than forty feet, and moreover knew that the RS5000 PIR insulation, if burned, would release toxic cyanide fumes. (Compl. ¶¶ 19, 341–343, 355.) Plaintiffs have adequately alleged, therefore, that the RS5000 PIR insulation was unfit for use at the two-hundred-foot-tall Grenfell Tower, and Saint-Gobain knew as much. (Compl. ¶¶ 18, 307, 340, 348–349.) Despite that knowledge, Saint-Gobain either manufactured and supplied the insulation to Grenfell Tower, or directed a foreign affiliate, Celotex, Ltd., to do so, or some combination of the two occurred. (Compl. ¶¶ 171–172, 174, 353, 356–357).

    c. <u>Rule 12(b)(7): Failure to Join Necessary and Indispensable Parties</u>

Defendants contend that this case must be dismissed under Rules 12(b)(7) and 19 because their foreign subsidiaries or affiliates[14] (collectively, "the foreign entities") are necessary and indispensable parties who cannot be joined to this litigation. The Court disagrees that the foreign entities are necessary parties, and, therefore, will decline to dismiss this case under Rules 19 and 12(b)(7).

---

[14] Primarily, AAP SAS, Celotex Limited, and Whirlpool EMEA S.p.A. (<u>See</u> ECF 49, Defs.' Memo. Supp. Mot. Dismiss Pursuant to Fed. R. Civ. Pro. 12 at 42.)

Plaintiffs are proceeding under two categories of legal theories. The foreign entities are not necessary and indispensable parties under either category.

In the first category of theories, Plaintiffs allege that Defendants were principals in principal-agent relationships with the foreign entities. Alleged "agent" corporations are not necessary parties to suits proceeding under such theories. See Publicker Indus., Inc. v. Roman Ceramics Corp., 603 F.2d 1065, 1070 (3d Cir. 1979) (recognizing that suit against corporate "principal" may be allowed even absent corporate "agent," because "obligors that are jointly liable may be sued independently"); Jurimex, 65 Fed. App'x at 808 (citing Publicker, 603 F.2d at 1070); Carl Schroeter GMBH & KO., KG. v. Crawford & Co., Civil Action No. 09-946, 2009 WL 1408100, at *5 (E.D. Pa. May 19, 2009) (Schiller, J.) (recognizing that suit could proceed against alleged corporate "principal" absent alleged corporate "agent").

In the second category, Plaintiffs allege that Defendants themselves undertook acts, other than control of their alleged agents, that would make them directly liable[15] for the Grenfell Tower fire. The foreign entities are not necessary parties to such suits either.

d. Rule 12(b)(2): Lack of Personal Jurisdiction over Whirlpool

It is undisputed that Whirlpool is registered to do business in Pennsylvania. The Third Circuit has held that a corporation's registering to do business in this way "can be viewed as its consent to be sued in Pennsylvania" and is a sufficient basis for Pennsylvania courts to exercise personal jurisdiction over that corporation. Bane v. Netlink, Inc., 925 F.2d 637, 640–41 (3d Cir. 1991). Whirlpool contends that, after the Supreme Court's decision in Daimler AG v. Bauman, 571 U.S. 117 (2014), Bane is no longer good law. This Court recently rejected a similar argument in Youse v. Johnson & Johnson, No. 18-3578, 2019 WL 233884, at *2–4 (E.D. Pa. Jan. 16, 2019)

---

[15] Or inherited liability for such acts under the doctrine of successor liability.

(Baylson, J.). For the reasons stated in Youse, this Court will continue to follow Bane, and will deny Whirlpool's Motion to Dismiss for lack of personal jurisdiction.

## VI. Conclusion

For the foregoing reasons, Defendants' Rule 12 Motion will be denied. An appropriate order, which also lays out the timeline for further proceedings, follows.

O:\CIVIL 19\19-2664 Behrens v Arconic\19cv2664 Memo re Defendants Motion to Dismiss.docx