IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**KRISTEN BEHRENS, ESQ.,** as

Administratrix, et al.

**v.**

**ARCONIC, INC.,** et al.

Civil action No. 19-2664

## EXPERT AND MASTER REPORT OF NOELLE LENOIR

## REGARDING THE FRENCH BLOCKING STATUTE

**TABLE OF CONTENTS**

I.    Introduction ............................................................................................................. 4

II.   Education and professional experience ................................................................... 5

   a)   Qualifications and experience .......................................................................... 5

   b)   Publications ...................................................................................................... 7

   c)   Compensation ................................................................................................... 9

III.  Questions to be addressed with regard to the impact of the FBS ......................... 9

IV.   FBS background ................................................................................................... 14

   a)   Historical background ..................................................................................... 14

   b)   Renewed interest and recent reforms ............................................................. 17

V.    Analysis of Article 1bis of the FBS .................................................................... 19

   a)   Conditions set forth for the transfer of data in response to pre-trial discovery requests 19

      ➢   Procedural conditions ............................................................................... 19

      ➢   Substantive conditions .............................................................................. 21

   b)   French case law on Article 1bis of the FBS .................................................. 23

      ➢   Criminal courts ......................................................................................... 23

      ➢   Civil and commercial courts ..................................................................... 24

VI.   The relevance of the FBS in the case at hand ..................................................... 26

   a)   Applicability of Article 1bis of the FBS ....................................................... 26

   b)   Possible methods of enforcement................................................................... 27

## TABLE OF APPENDICES

| Appendix Number | Description |
|:---:|:---|
| A | The Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters. |
| B | France's Declarations and reservations on Articles 4, 16, 17 and 23 of the Hague Evidence Convention translated in English |
| C | Brief of Amicus Curiae The Republic of France, Aeropsatiale (No. 85-1695) |
| D | Official translation of the relevant Articles of the French Civil Procedure Code (Articles 734 to 748). |
| E | Official translation of the relevant Articles of the General Data Protection Regulation of April 27, 2016. |
| F | CNIL Deliberation No. 2009-474 of July 23, 2009 concerning recommendations for the transfer of personal data in the context of American court proceedings known as "Discovery". |

I declare under penalty of perjury under the laws of the United States of America that the following is true and correct.

# SUMMARY

➢ In my Report on the analysis and the impact of the French Blocking Statute in the present litigation, I address the question of the applicability of its Article 1bis concerning private litigation. I analyse in particular the impact this law may have on the AAP SAS discovery dispute and thus address if and how it would be applicable to Plaintiffs' requests for production. I also make a recommendation on how the French Blocking Statute could apply to the circumstances of the discovery dispute as to the appropriate channel by which to respond to the Plaintiffs' requests.

➢ I first explain why from a French legal perspective the French Blocking Statute is binding, as confirmed by French case law and how it implies to abide by the procedures set forth in the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters. I indicate why this treaty is considered by French courts as the exclusive means of securing information in France for use in foreign litigation outside the EU. In that respect, I assume based on French case law that the French sovereign interests should be taken into account in the comity analysis required of U.S. courts in application of the Supreme Court's decision in *Société Nationale Industrielle Aerospatiale* of 1987.

➢ Second, I address the question raised in the present litigation whether the French Blocking Statute applies to documents located in the U.S. and originated in France. Based on French case law, I conclude that this law is applicable to these documents the more so that the documents are simply stored on the server of the law firm of the Defendants.

➢ Finally, I consider that the three methods provided by the Hague Convention may be used in this case, be it a Letter of Request, the appointment of a diplomatic or consular officer or the appointment of a Commissioner. In this instance, I recommend the appointment of a Commissioner as a suitable solution especially because this case involves a pure tort claim and the requested documents do not, to the best of my knowledge, involve any sovereignty issues. The use of Commissioners under the Hague Convention is not time-consuming, and in practice has become as much as Letters of Request a well-accepted procedure to obtain evidence in France.

## I.   **Introduction**

1. My name is Noëlle Lenoir. I have been appointed by the United States District Court for the Eastern District of Pennsylvania, presided over by Judge Michael Baylson, as a combination master and expert under Federal Rules of Civil Procedures 44.1 and 53, and Federal Rule of Evidence 706 to consider concerns that had arisen in the pre-trial proceedings about the so-called French Blocking Statute ("**FBS**") that the Arconic Defendants ("**Arconic**") in the above-mentioned civil action rely on to limit discovery of a subsidiary situated in France that is referred to as "**AAP SAS**"[1].

2. As expert and master, I will first analyze in my Report the relevance of the FBS to the AAP SAS discovery dispute[2]. Second, I will recommend a practical and suitable solution to this complex discovery issue.

3. The below sets forth the rationale behind the analysis in my Report.

4. I have not analyzed in-depth the pre-trial discovery request at issue from a European Union ("**EU**") law perspective, in particular with respect to Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data ("**GDPR**"). Since data protection is alluded to by Judge Baylson[3] and by the Defendants[4] and the Plaintiffs[5] in the documents that were transferred to me in order to prepare my Report, I only mention that the GDPR is complementary to the FBS. It is worth noting in that respect that the GDPR carries significant civil fines in case of violation and sets out specific conditions for the validity of data transfers outside the EU, and that both legislations must be complied with.

---

[1] Judge Michael Baylson, *Order Re: Appointment of Noëlle Lenoir*, December 20, 2019.
[2] Judge Michael Baylson, *Memorandum Re: French Blocking Statute and appointment of Noëlle Lenoir*, December 20, 2019.
[3] In the above-quoted Memorandum, Judge Baylson refers to the Sedona Conference guidance on Discovery Disclosure and Data Protection which underlines the necessity to respect "*the Data Protection Laws of any foreign sovereign*", p.10.
[4] *See* Document 96 Filed December 6, 2019, p.4 where the Defendants evoke "*compliance with privacy laws and the FBS*".
[5] *See* Document 87 Filed November 20, 2019, p.5 where the Plaintiffs mention that "*Arconic is attempting to dramatically limit the production of this material through its misguided reliance of the French Blocking Statute "FBS") and the General Data Protection regulation ('GDPR").*"

5. However, if more in-depth analysis of the GDPR would be useful so as to ensure legal certainty for the parties with regard to compliance with this EU legislation, I could provide this analysis at a later date if so requested.

6. In conducting my analysis of the FBS, I have mainly relied on French legal sources and legal writing, my educational background and professional experience, and the materials cited in this Report.

7. I reserve the right to modify or supplement this Report as appropriate if I become aware of new or additional information.

## II.     **Education and professional experience**

### a)  *Qualifications and experience*

8. I am currently a member of the Paris Bar and partner at Kramer Levin Naftalis & Frankel LLP in Paris, where I focus my practice on global compliance and risk management, data protection law, competition law, public law (including constitutional law), and regulation at the national, European, and international level. I also have experience in government and internal white collar investigations, cross-border data transfer, e-discovery and the French blocking statute, and data controllers' and processors' liability.

9. After having graduated in law and in political sciences at the University of Paris and the Paris Institute for Political Studies, I passed a selective competition to enter the administration of the French Senate. I thus began my career in 1972 as legal advisor to the Judiciary Committee of the French Senate, where I specialized in criminal law and human rights law.

10. From 1982 to 1984, I was General Counsel of the French Data Protection Authority (CNIL). I have been a judge on the Conseil d'Etat (Administrative Supreme Court) between 1984 and 1988 before serving as Chief of Staff to the Minister of Justice (1988-1990).

11. I have served as the first woman and youngest ever Justice on the French Constitutional Court (1992/2001, non-renewable tenure).

12. After being assigned by the Prime Minister of France to a project on bioethics law (1990-1991), I went on to preside over the EU Group of Ethics for Science & New Technology between 1994 and 2001, as well as the International Committee on Bioethics of UNESCO (1991–1998) that drafted the Universal Declaration on the Human Genome and Human Rights Declaration, which the United Nations endorsed in 1998. I have notably taught at University College London (2000), Columbia Law School in New York City (2001), Paris Institute for Political Studies, the Law Faculty of Paris and at the HEC Paris, the most prominent business school in France.

13. I then served as French Minister of European Affairs from 2002 to 2004 where I followed negotiations with Eastern European countries before their accession to the EU and the negotiation of an EU Constitutional treaty (later known as the "Lisbon treaty," which is now operative). I was Chief Ethics Officer of the French National Assembly from 2012 to 2014.

14. I also chaired several other ethics committees, including the French Public Broadcast's Ethics Committee and the National Parcoursup's Ethics and Scientific Committee in charge of assessing the French system of access to university education. Since 2017, I have been appointed one of the three members of the Independent Compliance Review Panel of Airbus (along with Theo Waigel, a former German prosecutor and Federal Minister of Finance of Germany, and Lord Gold, a former litigator) in the context of international investigations by various authorities[6].

15. Additionally, I am a member of both the American Law Institute and the French Academy of Technologies. I am on the board of the "Association Française des Constitutionalistes". I am a former member of the Board of Directors of Generali, Valeo and Compagnie des Alpes. I am founding chairwoman of the Cercle des Européens, a European think tank.

---

[6] https://www.airbus.com/newsroom/press-releases/en/2017/05/Airbus-establishes-new-Independent-Compliance-Review-Panel.html

16. I am currently vice-president of the International Chamber of Commerce (French Section) and president of the Legal Committee of the "Grand Paris/Capitale Economique" in charge of making proposals to reinforce Paris's attractiveness as a legal marketplace.

   *b) Publications*

17. I have published several articles in law journals on relevant subject matters, including the French Blocking Statute, data protection and discovery, and business secrecy. Amongst other publications are the following on these issues:

18. **French Blocking Statute:**

   - Le rapport Gauvain et la protection des "intérêts économiques essentiels » de la France, La Semaine Juridique, July 22, 2019

   - The Gauvain Report and Other Recent Legal Developments Reaffirm the Importance of the French Blocking Statute, Kramer Levin, April 5, 2019

   - L'extraterritorialité, nouvelle donne de la mondialisation, Échanges Internationaux ICC Fr n°112, September 2018

   - La protection des secrets d'affaires, Lamy droit des affaires, November 2016

   - L'intérêt de la loi du 26 juillet 1968 et l'obtention des preuves au niveau international: Un regain d'intérêt (À propos de CA Nancy, 4 juin 2014), Petites affiches, January 19, 2015

   - Les entreprises européennes pourront protéger leurs secrets d'affaires !, Option Finance droit et affaires, June 2014

   - La collecte des preuves dans le cadre des procédures judiciaires : l'amorce d'un dialogue entre la France et les Etats-Unis ? Petites affiches, June 19, 2014

- Le droit de la preuve à l'heure de l'extraterritorialité, Revue Française de Droit Administratif, April 2014

19. **Data Protection:**

- Les règles contraignantes d'entreprises ("BCR"), une solution pour les multinationales qui peut être à géométrie variable, Kramer Levin, June 26, 2019

- Deuxième sanction de la CNIL : il est impératif de protéger les données de vos clients, Kramer Levin, June 18, 2019

- Google's Fine and the French Data Protection Authority's Far-reaching GDPR Compliance Measures, Kramer Levin, February 27, 2019

- Protection des données personnelles et responsabilités plurielles, Semaine Juridique, October 8, 2018

- Alerte professionnelle et protection des données personnelles, Semaine Juridique, May 7, 2018

- C'est la dernière ligne droite : veillez à être prêt à appliquer le RGPD avant le 25 mai prochain. Et demandez-vous : suis-je sur la bonne voie ?, Kramer Levin, February 5, 2018

- The Final Race to GDPR: Are You on the Right Track, Kramer Levin, October 23, 2018

- L'Europe peut-elle empêcher le transfert de ses données hors de ses frontières ? La tribune, February 1, 2016

- Protection des données, liberté de religion et certificats de baptême, Les Petites Affiches, April 24, 2015

- La protection des données personnelles nouveau champ de conformité pour les entreprises, Finance & gestion, June 2017

- Le regain d'actualité de la loi de blocage, La lettre des Juristes d'Affaires, February 17, 2014.

### c)   *Compensation*

20. I am being compensated $800 per hour for my services. This compensation is not contingent upon my performance, the outcome of the litigation, or any issues involved in or related to this litigation.

## III.   <u>Questions to be addressed with regard to the impact of the FBS</u>

21. To prepare my Report on the analysis of the FBS and its impact on this litigation, including any impact it may have on the AAP SAS discovery dispute, I have addressed if and how the FBS would be applicable to Plaintiffs' requests for production ("**RFP**").

22. Adopted in 1968, the FBS was amended in 1980 in order to extend its scope to pre-trial discovery in private litigation. The exact title of this legislation is **law No. 68-678 of July 26, 1968, amended by law No. 80-538 of July 16, 1980, relating to the communication to foreign natural or legal persons of documents and information of an economic, commercial, industrial, financial or technical nature**[7]. The FBS prohibits the transfer of various categories of documents and information in response to foreign discovery requests, unless the requested entity (a private party or a public authority) uses the proper channels provided by applicable treaties or international agreements, whether those treaties or agreements are unilateral or bilateral.

23. Articles 1 and 1bis of the FBS distinguish two kinds of requests depending on the requesting party.

---

[7] Published in the Official Journal of the French Republic on July 27, 1968 and in its amended version on July 17, 1980.

24. Article 1[8] prohibits - *"[s]ubject to treaties or international agreements"* - the communication to foreign public authorities (including, for example, the U.S. Department of Justice, or "DOJ", and the U.S. Securities and Exchange Commission or "SEC") of any information or documents *"relating to economic, commercial, industrial, financial or technical matters (...) which would harm the sovereignty security or essential economic interests of France or contravening public policy."* Article 1 is applicable notably in the context of international investigations and requires that foreign authorities, to obtain the documents they request, must use the channels provided by international agreements or treaties such as Mutual Legal Assistance Treaties ("**MLAT**") both in the civil[9] and criminal[10] context. This Article is not applicable to the case at hand.

25. Only Article 1bis,[11] which concerns discovery requests between private parties, is applicable to this litigation. In the same way as set forth in Article 1 of the FBS, Article 1bis allows foreign disclosures provided that the requesting party uses the mechanisms provided by treaties or international agreements. In the present case, as explained below, Article 1bis refers to the provisions of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("**the Hague Convention**") ratified by both the U.S. and France. Domestic laws and regulations that may be applicable in absence of a treaty or international agreement are also referred to in Article 1bis. In instance, Articles 734 to 748 of the French code of civil procedure set out the procedure of Letters rogatory, which are commonly referred to as "Letters of Request" for discovery.

---

[8]Article 1 of Law No. 68-678 of July 26, 1968 and amended in 1980 states that: *"Subject to treaties or international agreements it is prohibited for any individual of French nationality or who usually resides on French territory and for any officer, representative, agent or employee of an entity having a head office or establishment in France to communicate to foreign public authorities, in writing, orally or by any other means, anywhere, documents or information relating to economic, commercial, industrial, financial or technical matters, the communication of which would harm the sovereignty, security or essential economic interests of France or contravening public policy, specified by the administrative authorities as necessary."*

[9] *See* Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters.

[10] *See* Treaty on Mutual Legal Assistance in Criminal Matters between the United States of America and France, December 10, 1998.

[11]Article 1bis of amended Law No. 68-678 of July 26, 1968.

26. According to Article 1bis of the FBS:

> "*Subject to any treaties or international agreements and the laws and regulations in force*, *it is prohibited for any person to request, to investigate or to communicate in writing, orally or by any other means, documents or information relating to economic, commercial, industrial, financial or technical matters leading to the establishment of proof in light of foreign administrative or judicial proceedings or as a part of such proceedings.*" (Emphasis added).

27. Article 2[12] requires that those to whom discovery requests are served "*inform without delay the relevant minister*," *e.g.*, the Minister of Foreign Affairs[13]. This provision was originally intended to enable French diplomatic authorities to open discussions with their foreign counterparts so that any potential difficulties raised by discovery request could be resolved amicably[14]. The Minister of Foreign Affairs who is informed that a company has received a discovery request will typically acknowledge the notified information, but will take no action other than reminding the French party that has received the discovery request of the obligation to conform to the FBS. In any event, failure to inform the Minister is not sanctioned. Thus, I will not examine Article 2 of the FBS.

28. Finally, Article 3[15] punishes any violation of the FBS with fines up to €18,000 for individuals and €90,000 for legal entities, and/or six months imprisonment.

29. **Based on the above, my Report will address the three questions raised by Judge Baylson in the Court's order appointing me to prepare a Report and make recommendations relating to the FBS:**

   - The first question is to determine whether Article 1bis of the FBS is applicable to the present case, since "*the documents, or at least a significant portion of them, are located in the United States*". These documents have indeed been transferred

---

[12]Article 2 of amended Law No. 68-678 of July 26, 1968 states: "*The persons referred to in Article 1 and 1bis are required to inform the competent minister without delay when they receive any request concerning such communications*".

[13]Decree No. 81-550 of 12 May 1981 implementing Article 2 of amended Law No. 68-678 of July 26, 1968 relating to the communication of documents and information of an economic, commercial or technical nature to foreign natural or legal persons.

[14]Report of Deputy M. A. Mayoud, French Parliament No. 1814, session of June 19, 1980, p. 45.

[15]Article 3 of amended Law No. 68-678 of July 26, 1968.

electronically to the U.S. because the French counsel of Arconic works in DLA Piper's U.S. Paris offices and DLA Piper's Relativity databases are located in New York.

- Assuming Article 1bis of the FBS is applicable, the second question is <u>to determine whether the mechanisms set forth by the Hague Convention referred to by the FBS should be used for the discovery requested, since the Defendants urge</u> the Court "*to ensure compliance with the FBS*". My analysis includes an assessment of the French sovereign interests that should be taken into account in the comity analysis required of U.S. courts in application of the Supreme Court's decision in *Société Nationale Industrielle Aerospatiale* of 1987[16].

- Finally, I make <u>a recommendation on how the FBS could apply to the circumstances of the discovery dispute</u> as to the appropriate channel by which to respond to the Plaintiffs' RFP of documents.

30. In addition to these issues, I note that it would be appropriate to examine compliance with the GDPR of the RFP in question. Indeed, under the 1995 directive on data protection[17], replaced by the GDPR entered into force in 2018 which contains similar provisions with regard international discovery matters, the CNIL in its 2009 deliberation[18], declared that obtaining authorization from a French judge to respond to a U.S. Letter of Request, required by the FBS, does not by itself release the parties from their obligation to comply with the provisions of data protection law, as the two regulations - the data protection law and the FBS - are complementary. The CNIL concluded that the transfer of personal data in the context of discovery proceedings must necessary be conducted in the context of the Hague Convention.

31. Following this deliberation, the EU Data Protection Working Party ("WP29") – an advisory body made up of representatives from Member States data protection authorities

---

[16] *Société Nationale Industrielle Aerospatiale v. US. Dist. Court for S. Dist. Of Iowa*, 482 U.S. 522 (1987).
[17] Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data.
[18] Deliberation No. 2009-474 of July 23, 2009 concerning recommendations for the transfer of personal data in the context of American court proceedings known as "Discovery".

– published an opinion on pre-trial discovery for cross border civil litigation[19], which states that *"when it is possible for the Hague Convention to be used, the Working Party urges that this approach should be considered first as a method providing for the transfer of information for litigation purposes."*

32. It is likely that the European Data Protection Committee (the successor to the WP29) will maintain this approach regarding the applicability of the GDPR to discovery requests, in application of Article 48 of the GDPR which provides that :

*"Any judgment of a court or tribunal and any decision of an administrative authority of a third country requiring a controller or processor to transfer or disclose personal data may only be recognised or enforceable in any manner if based on an international agreement, such as a mutual legal assistance treaty, in force between the requesting third country and the Union or a Member State, without prejudice to other grounds for transfer pursuant to this Chapter."* (Emphasis added).

33. It is worth noting that this provision refers to requests from courts or administrative authorities, but not directly from private parties. Second, the "other grounds" referred to in Article 48 may include, as stated by Article 49 (e) of the GDPR, the fact that *"the transfer is necessary for the establishment, exercise or defence of legal claims."[20]*

34. **My Report examines questions concerning the FBS in three parts**:

> ➤ **Part IV** sets forth background information, beginning with a brief history of extraterritorial discovery conflicts that led to the adoption of the FBS, and mentioning reforms to the FBS that reflect a renewed interest in France regarding this legislation;

> ➤ **Part V** contains an analysis of Article 1bis of the FBS as it stands today based on the different solutions agreed upon through the Hague Convention and on related French case law;

---

[19] WP29, *"Working document 1/2009 on pre-trial discovery for cross border civil litigation"*, adopted on February, 11 2009, WP 158.
[20] WP29, *"Guidelines on Article 49 of Regulation 2016/679"*, adopted February 6, 2018, at 12, WP 261.

> ➤ **Part VI** verifies the applicability of the FBS in the case at hand and considers the conditions under which the FBS may be applied to respond to the pre-trial discovery request.

## IV.   FBS background

### a)  *Historical background*

35. Since the 1950s, in response to what governments in Europe and North America had considered to be intrusive requests for production of documents by U.S. public authorities parties at the pre-trial phase of litigation, several countries have adopted so-called "Blocking Statutes" intended to protect the guarantees offered by their own legal systems. Contrary to what this name suggests, these laws were generally not aimed to totally oppose U.S. extraterritorial discovery, but rather to channel requests for discovery in order to ensure state management of the process and to prevent abusive practices, such as "fishing expeditions."

36. About **twenty countries have adopted Blocking Statutes,** including Australia,[21] Canada,[22] the Netherlands,[23] the United Kingdom,[24] Germany,[25] and Switzerland[26]. Canada was the first country ever to adopt such legislation, in 1947[27]. The FBS does not significantly differ from these laws, as it was similarly inspired by the same concern to resolve increasing conflicts between France's legislation and U.S. evidence collection laws.

37. **The FBS was adopted in 1968** expressly to limit document requests' extraterritorial effect during investigations of French shipping companies then being conducted by both the U.S. DOJ and the Federal Maritime Commission. The approach of the U.S. authorities,

---

[21] Foreign Proceeding (Prohibition of Certain Evidence) Act, No. 121 of 1976, amended by Foreign Proceeding (Prohibition of Certain Evidence) Amendment Act, No. 202 of 1976, replaced by Foreign Proceedings (Excess of Jurisdiction) Act, No. 3 of 1984.
[22] Foreign Extraterritorial Measures Act R.S.C., 1984, c. 49, s. 1, amended in 1996.
[23] The Netherlands Economic Competition Act of June 28, 1956 as amended by Act of July 16, 1958.
[24] Shipping Contracts and Commercial Documents Act of 1964, Eliz. 2, ch. 87.
[25] Federal Maritime Shipping Act of May 24, 1965, Art.11.
[26] Article 271 of the Swiss Criminal Code as amended by No I of the FA of 5 Oct. 1950, in force since 5 Jan. 1951 (AS 1951 1 16; BBl 1949 1 1249).
[27] Business Records Protection Act, 1947 Ont. Rev. Stat. c. 54.

calling on these companies to disclose information on their strategies and their business relations with third parties, concerned the French government, just as similar requests had concerned other foreign governments.

38. **In 1980, the FBS was amended** by the law n°80-538 July 16, 1980. First, its scope was extended to all economic sectors. Second, while the FBS could previously only be invoked in the context of investigations initiated by foreign administrative or judicial authorities[28], it now became applicable to the search for evidence by private plaintiffs or their counsel through the pre-trial discovery mechanism.[29]

39. **In the meantime, the Hague Convention of March 18, 1970 was adopted.** It is a multilateral agreement (the U.S. and France are both signatories) specifically aimed at overcoming conflicts between common law and civil law procedures of taking evidence in commercial and civil matters. It clearly results from the parliamentary debate on the amended FBS in 1980 that the expression "*Subject to any treaties or international agreements*" was designed to give effect to the processes provided by the Hague Convention for cross-border discovery in civil litigation[30].

40. As with any contract, the Hague Convention is a compromise. The procedures set forth borrow from the civil law system (Letters of Request) but also consist of innovative processes (such as the designation of a Commissioner, instead of a judge, as a trusted third party). All of these procedures provide that the foreign judge sends requests for discovery to the "central authority" of the country where assistance is requested. In France, the "central authority is the Ministry of Justice, and more precisely regarding civil matters the "Service Civil de l'Entraide Judiciaire Internationale" (department of mutual legal assistance in civil matters).

41. The Hague Convention has always been interpreted by the French government as binding pursuant to Article 55 of the French Constitution, which affirms the supremacy of treaties

---

[28] N. Lenoir, Le droit de la preuve à l'heure de l'extraterritorialité, RFDA 2014 p.487.
[29] *See* the full report of the debates of the French National Assembly during the second sitting of June 24, 1980 (JORF No. 49 AN, p. 2231 ff.).
[30] This is what emerges from the Report of Deputy M. A. Mayoud, French Parliament No. 1814, session of June 19, 1980, p. 45, according to which "*the research or communications will remain possible, if done in compliance with the procedures provided for in the international conventions in force and specified, for some of them, by the code of civil procedure*".

and international agreements over statutes[31]. This interpretation has significant consequences since such supremacy is rigorously protected by judicial and administrative courts[32]. The Convention has partially set forth standards that can be modified by the contracting parties in more restrictive or permissive ways. For instance, special conditions were imposed by France with regard to the application of Articles 15 to 17 regarding the taking of evidence by diplomatic officers, consular agents, and Commissioners. In a more general way, Article 27 provides that "*the provisions of the present Convention shall not prevent a Contracting State from -- a) declaring that Letters of Request may be transmitted to its judicial authorities through channels other than those provided for in Article 2; b) permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions; c) permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.*" France did not opt for less restrictive conditions.

42. From a French legal perspective, opting for less restrictive conditions, or not doing so, does not take away from the Hague Convention's impact as a treaty that requires parties to use specific channels to transfer data in response to discovery.

43. Even in the EU, where a regulation has been adopted to facilitate the taking of evidence in the European judicial area, the discovery process is carried out under the auspices of a judge. The EU legislation on cooperation between the courts of the Member States in the taking of evidence - Regulation No 1206/2001[33] - improves civil processes by simplifying and accelerating such cooperation by removing the need to transmit the request to a central authority (Ministry of Justice), as provided by the Hague Convention. However, it still requires that requests are sent by a judge in one Member State to a judge from another Member State and not the parties themselves[34].

---

[31] Brief of Amicus Curiae The Republic of France, Aeropsatiale (No. 85-1695).
[32] *See* Court of Cassation, Joint Section, May 24, 1975, *Administration des douanes v. Société Cafés Jacques Vabre,* n° 62814; "Conseil d'Etat" (Administrative Supreme Court), Assembly, October 20, 1989, *Nicolo,* n° 108243. All statutes deemed in contradiction with a treaty or international agreement entered into force must be put aside, and the judge must instead apply the treaty.
[33] Council Regulation (EC) No 1206/2001 of 28 May 2001 on cooperation between the courts of the Member States in the taking of evidence in civil or commercial matters.
[34] Article 17 of the Council Regulation No 1206/2001.

*b)* *Renewed interest and recent reforms*

44. Recent legal developments in France have contributed to reaffirming the determination of the French government to ensure that the FBS is followed.

45. First, **decree No 2016-66 of January 30, 2016**[35] created a new function within the Minister of Finances: "*Commissioner for strategic information and economic security,*" whose holder is appointed by the President of the French Republic. The Commissioner works closely with the general Secretary for Defense and National Security and is assisted by a network of correspondents in each ministry and in the main embassies of France abroad. He or she heads the "*Strategic Information and Economic Security Service*"[36] ("**SISSE**"), which is responsible, among other things, for ensuring compliance with the FBS. Contrary to what is alluded to by the Defendants[37], SISSE does not enjoy decision-making power. It cannot grant waivers to allow a company to circumvent the procedures defined by the Hague Convention and imposed by the FBS. In practice, the SISSE advices companies seeking guidance on the applicable procedures and how to follow the FBS by using the appropriate channels for discovery (the Hague Convention in civil and commercial matters; MLAT in criminal matters). Nevertheless, the SISSE yet plays a limited role.

46. When asked to give advice to companies that have received RFP for discovery or pre-trial discovery, the SISSE generally transmits the request for advice – for instance in civil matters - to the Service Civil de l'Entraide Judiciaire Internationale of the Ministry of Justice. In response, this Department usually sends to the SISSE a certificate signed on behalf of the Ministry of Justice which explains how to apply the FBS. This certificate is then forwarded by the SISSE to the company.

47. Second, **the Law No. 2016-1691 of December 9, 2016** ("**Sapin II Law**")[38] created the French Anti-Corruption Agency ("**AFA**")[39] with the goal of bringing French Legislation

---

[35] Decree n° 2016-66, January 29, 2016.
[36] The SISSE is more generally in charge of promoting and defending the essential economic interests of France.
[37] In Document 96 Filed December 6, 2019, p. 6 and 7 quoted Judge Michael Baylson in *Memorandum Re: French Blocking Statute and appointment of Noëlle Lenoir*, December 20, 2019 (fn. 6).
[38] Law n° 2016-1691, December 9, 2016 on transparency, corruption and modernisation of the economy.

in line with international standards in the fight against corruption. The AFA is notably entrusted with the mission of ensuring compliance with provisions of the FBS. At the request of the French Prime Minister, the AFA is in charge of filtering the documents to be transmitted "*in the context of the execution of a decision of foreign authorities imposing on a company with registered office in France an obligation to undergo a process aimed at improving its internal procedures of prevention and detection of corruption[40]*."

48. A recent example of implementation of the FBS by French National Financial Prosecutor ("**PNF**")[41] as well as the AFA indicates a willingness to ensure effectiveness of this law. The criminal settlement between Airbus SE and the French PNF on January 29, 2020[42] reveals that during the relevant investigations, the PNF was in charge of implementing the FBS and was thus the authority that transmitted requested documents to the U.S. DOJ and to its U.K. counterpart, the Serious Fraud Office ("**SFO**")[43], except for documents considered to be touching on the sovereignty of France. Based on this settlement, for a period of three years, the AFA is committed to play a similar role in reporting at least once a year to PNF, SFO, and DOJ "*in compliance with the provisions of Act n° 68-678 of 26 July 1968*", *i.e.*, the FBS[44].

49. The AFA does not involve itself in pre-trial discovery, especially related to potential litigation between private parties. However, the fact that a publicly designated body like the AFA is now entrusted with the task of ensuring observance of Article 1 of the FBS when a final decision of the foreign authority has been adopted (be it a criminal settlement or a judgment) shows a renewed degree of interest in the FBS by French legislature and

---

[39] The AFA assists the French government in its efforts to detect and prevent all forms of corruption, including influence-peddling, bribery, and misappropriation of public funds.  In addition, it assesses the efficacy of mandatory corporate compliance programs and oversees any corporate monitorships.

[40] Article 3 of Law No. 2016-1691 of December 9, 2016.

[41] The PNF is an institution equivalent to the Fraud Section of the Criminal Division of the DOJ.

[42] *Le Procureur de la République financier et Airbus S*, PNF-16 159 000 839 of January 29, 2020.

[43] The UK prosecuting authority which investigates cases of serious fraud, bribery and corruption.

[44] Article 1 of the FBS has long been taken into account by the DOJ in proceedings aimed at reaching DPAs with French companies, including Technip, Alcatel-Lucent, Total, and Alstom. This filtering is usually associated with the designation of an independent monitor. For instance, the Alcatel-Lucent DPA states that "*Alcatel-Lucent shall cooperate fully with the Monitor and the Monitor shall have the authority to take such reasonable steps as, in its view, may be necessary to be fully informed about Alcatel-Lucent's compliance program within the scope of the Mandate in accordance with the principles set forth herein and applicable law, including applicable data protection and labor laws and regulations, such as, among others, Article I of French Law No. 68-678 of July 26, 1968, as amended by Law No. 80-538 of July 16, 1980*"; in *U.S. v Alcatel-Lucent S.A.*, 10-20907 of February 22, 2011, pp. 75 and 79.

authorities as well as the acceptance of foreign authorities, in particular the DOJ, to recognize the FBS as an important element of French sovereignty[45].

## V.  Analysis of Article 1bis of the FBS

### a)  *Conditions set forth for the transfer of data in response to pre-trial discovery requests*

50. As mentioned above, Article 1bis of the FBS does not prohibit cross-border transfer of data for pre-trial discovery purpose, but it does subject such transfer to certain procedural and substantive conditions. These conditions in civil matters are based on what the 1970 Hague Convention referred to in the expression "*Subject to treaties or international agreements*".

   ➢ Procedural conditions

51. The procedural conditions require the requesting parties to use three alternative methods for conducting evidence-taking proceedings abroad.

52. The first method consists of using a **"Letter of Request,"** the process of which is described in Articles 2 to 14 of the Hague Convention. Under this process, the requesting party asks the court where the action is pending to transmit the Letter of Request specifying the evidence to be obtained to the central authority of the country where the evidence is located. In France, the Letter of Request (which must be written in French or accompanied by a translation in French) is sent to the Ministry of Justice or, more precisely in the context of civil litigation, the Service Civil d'Entraide Judiciaire Internationale (in civil matters). The Hague Conference on Private International Law

---

[45] The Gauvain Report [of 2019], named after the deputy who wrote it, recommends modernizing the FBS in order to strengthen its application. In particular, the report discusses e-discovery, the proliferation of cross border investigations, as well as the prospect of investigations launched by countries other than the U.S. as justification for reaffirming the centrality of the FBS. However, this report is subject to public consultation whose outcome will only be known in the future months. *See.* R. Gauvain, *Rétablir la souveraineté de la France et de l'Europe et protéger nos entreprises des lois et mesures à portée extraterritoriale*, report to the Prime Minister, April 2019 and N. Lenoir, *The Gauvain Report and Other Recent Legal Developments Reaffirm the Importance of the French Blocking Statute*, April 5, 2019.

("**HCCH**") has published a model form in order to avoid errors and formal omissions in connection with transmitting a Letter of Request[46].

53. The Service Civil d'Entraide Judiciaire Internationale then either approves or disapproves the request. Based on Article 12 of the Hague Convention, disapproval of a Letter of Request is only possible if the State where the request has been sent "*considers that its sovereignty or security would be prejudiced thereby*". In that case, its decision may be appealed by any of the parties or by the public prosecutor to the Court of Appeals, which ultimately decides whether to perform the requested acts.

54. If the request has been approved, the Letter of Request is transmitted to the public prosecutor of the competent court, whose president appoints a judge to conduct the evidentiary proceeding. This judge, who may apply coercive powers if needed in the form of fines or daily penalities, implements the Letter of Request in accordance with French law unless the foreign court has requested that it should be implemented in a particular manner. The judge must inform the foreign court of the venue, date, and time at which the implementation of the Letter of Request will be carried out.

55. Article 9 of the Hague Convention states that Letters of Request "*shall be executed expeditiously*". In practice, they take between four weeks to a year to be carried out in very complex cases, depending on the time needed to secure a judge and courtroom, address French law issues and the preparation of documents and the depositions of witnesses.

56. Under the second method provided for by Articles 15 and 16 of the Hague Convention, plaintiffs may request that **an American diplomatic or consular officer** accredited in France be appointed to take evidence in France. His or her designation must be approved by the French Ministry of Justice Service Civil d'Entraide Judiciaire Internationale subject to certain conditions. In addition, the Ministry must be given due notice of the date and time at which the evidence is to be taken so that it can make representatives available if necessary.

---

[46] The model form can be found on the HCCH website: https://www.hcch.net/en/publications-and-studies/details4/?pid=6557&dtid=65

57. Under the third method described in Article 17, a litigant may request the appointment of a **Commissioner** who can be a French or foreign lawyer. For such an appointment, prior authorization from France's Ministry of Justice is required. The request for authorization from the Ministry of Justice mainly involves explaining the reasons of the choice of such channel and listing the requested documents[47].

58. Unlike Letters of Request, which are carried out in accordance with French law, the Commissioner takes evidence in accordance with the procedures requested by the laws of the country in which the plaintiff has initiated the action (in this litigation, the U.S.). As a result of France's declaration on Article 17 of the Hague Convention[48], Commissioners (as well as diplomatic agents or consular officers) do not have the coercive powers granted to a judge commissioned to execute a Letter of Request.

   ➢ Substantive conditions

59. The Hague Convention includes a provision allowing contracting parties to make reservations to Article 23 concerning pre-trial discovery[49]. In 1987, France relaxed its previous position of unconditional adherence to the Article 23 reservation prohibiting pre-trial discovery, in order to accept such discovery provided certain conditions are met. The revised 1987 reservation to Article 23 states that *"The declaration made by the French Republic in accordance with Article 23 relating to Letters of Request issued for the purpose of obtaining pre-trial discovery of documents does not apply when the requested documents are enumerated limitatively in the Letter of Request and have a direct and precise link with the object of the procedure"*. Even though this declaration only refers to Letters of Request, in practice, French authorities consider that the conditions it lays down are applicable where a Commissioner or a diplomatic agent is appointed. Based on the

---

[47]France's relevant declaration provides: *"The Service Civil de l'Entraide Judiciaire Internationale will be kept informed of any difficulties. The application for authorization, which will be addressed to the Ministry of Justice by the requesting authority, should specify:*
   *1. the reasons why this method of investigation was chosen in preference to that of Letters of Request, bearing in mind the judiciary expenses involved.*
   *2. the criteria for designating the Commissioners when the person designated does not reside in France."*
[48] France's declaration on Article 17 provides: *"the Service Civil de l'Entraide Judiciaire Internationale, Ministère de la Justice, has been designated as the authority competent to authorize persons duly appointed as Commissioners to take evidence without compulsion in aid of proceedings commenced in the courts of a Contracting State. This authorization, which will be given for each particular case,* [is] *accompanied if need be by particular conditions (...).*
[49] Article 23 of the Hague Convention states that: *"A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries."*

request for authorization to appoint a Commissioner, the Service Civil d'Entraide Judiciaire Internationale of the Ministry of Justice verifies if the conditions set forth in the reservation of France to Article 23 of the Hague Convention are met. To the best of my knowledge, over the recent years, these appointments have been authorized by the Ministry of Justice without objection as the lists of requested documents were sufficiently accurate and precise.

60. A RFP of documents for pre-trial discovery is thus subject to **two conditions**: first, the **specificity of the requested documents**, and, second, the **relevance of these documents**. These conditions are aimed at countering fishing expeditions, which are particularly problematic given the potential for transferring a considerable amount of undifferentiated electronically stored information ("**ESI**") and the cost thereof. French courts have liberally interpreted these conditions. For instance, in 2003, the Paris Court of Appeal[50] noted that the requesting party was not in possession of the documents, and therefore did not know precisely how to frame its questions to obtain the documents in the possession of the French party. As a result, the Court held that the documents were to be regarded as "*limitatively enumerated*" as long as they could be identified with a reasonable degree of specificity according to a certain number of criteria such as a range of dates, their nature or their author.[51].

61. Indeed, the French law system is familiar with pre-trial discovery. However, the French procedure for disclosure is different from the U.S. procedure due to the role of the judge. At the pre-trial phase, the judge – and not the parties – can order "*measures in futurum*" on the basis of Article 145 of the French code of civil procedure. This Article allows to obtain the court's appointment of a bailiff who can then seize documents (in electronic or paper format) from the premises of a company against which the applicant intends to bring an action.

62. Article 145 of the French code of civil procedure states that:

   "*If there is a legitimate reason to preserve or to establish, before any legal process, the evidence of the facts upon which the resolution of the dispute depends, legally permissible*

---

[50] Paris Court of Appeal, September 18, 2003, n° 2002/18509.
[51] This case regarded Article 1 of the 1968 law.

*preparatory inquiries may be ordered at the request of any interested party, by way of a petition[52] or by way of a summary procedure[53]."*

63. The conditions under which an RFP are assessed are similar to those used according to the reservation of France to Article 23 of the Hague Convention. With regard to the first criteria, the requested documents must be identified with a <u>reasonable degree of specificity</u>[54]. With regard to the criteria of <u>relevance</u>, there must be a sufficient link between the requested "*measure in futurum*" and the future potential trial, *i.e.*, the documents must be likely to have an influence on the resolution of the dispute[55].

64. Article 145 of the French code of civil procedure has led to abundant case law. Thus, French judges are familiar with the criteria by which to avoid fishing expeditions.

*b) French case law on Article 1bis of the FBS*

➢ Criminal courts

65. Violation of the FBS was not criminally sanctioned until 2007, when the French Supreme Court in civil and criminal matters, the "Court of Cassation", in "Christopher X"[56], upheld a judgment imposing a fine of €10,000 on a lawyer for a breach of the FBS. This case involved the French insurance company MAAF and the California Department of Insurance. The lawyer representing the California Department of Insurance asked specific and directed questions of former director of the French MAAF (a Defendant in the pending US litigation) in order to obtain information about certain MAAF Board of director meetings without complying with the FBS.

66. Even though the circumstances of the **"Christopher X" ruling** are unusual, the Court of Cassation confirmed as a general principle that the FBS is binding and that the Hague Convention is the exclusive means of securing information in France for use in foreign

---

[52] This petition is a non-adversarial procedure used when the element of surprise is necessary.
[53] This refers to adversarial proceedings between the parties.
[54] Paris Court of Appeal, September 18, 2003, No. 2002/18509.
[55] Court of Cassation, Civil Section, May 16, 2012, No. 11-17.229.
[56] Court of Cassation, Criminal Section, *Christopher X*, December 12, 2017, No. 07-83.288.

litigation[57]. Indeed, the offense in this matter was seeking potentially relevant information for a US proceeding from French witnesses without complying with the Hague Convention process, and this is the rule that was confirmed by the French Supreme Court.

> ➢ Civil and commercial courts

67. Out of about twenty French decisions referring to the FBS that I have so far identified, five are related to the application of Article 1bis in civil matters in a pre-trial phase. In all of these cases regarding Article 1bis, the courts confirmed that the FBS was applicable, sometimes to reject the request of documents and sometimes to accept it.

68. For example, **in 1993[58], the President of the Nanterre High Court** rejected an RFP of documents in the possession of a French company made by a former President of the Republic of Lebanon, who faced accusations of corruption and wanted to testify before a parliamentary committee prior to initiating legal proceedings abroad. The judge deemed the request to be grounded in Article 145 of the French code of civil procedure, and in breach of Article 1bis of the FBS. The judge thus urged the litigant *"to use the procedure of international letters rogatory provided for in Articles 733 et seq. of the above-mentioned code".*

69. **In 2005[59]**, the **Paris Commercial Court** held that an order by a judge in the Southern District Court of New York requiring a bank to disclose documents relating to transactions entered into in connection with oil chartered by the Democratic Republic of the Congo was contrary to Article 1bis of the FBS. The order stated *"that the Hague Convention constitutes the common legal instrument binding on the judges of both countries".[60]* The judge underlined that application of the FBS *"would have enabled the French court to review the legality of the disputed measure in the light of French public order,"* i.e., to verify if the requested documents have a sufficient link with the dispute at issue.

---

[57] In French law, a statute cannot be considered repealed due to lack of implementation. *See* Court of Cassation, Criminal Section, May 12, 1960, JCP 1960. II. 11765, and Court of Cassation, Criminal Section, January 29, 2019, n° 16-85.746.
[58] Nanterre High Court, December 22, 1993, n°93-4436.
[59] Paris Commercial Court, July 20, 2005, n°04-4060.
[60] In this case, the judge also considered that this order violated Article 511-33 of the Monetary and Financial Code on compliance with professional banking secrecy.

70. **In 2014**[61], in a case related to a product liability claim, **Nancy Court of Appeal** refused to grant exequatur, pursuant to Article 1bis of the FBS, to an order by a judge in the Eastern District of New York to disclose documents intended to be produced in a pre-trial discovery proceeding in the U.S. The American company that had manufactured the defective product had been ordered to produce the documents requested by the plaintiffs within three months. It had reverted to its former subsidiary in France (which it had sold several years ago) to obtain this documents for the purpose of its own defense. However, the Court of Appeal held that the order was a "fishing expedition," which it refused to abide.

71. **In 2003**[62], **the Court of Cassation** had been called to review a court's order, based on Article 145 of the French code of civil procedure, addressed to Renault to communicate to Broadhurst, an investment company, various commercial, accounting, and financial documents concerning relations between Renault and Dacia, a Romanian company of which Renault and Broadhurst were both shareholders. The Court of Cassation deemed unnecessary to refer to the FBS, writing that "*no principle prohibits the judge from ordering an investigative measure that could be useful in the context of a litigation brought abroad if the investigative measure has a connection with the forum regarding its implementation*".

72. **In 2008**[63], the **Paris High Court** accepted the enforcement ("*Exequatur*") of a U.S. decision rewarding plaintiffs damages. During the U.S. proceedings, the plaintiffs made requests for the transmission of documents in the context of discovery, which the Defendant refused in order to avoid violating Article 1bis of the FBS. As a result of this refusal, terminating sanctions were imposed by the US judge that excluded the French party from the proceedings. However, the Paris High Court noted that the Defendant had accepted the sanctions at the final hearing, and accordingly considered that the French party had used the FBS simply as a dilatory tactic.

73. This case law shows that French courts are not opposed to pre-trial discovery foreign requests, insofar as they are conducted in compliance with the FBS when applicable.

---

[61] Nancy Court of Appeal, June 4, 2014, n° 14-01547.
[62] Court of Cassation, Civil Section, November 20, 2003, n° 01-15.633.
[63] Paris High Court, May 14, 2008, n° 07-11004.

## VI.   The relevance of the FBS in the case at hand

### a)   *Applicability of Article 1bis of the FBS*

74. The first question to be addressed in the present litigation is whether the FBS may apply to documents located in the U.S. that originated in France.

75. It appears that the criteria for applying the FBS do not turn on the nationality of the litigant, but rather on the site of the evidence sought. In this regard, the Court of Cassation held in 2008[64] that "*any person, regardless of nationality, may be prosecuted on the basis of Article 1bis of the July 16, 1968 Law, as amended, as long as he or she personally participated in the commission of the offence.*" Indeed it considered that the FBS applies even if the requested documents are located in the US as long as, pursuant to the French Criminal Code, there is a French victim at the time the offence is committed and that this French victim files a complaint with the French criminal authorities. Even though it concerns a criminal matter, this case law can be transposed in the present case the more so that the documents requested by Plaintiffs originated in France and are simply stored on the server of the law firm of the Defendants.

76. As indicated by an answer of the French government to a written question raised by a French deputy, Article 1bis of the FBS applies only to the gathering of documents or information in view of judicial proceedings. It thus does not impede communication between the parties' attorneys. But it does prohibit an American attorney of a French party in a U.S. action from responding to a discovery request with documents furnished by the French party. Such discovery requests must go through the Hague Convention[65].

77. Indeed, in the 2008 case mentioned above (fn. 63), the documents sought from the French party were located in the U.S., having been transferred there previously by one of the French parties to their US counsel for review, much as in this matter. The French prosecutor in his brief to the French court on enforcement took the position that under French law the FBS applies to the documents located in the U.S., requiring compliance

---

[64] Court of Cassation, Criminal Section, 30 January 2008, no. 06-84.098.
[65] Questions and Answers, Official Journal of the French Republic, Jan. 26, 1981, p.373.

with the Hague Convention, but the French court disposed of the matter on other grounds, as indicated above.

78. Based on the foregoing above, I can confirm that the fact that the requested documents are stored on the server of the law firm of Arconic in New-York should not exempt Arconic from compliance with the FBS.

*b) Possible methods of enforcement*

79. Assuming the FBS is applicable in the present case, it remains to determine the most suitable method of enforcement of this law.

80. The three aforementioned methods may be used in this case. In 2019, there were over 100 requests sent to the Service Civil d'Entraide Judiciaire Internationale of the French Ministry of Justice. Out of these 100 requests, sixteen came from the U.S., including six Letters of Request, two appointments of a diplomatic or consular officer, and eight appointments of a Commissioner. Therefore, it will be up to the court in the present case to decide, with precise reasons, which method to use.

81. The timeframes for each of these methods are not excessive. In fact, once the judge has been designated, the Letter of Request will be executed within approximately six months, depending on the number and type of requested documents. Regarding the appointment of a Commissioner, authorization is granted by the French Ministry of Justice within two to six days.

82. Finally, the slower Letter of Request procedure might be justified in a case related to products liability if the disputed information and documents are related to matters of national defense or national security that would not appear to be the case in this matter.

83. In this instance, I believe that appointing a Commissioner would be an appropriate solution. Indeed, this case involves a pure tort claim and the requested documents do not, to the best of my knowledge, involve any sovereignty issues. Furthermore, appointing a Commissioner will allow the French parties to quickly comply with U.S. discovery obligations without creating any delays in the U.S. The Hague Commissioner process may

even be combined with the appointment of the Commissioner acting also as a "Privacy Monitor", whose mission is to oversee compliance with French and European data privacy rules, as has been done in the Southern District of New York[66].

84. As demonstrated by a recent article on *International Comity and Chapter II of the Hague Evidence Convention,* the use of Commissioners under the Convention is not time-consuming, and in practice has become as which as Letters of Request a well-accepted procedure to obtain evidence in France[67].

Signed in Paris, France, February 19, 2020.

Noëlle Lenoir

---

[66] See Order issuing request for international judicial assistance, appointing Commissioner, appointing Privacy Monitor, and directing submission of Hague Convention application, *Patrice Lataillade v. LVMH Moët-Hennessy-Louis Vuitton* (S.D.N.Y  2018)

[67] A. Blumrosen, *International Comity and Chapter II of the Hague Evidence Convention,* The International Dispute Resolution News, Spring 2019.  See, e.g., the following matters in US courts in which a Commissioner was appointed:  *Foreign Exchange Benchmark Rates Antitrust Litigation* (S.D.N.Y. 2017); *In Re LIBOR Antitrust Litigation* (S.D.N.Y. 2016).

# APPENDIX A



HAGUE CONFERENCE ON
PRIVATE INTERNATIONAL LAW
CONFÉRENCE DE LA HAYE
DE DROIT INTERNATIONAL PRIVÉ

## 20. CONVENTION ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS[1]

*(Concluded 18 March 1970)*

The States signatory to the present Convention,
Desiring to facilitate the transmission and execution of Letters of Request and to further the accommodation of the different methods which they use for this purpose,
Desiring to improve mutual judicial co-operation in civil or commercial matters,
Have resolved to conclude a Convention to this effect and have agreed upon the following provisions –

CHAPTER I – LETTERS OF REQUEST

### Article 1

In civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act.
A Letter shall not be used to obtain evidence which is not intended for use in judicial proceedings, commenced or contemplated.
The expression "other judicial act" does not cover the service of judicial documents or the issuance of any process by which judgments or orders are executed or enforced, or orders for provisional or protective measures.

### Article 2

A Contracting State shall designate a Central Authority which will undertake to receive Letters of Request coming from a judicial authority of another Contracting State and to transmit them to the authority competent to execute them. Each State shall organise the Central Authority in accordance with its own law.
Letters shall be sent to the Central Authority of the State of execution without being transmitted through any other authority of that State.

### Article 3

A Letter of Request shall specify –
a)    the authority requesting its execution and the authority requested to execute it, if known to the requesting authority;
b)    the names and addresses of the parties to the proceedings and their representatives, if any;
c)    the nature of the proceedings for which the evidence is required, giving all necessary information in regard thereto;
d)    the evidence to be obtained or other judicial act to be performed.

---

[1] This Convention, including related materials, is accessible on the website of the Hague Conference on Private International Law (www.hcch.net), under "Conventions" or under the "Evidence Section". For the full history of the Convention, see Hague Conference on Private International Law, *Actes et documents de la Onzième session (1968)*, Tome IV, *Obtention des preuves* (219 pp.).

Where appropriate, the Letter shall specify, *inter alia* –

e) the names and addresses of the persons to be examined;
f) the questions to be put to the persons to be examined or a statement of the subject-matter about which they are to be examined;
g) the documents or other property, real or personal, to be inspected;
h) any requirement that the evidence is to be given on oath or affirmation, and any special form to be used;
i) any special method or procedure to be followed under Article 9.

A Letter may also mention any information necessary for the application of Article 11.
No legalisation or other like formality may be required.

## Article 4

A Letter of Request shall be in the language of the authority requested to execute it or be accompanied by a translation into that language.
Nevertheless, a Contracting State shall accept a Letter in either English or French, or a translation into one of these languages, unless it has made the reservation authorised by Article 33.
A Contracting State which has more than one official language and cannot, for reasons of internal law, accept Letters in one of these languages for the whole of its territory, shall, by declaration, specify the language in which the Letter or translation thereof shall be expressed for execution in the specified parts of its territory. In case of failure to comply with this declaration, without justifiable excuse, the costs of translation into the required language shall be borne by the State of origin.
A Contracting State may, by declaration, specify the language or languages other than those referred to in the preceding paragraphs, in which a Letter may be sent to its Central Authority.
Any translation accompanying a Letter shall be certified as correct, either by a diplomatic officer or consular agent or by a sworn translator or by any other person so authorised in either State.

## Article 5

If the Central Authority considers that the request does not comply with the provisions of the present Convention, it shall promptly inform the authority of the State of origin which transmitted the Letter of Request, specifying the objections to the Letter.

## Article 6

If the authority to whom a Letter of Request has been transmitted is not competent to execute it, the Letter shall be sent forthwith to the authority in the same State which is competent to execute it in accordance with the provisions of its own law.

## Article 7

The requesting authority shall, if it so desires, be informed of the time when, and the place where, the proceedings will take place, in order that the parties concerned, and their representatives, if any, may be present. This information shall be sent directly to the parties or their representatives when the authority of the State of origin so requests.

## Article 8

A Contracting State may declare that members of the judicial personnel of the requesting authority of another Contracting State may be present at the execution of a Letter of Request. Prior authorisation by the competent authority designated by the declaring State may be required.

## Article 9

The judicial authority which executes a Letter of Request shall apply its own law as to the methods and procedures to be followed.

However, it will follow a request of the requesting authority that a special method or procedure be followed, unless this is incompatible with the internal law of the State of execution or is impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties.
A Letter of Request shall be executed expeditiously.


## Article 10

In executing a Letter of Request the requested authority shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by the authorities of its own country or of requests made by parties in internal proceedings.


## Article 11

In the execution of a Letter of Request the person concerned may refuse to give evidence in so far as he has a privilege or duty to refuse to give the evidence –
a)    under the law of the State of execution; or
b)    under the law of the State of origin, and the privilege or duty has been specified in the Letter, or, at the instance of the requested authority, has been otherwise confirmed to that authority by the requesting authority.

A Contracting State may declare that, in addition, it will respect privileges and duties existing under the law of States other than the State of origin and the State of execution, to the extent specified in that declaration.


## Article 12

The execution of a Letter of Request may be refused only to the extent that –
a)    in the State of execution the execution of the Letter does not fall within the functions of the judiciary; or
b)    the State addressed considers that its sovereignty or security would be prejudiced thereby.

Execution may not be refused solely on the ground that under its internal law the State of execution claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not admit a right of action on it.


## Article 13

The documents establishing the execution of the Letter of Request shall be sent by the requested authority to the requesting authority by the same channel which was used by the latter.
In every instance where the Letter is not executed in whole or in part, the requesting authority shall be informed immediately through the same channel and advised of the reasons.


## Article 14

The execution of the Letter of Request shall not give rise to any reimbursement of taxes or costs of any nature.
Nevertheless, the State of execution has the right to require the State of origin to reimburse the fees paid to experts and interpreters and the costs occasioned by the use of a special procedure requested by the State of origin under Article 9, paragraph 2.
The requested authority whose law obliges the parties themselves to secure evidence, and which is not able itself to execute the Letter, may, after having obtained the consent of the requesting authority, appoint a suitable person to do so. When seeking this consent the requested authority shall indicate the approximate costs which would result from this procedure. If the requesting authority gives its consent it shall reimburse any costs incurred; without such consent the requesting authority shall not be liable for the costs.

CHAPTER II – TAKING OF EVIDENCE BY DIPLOMATIC OFFICERS, CONSULAR AGENTS AND COMMISSIONERS

## Article 15

In a civil or commercial matter, a diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, take the evidence without compulsion of nationals of a State which he represents in aid of proceedings commenced in the courts of a State which he represents.

A Contracting State may declare that evidence may be taken by a diplomatic officer or consular agent only if permission to that effect is given upon application made by him or on his behalf to the appropriate authority designated by the declaring State.

## Article 16

A diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, also take the evidence, without compulsion, of nationals of the State in which he exercises his functions or of a third State, in aid of proceedings commenced in the courts of a State which he represents, if –

a) a competent authority designated by the State in which he exercises his functions has given its permission either generally or in the particular case, and

b) he complies with the conditions which the competent authority has specified in the permission.

A Contracting State may declare that evidence may be taken under this Article without its prior permission.

## Article 17

In a civil or commercial matter, a person duly appointed as a commissioner for the purpose may, without compulsion, take evidence in the territory of a Contracting State in aid of proceedings commenced in the courts of another Contracting State if –

a) a competent authority designated by the State where the evidence is to be taken has given its permission either generally or in the particular case; and

b) he complies with the conditions which the competent authority has specified in the permission.

A Contracting State may declare that evidence may be taken under this Article without its prior permission.

## Article 18

A Contracting State may declare that a diplomatic officer, consular agent or commissioner authorised to take evidence under Articles 15, 16 or 17, may apply to the competent authority designated by the declaring State for appropriate assistance to obtain the evidence by compulsion. The declaration may contain such conditions as the declaring State may see fit to impose.

If the authority grants the application it shall apply any measures of compulsion which are appropriate and are prescribed by its law for use in internal proceedings.

## Article 19

The competent authority, in giving the permission referred to in Articles 15, 16 or 17, or in granting the application referred to in Article 18, may lay down such conditions as it deems fit, *inter alia*, as to the time and place of the taking of the evidence. Similarly it may require that it be given reasonable advance notice of the time, date and place of the taking of the evidence; in such a case a representative of the authority shall be entitled to be present at the taking of the evidence.

## Article 20

In the taking of evidence under any Article of this Chapter persons concerned may be legally represented.

## Article 21

Where a diplomatic officer, consular agent or commissioner is authorised under Articles 15, 16 or 17 to take evidence –

a)    he may take all kinds of evidence which are not incompatible with the law of the State where the evidence is taken or contrary to any permission granted pursuant to the above Articles, and shall have power within such limits to administer an oath or take an affirmation;

b)    a request to a person to appear or to give evidence shall, unless the recipient is a national of the State where the action is pending, be drawn up in the language of the place where the evidence is taken or be accompanied by a translation into such language;

c)    the request shall inform the person that he may be legally represented and, in any State that has not filed a declaration under Article 18, shall also inform him that he is not compelled to appear or to give evidence;

d)    the evidence may be taken in the manner provided by the law applicable to the court in which the action is pending provided that such manner is not forbidden by the law of the State where the evidence is taken;

e)    a person requested to give evidence may invoke the privileges and duties to refuse to give the evidence contained in Article 11.

## Article 22

The fact that an attempt to take evidence under the procedure laid down in this Chapter has failed, owing to the refusal of a person to give evidence, shall not prevent an application being subsequently made to take the evidence in accordance with Chapter I.

### CHAPTER III – GENERAL CLAUSES

## Article 23

A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries.

## Article 24

A Contracting State may designate other authorities in addition to the Central Authority and shall determine the extent of their competence. However, Letters of Request may in all cases be sent to the Central Authority.
Federal States shall be free to designate more than one Central Authority.

## Article 25

A Contracting State which has more than one legal system may designate the authorities of one of such systems, which shall have exclusive competence to execute Letters of Request pursuant to this Convention.

## Article 26

A Contracting State, if required to do so because of constitutional limitations, may request the reimbursement by the State of origin of fees and costs, in connection with the execution of Letters of

Request, for the service of process necessary to compel the appearance of a person to give evidence, the costs of attendance of such persons, and the cost of any transcript of the evidence.

Where a State has made a request pursuant to the above paragraph, any other Contracting State may request from that State the reimbursement of similar fees and costs.

## Article 27

The provisions of the present Convention shall not prevent a Contracting State from –

a)  declaring that Letters of Request may be transmitted to its judicial authorities through channels other than those provided for in Article 2;

b)  permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions;

c)  permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.

## Article 28

The present Convention shall not prevent an agreement between any two or more Contracting States to derogate from –

a)  the provisions of Article 2 with respect to methods of transmitting Letters of Request;

b)  the provisions of Article 4 with respect to the languages which may be used;

c)  the provisions of Article 8 with respect to the presence of judicial personnel at the execution of Letters;

d)  the provisions of Article 11 with respect to the privileges and duties of witnesses to refuse to give evidence;

e)  the provisions of Article 13 with respect to the methods of returning executed Letters to the requesting authority;

f)  the provisions of Article 14 with respect to fees and costs;

g)  the provisions of Chapter II.

## Article 29

Between Parties to the present Convention who are also Parties to one or both of the Conventions on Civil Procedure signed at The Hague on the 17th of July 1905 and the 1st of March 1954, this Convention shall replace Articles 8-16 of the earlier Conventions.

## Article 30

The present Convention shall not affect the application of Article 23 of the Convention of 1905, or of Article 24 of the Convention of 1954.

## Article 31

Supplementary Agreements between Parties to the Conventions of 1905 and 1954 shall be considered as equally applicable to the present Convention unless the Parties have otherwise agreed.

## Article 32

Without prejudice to the provisions of Articles 29 and 31, the present Convention shall not derogate from conventions containing provisions on the matters covered by this Convention to which the Contracting States are, or shall become Parties.

## Article 33

A State may, at the time of signature, ratification or accession exclude, in whole or in part, the application of the provisions of paragraph 2 of Article 4 and of Chapter II. No other reservation shall be permitted. Each Contracting State may at any time withdraw a reservation it has made; the reservation shall cease to have effect on the sixtieth day after notification of the withdrawal.

When a State has made a reservation, any other State affected thereby may apply the same rule against the reserving State.

## Article 34

A State may at any time withdraw or modify a declaration.

## Article 35

A Contracting State shall, at the time of the deposit of its instrument of ratification or accession, or at a later date, inform the Ministry of Foreign Affairs of the Netherlands of the designation of authorities, pursuant to Articles 2, 8, 24 and 25.

A Contracting State shall likewise inform the Ministry, where appropriate, of the following –

a)   the designation of the authorities to whom notice must be given, whose permission may be required, and whose assistance may be invoked in the taking of evidence by diplomatic officers and consular agents, pursuant to Articles 15, 16 and 18 respectively;

b)   the designation of the authorities whose permission may be required in the taking of evidence by commissioners pursuant to Article 17 and of those who may grant the assistance provided for in Article 18;

c)   declarations pursuant to Articles 4, 8, 11, 15, 16, 17, 18, 23 and 27;

d)   any withdrawal or modification of the above designations and declarations;

e)   the withdrawal of any reservation.

## Article 36

Any difficulties which may arise between Contracting States in connection with the operation of this Convention shall be settled through diplomatic channels.

## Article 37

The present Convention shall be open for signature by the States represented at the Eleventh Session of the Hague Conference on Private International Law.

It shall be ratified, and the instruments of ratification shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

## Article 38

The present Convention shall enter into force on the sixtieth day after the deposit of the third instrument of ratification referred to in the second paragraph of Article 37.

The Convention shall enter into force for each signatory State which ratifies subsequently on the sixtieth day after the deposit of its instrument of ratification.

## Article 39

Any State not represented at the Eleventh Session of the Hague Conference on Private International Law which is a Member of this Conference or of the United Nations or of a specialised agency of that Organisation, or a Party to the Statute of the International Court of Justice may accede to the present Convention after it has entered into force in accordance with the first paragraph of Article 38.

The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for a State acceding to it on the sixtieth day after the deposit of its instrument of accession.

The accession will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession. Such declaration shall be deposited at the Ministry of Foreign Affairs of the Netherlands; this Ministry shall forward, through diplomatic channels, a certified copy to each of the Contracting States.

The Convention will enter into force as between the acceding State and the State that has declared its acceptance of the accession on the sixtieth day after the deposit of the declaration of acceptance.

## Article 40

Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.

At any time thereafter, such extensions shall be notified to the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification indicated in the preceding paragraph.

## Article 41

The present Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 38, even for States which have ratified it or acceded to it subsequently.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Netherlands at least six months before the end of the five year period.

It may be limited to certain of the territories to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

## Article 42

The Ministry of Foreign Affairs of the Netherlands shall give notice to the States referred to in Article 37, and to the States which have acceded in accordance with Article 39, of the following —

a)      the signatures and ratifications referred to in Article 37;

b)      the date on which the present Convention enters into force in accordance with the first paragraph of Article 38;

c)      the accessions referred to in Article 39 and the dates on which they take effect;

d)      the extensions referred to in Article 40 and the dates on which they take effect;

e)      the designations, reservations and declarations referred to in Articles 33 and 35;

f)      the denunciations referred to in the third paragraph of Article 41.

In witness whereof the undersigned, being duly authorised thereto, have signed the present Convention.

Done at The Hague, on the 18th day of March, 1970, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Netherlands, and of which a certified copy shall be sent, through the diplomatic channel, to each of the States represented at the Eleventh Session of the Hague Conference on Private International Law.

# APPENDIX B

# DECLARATION/RESERVATION/NOTIFICATION

Declarations
Reservations

Articles: 4,16,17,23

(Translation)
In accordance with the provisions of Article 33, the French Government declares:
– that in pursuance of Article 4, para. 2, it will execute Letters of Request only if they are in French or if they are accompanied by a translation into French;
– that, in pursuance of Article 23, Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries will not be executed;

(...)

In accordance with the provisions of Article 16, the *Service Civil de l'Entraide Judiciaire Internationale, Ministère de la Justice* [click here for current contact details], has been designated as the authority competent to authorize diplomatic officers or consular agents of a Contracting State to take the evidence without compulsion of persons other than nationals of that State in aid of proceedings commenced in the courts of a State which they represent. This authorization which will be given for each particular case accompanied by particular conditions if need be, shall be subject to the following general conditions:
1. the evidence must only be taken within the precincts of the Embassies;
2. the Service Civil de L'Entraide Judiciaire Internationale must be given due notice of the date and time at which the evidence is to be taken so that it can make representatives available if necessary;
3. the evidence must be taken in a room to which the public has access;
4. the persons who are to give evidence must receive due notice in the form of an official summons drawn up in French or accompanied by a translation into French, and stating:
(a) that the taking of evidence for which the person concerned is summoned is based on the provisions of the Hague Convention of 18 March 1970 on the taking of evidence abroad in civil or commercial matters, and is part of the judicial proceedings taken in a court designated by a Contracting State by name;
(b) that appearance for the giving of evidence is voluntary and that non-appearance cannot lead to prosecution in the requesting State;
(c) that the parties to any action consent to it or, if they do not, their reasons for this;
(d) that the person who is to give evidence is entitled to legal advice;
(e) that the person who is to give evidence can claim dispensation or prohibition from doing so.

A copy of the summonses will be sent to the Ministère de la Justice.

5. The Service Civil de l'Entraide Judiciaire Internationale will be kept informed of any difficulties.

In accordance with the provisions of Article 17, the *Service Civil de l'Entraide Judiciaire Internationale, Ministère de la Justice* [click here for current contact details], has been designated as the authority competent to authorize persons duly appointed as commissioners to take evidence without compulsion in aid of proceedings commenced in the courts of a Contracting State.
This authorization, which will be given for each particular case, accompanied if need be by particular conditions, shall be subject to the following general conditions:
1. the evidence must only be taken within the precincts of the Embassies;

2. the Service Civil de l'Entraide Judiciaire Internationale must be given due notice of the date and time at which the evidence is to be taken so that it can make representatives available if necessary;

3. the evidence must be taken in a room to which the public has access;

4. the persons who are to give evidence must receive due notice in the form of an official summons drawn up in French or accompanied by a translation into French, and stating:

(a) that the taking of evidence for which the person concerned is summoned is based on the provisions of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, and is part of the judicial proceedings taken in a court designated by a Contracting State by name;

(b) that appearance for the giving of evidence is voluntary and that non-appearance cannot lead to prosecution in the requesting State;

(c) that the parties to any action consent to it or, if they do not, their reasons for this;

(d) that the person who is to give evidence is entitled to legal advice;

(e) that the person who is to give evidence can claim dispensation or prohibition from doing so.

A copy of the summonses will be sent to the Ministère de la Justice.

5. The Service Civil de l'Entraide Judiciaire Internationale will be kept informed of any difficulties.

The application for authorization, which will be addressed to the Ministère de la Justice by the requesting authority, should specify:

1) the reasons why this method of investigation was chosen in preference to that of Letters of Request, bearing in mind the judiciary expenses involved.

2) the criteria for designating the commissioners when the person designated does not reside in France.

The French Government declares that, in pursuance of the provisions of Article 8, members of the judicial personnel of the requesting authority of a Contracting State may be present at the execution of a Letter of Request.

Modification dated 19 January 1987 of the declaration relating to Article 23:

(Translation)
The declaration made by the French Republic in accordance with Article 23 relating to Letters of Request issued for the purpose of obtaining pre-trial discovery of documents does not apply when the requested documents are enumerated limitatively in the Letter of Request and have a direct and precise link with the object of the procedure.

N.B.: The instrument of ratification of France (a copy of which can be downloaded here) clearly indicates that the Convention applies to the entire territory of the French Republic. Consequently, besides Metropolitan France and the Overseas Departments (French Guyana, Guadeloupe, Reunion, Martinique), the Convention applies to all of the other French overseas territories. *(Translation by the Permanent Bureau)*

# APPENDIX C

No. 85-1695

In the

Supreme Court of the United States

October Term, 1986

Société Nationale Industrielle Aérospatiale and
Société de Construction d'Avions de Tourisme,

                                                                        *Petitioners,*

—v.—

United States District Court for the
District of Iowa,

                                                                        *Respondent.*

(Dennis Jones, John and Rosa George,
Real Parties in Interest)

ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE EIGHTH CIRCUIT

BRIEF OF *AMICUS CURIAE*
THE REPUBLIC OF FRANCE IN SUPPORT
OF PETITIONERS

CLEARY, GOTTLIEB, STEEN & HAMILTON
One State Street Plaza
New York, NY 10004
(212) 344-0600
    PETER S. PAINE, JR.
    GEORGE J. GRUMBACH, JR.*
    MITCHELL A. LOWENTHAL
    JESSICA STORM TAVAKOLI

CLEARY, GOTTLIEB, STEEN & HAMILTON
41, Avenue de Friedland
75008 Paris, France
(1)45 63 14 94
    WILLIAM B. McGUINN, III
    MARTIN GDANSKI

Attorneys for *Amicus Curiae*
*Counsel of Record

viii

PAGE

Restatement of Foreign Relations Law of the United States (Revised) § 437[420] (Tent. Draft No. 7, 1986) .............................................. 22, 23

Senate Comm. on Foreign Relations, Evidence Convention, S. Exec. Rep. No. 92-25, 92d Cong., 2d Sess. (1972) ............................................. 4

Wilmarth, Lawyers and the Practice of Law in England: One American Visitor's Observation, Part II, 14 Int'l Lawyer 171 (1980). ................................ 4

C. Wright and A. Miller, Federal Practice and Procedure (1970). .................................... 7

## INTEREST OF THE REPUBLIC OF FRANCE AS AMICUS CURIAE

The Republic of France submits this brief *amicus curiae* upon the consent of the parties to this proceeding. The Republic of France is a party to the multilateral Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *opened for signature* March 18, 1970, 28 U.S.C. § 1781 (Supp. 1986), 23 U.S.T. 2555, T.I.A.S. No. 7444 (the "Hague Convention" or the "Convention"), a treaty to which the United States and sixteen other sovereign nations are also signatories. The Convention sets forth procedures for the taking of evidence in one signatory country for use in civil proceedings in another. The court below erroneously affirmed an order permitting United States litigants seeking evidence situated in France to disregard Convention procedures so long as the persons from whom the discovery is sought are parties to the litigation and subject to the American court's *in personam* jurisdiction. In order to so hold, the court below impermissibly read into the Convention a crucial limitation that is unsupported by the language or the negotiating history of that agreement. The lower court's holding also undermines one of the essential purposes of the Convention, the prevention of conflicts between different judicial systems with overlapping sovereignty.

The Republic of France has an evident interest in regulating actions taken on French territory to carry out foreign discovery demands. Moreover, French law makes it a criminal offense for persons subject to French jurisdiction to comply with foreign evidentiary demands unless they are consistent with the provisions of a treaty such as the Hague Convention. The lower court's decision is directly in conflict with French law, as well as with the French sovereign interests that it expresses.

The Republic of France is a signatory to the Hague Convention, and its citizens are engaged in substantial international commerce and attendant litigation. It is a close trading partner and long-standing ally of the United States, with which it shares a long and proud tradition of democratic government

2

and justice under law. It is also the nation whose sovereign interests will be directly and materially infringed by any attempt to implement the discovery program upheld by the lower court. The Republic of France thus has a substantial interest in the outcome of this appeal.

## SUMMARY OF ARGUMENT

The delegates to the Hague Convention, who represented nations with different judicial systems that had all embraced different, yet effective, methods for the trial of civil and commercial matters, recognized that there is no judicial system of universal applicability. Thus, the Convention was not intended to codify one nation's rules. Instead, the drafters sought to find a common ground to resolve the international friction caused by one nation's application of its domestic discovery rules in another's territory. The Convention was designed to enable litigants engaged in the broad panoply of civil litigation to obtain evidence admissible in the forum state without violating the sovereign interests of the nation from whose territory that evidence was to be collected.

The Republic of France ratified the Hague Convention intending it to provide the sole means by which discovery demands emanating from other signatory countries would be carried out on French soil. The French Code of Civil Procedure was extensively amended in order to make the Convention procedures an integral part of domestic French law. French criminal law was correspondingly revised to prohibit French nationals from complying with foreign demands for evidence situated in France except where the demand is issued in accordance with the Hague Convention or another treaty to which France is a party.

The court below upheld a discovery demand aimed at the collection of evidence located in France that openly flouts Hague Convention procedures. In so doing, the court confronted the French parties controlling the evidence with equally

3

unacceptable alternatives: defy French criminal law or risk sanctions in the United States proceeding. The lower court's rationale—that the Convention does not apply if the target of the discovery demand is itself a party to the litigation—is at odds with the language and negotiating history of the Convention. The holding below frustrates the Convention's objective of reducing tensions between nations with different judicial systems precisely in those cases where the potential for conflict is greatest: evidence situated abroad is invariably at issue where, as here, one or more of the parties is a foreigner with no ties to the United States other than participation in commerce.

The lower court's decision to disregard the Hague Convention is unwise from the viewpoint of international judicial relations. It is also entirely unnecessary to the effective gathering of evidence in this or similar cases. Contrary to the lower court's suggestion, Hague Convention procedures do not impose undue burdens or restrictions on American litigants seeking evidence in France. In most cases, voluntary compliance by the recipient of the demand results in discovery coextensive with that available under traditional American rules, with no significant delays or incremental costs imposed on either party. In the isolated instances where the party from whom discovery is sought declines to cooperate voluntarily, French courts possess evidence-gathering powers that can be used effectively in aid of an American request. The Republic of France will continue to make use of those powers whenever so required under the Convention. Moreover, in the single area where the Convention leaves implementation up to the discretion of France—Article 23 concerning pre-trial discovery of documents—the Republic of France will use its compulsory powers to require production if the demand is formulated pursuant to the Convention, and meets minimum standards of relevance and specificity.

For the foregoing reasons, the decision of the lower court should be reversed, and this action remanded with instructions that demands for evidence situated in France be made in accordance with Hague Convention procedures.

4

# ARGUMENT

## POINT I

### THE HAGUE CONVENTION IS THE EXCLUSIVE MEANS OF DISCOVERY IN TRANSNATIONAL LITIGATION AMONG THE CONVENTION'S SIGNATORIES UNLESS THE SOVEREIGN ON WHOSE TERRITORY DISCOVERY IS TO OCCUR CHOOSES OTHERWISE

### A. The Negotiating History And Language Of The Convention Mandate Its Use

The Republic of France, the United States and the other signatory nations to the Hague Convention intended to provide a mechanism to define and ease discovery among parties engaged in international commercial activities.[1] The treaty was designed primarily to reconcile the procedural differences between common law discovery procedures, particularly those of the United States, and the systems of civil law nations in order to "improve mutual judicial co-operation in civil or commercial matters." Preamble to the Hague Convention, *reprinted in* 28 U.S.C. § 1781 (Supp. 1986).[2] As Secretary of State Rogers explained in his letter submitting the Convention to President Nixon:

---

[1]   *See* Message From the President of the United States Transmitting the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, S. Exec. Doc. No. A, 92d Cong., 2d Sess. (1972), *reprinted in* 12 Int'l Legal Materials 323 (1973) [hereinafter cited as the "Message from the President"]; Letter Of Submittal From Secretary of State William P. Rogers to the President Regarding the Evidence Convention, S. Exec. Doc. No. A, 1, 92d Cong., 2d Sess. (1972), *reprinted in* 12 Int'l Legal Materials 324 (1973) [hereinafter cited as the "Rogers Letter"]; Senate Comm. on Foreign Relations, Evidence Convention, S. Exec. Rep. No. 92-25, 92d Cong., 2d Sess. 1-2 (1972).

[2]   To a lesser extent, the Convention also harmonized conflicting notions of discovery in various common law countries. Thus, for example, discovery in the United Kingdom is not as broad as that permitted in the United States. *See, e.g.*, Wilmuth, *Lawyers and the Practice of Law in England: One American Visitor's Observation, Part II*, 14 Int'l Lawyer 171 (1980).

---

5

The substantial increase in litigation with foreign aspects arising, in part, from the unparalleled expansion of international trade and travel in recent decades had intensified the need for an effective international agreement to set up a model system to bridge differences between the common law and civil law approaches to the taking of evidence abroad.

Rogers Letter, *supra* p. 4, at 324 (1973). In recognition of these differences, and accepting that no one system can have worldwide applicability, the drafters of the Convention sought to establish methods for discovery both "tolerable" to the authorities of the state where evidence is located, and "utilizable" in the forum where the action would be tried. *See* Report of the United States Delegation to Eleventh Session of Hague Conference on Private International Law, *reprinted in* 8 Int'l Legal Materials 785, 806 (1969) [hereinafter cited as the "1969 U.S. Delegation Report"].[3] The Convention is thus best understood as a conscious compromise negotiated between representatives of legal systems with very different approaches to obtaining evidence for trial.

This compromise was necessary to overcome the sharp differences, and consequent conflict, between the procedural rules governing discovery in civil law nations and the United States. Indeed, absent the Convention, application of the rules usually employed in French domestic litigation would frequently stymie American discovery.

In domestic actions, French law, like the laws of most civil law jurisdictions,[4] vests in the judge rather than the parties

---

[3]   In particular, the drafters were cognizant of and seriously concerned with addressing civil law countries' consideration of sovereignty. *Id.*; Rogers Letter, *supra* p. 4, at 324.

[4]   For discussions of the discovery rules of other civil law nations see, J. Merryman, *The Civil Law Tradition*, 120-131 (1969); *International Cooperation in Litigation: Europe* (H. Smit ed. 1965). *See also* Collins, *Opportunities for and Obstacles to Obtaining Evidence in England for Use in Litigation in the United States*, 13 Int'l Law. 27 (1979) (discovery in the *(footnote continued on following page)*

6

responsibility for the production of written evidence. All requests by parties for the production of written evidence are made to the judge, who thereafter orders production of such evidence. Nouveau Code de Procédure Civile ("Nouv. C. Pr. Civ.") arts. 132-142 (78th ed. Petits Codes Dalloz 1986). The judge decides whether to order oral testimony by the parties, Nouv. C. Pr. Civ. arts. 184, 185, and non-party witnesses, Nouv. C. Pr. Civ. art. 222; Enquête, Témoins, Attestations, Encyclopédie Dalloz de Procédure Civile (1999), par. 94, and conducts the taking of such testimony, Nouv. C. Pr. Civ. arts. 184-231. Although parties and their counsel may be present when testimony is taken of other parties, Nouv. C. Pr. Civ. arts. 189, 192, or of lists of questions to the judge to be asked orally of the parties or witnesses, the judge decides whether such questions will be asked, Nouv. C. Pr. Civ. arts. 193, 214. Direct interrogation of a party or non-party witness by the party's counsel is not permitted. Nouv. C. Pr. Civ. art. 214. See E. Blanc, Nouveau Code de Procédure Civile Commenté dans l'Ordre des Articles (1985) (hereinafter cited as "Blanc"), discussion under art. 193.5 See generally Borel & Boyd, Opportunities for and Obstacles to Obtaining Evidence in France for Use in Litigation in the United States, 13 Int'l Law. 35 (1979).

In contrast, discovery in the United States is managed primarily by the parties to an action. In the pre-trial stage, the judge rarely questions witnesses directly or examines documents, except to resolve disputes when party-managed discov-

5 The scholarly opinions of legal commentators carry great weight in France and are highly regarded as persuasive authority in the French legal system. Decided case law is not controlling in French jurisprudence, in contrast to the principle of stare decisis in the United States. See generally, Amos and Walton's Introduction to French Law (3d ed. 1967).

7

ery breaks down or in connection with substantive motions. See, e.g., C. Wright and A. Miller, Federal Practice and Procedure §§ 2207, 2214, 2285 (1970).

The sovereignty of the Republic of France requires that the taking of evidence on French territory remain the prerogative of the French judiciary. In response to a questionnaire circulated in 1967 to participating governments prior to the Hague Conference on Private International Law, the Republic of France stated that the French conception of sovereignty and "ordre public" implies that the French collection of evidence on French territory may be undertaken only by French judicial authorities. See Réponses des Gouvernements au Questionnaire sur la Réception des Dépositions à l'Etranger, Conférence de La Haye de Droit International Privé, IVe Actes et Documents de la Onzième Session, Obtention des Preuves à l'Etranger 21, 33 (Bureau Permanent de la Conférence ed. 1970).6 Discovery requests in accordance with American rules by American litigants and, a fortiori, discovery orders by American courts directly to French nationals in France, undermine the sovereignty of the Republic of France by usurping the powers and duties of the French judiciary in the discovery process.

The Convention reconciles the different methods used by its signatories to gather evidence through the use of simplified procedures for letters of request,7 and methods for taking

6 See also Oxman, The Choice Between Direct Discovery and Other Means of Obtaining Evidence Abroad: The Impact of the Hague Convention, 37 Univ. Miami L. Rev. 733, 764 (1983) ("The term 'judicial sovereignty' implies respect for the exclusivity of governmental organs within their own territories—the monopoly of governmental power that lies at the heart of territorial sovereignty.").

7 Letters of request from the judicial authorities in one sovereign state to those in another allow the requesting state's courts to enlist the assistance of the foreign state to obtain evidence or perform some other judicial act in a judicial proceeding. Hague Convention art. 1. The Convention requires the foreign authority to "follow a request of the requesting authority that a special method or procedure be followed, unless [it] is incompatible with"
(footnote continued on following page)

8

evidence by diplomatic officers, consular agents and commissioners.[4] These procedures provide for the involvement or consent of the sovereign on whose territory evidence is to be obtained, while obligating that sovereign to permit, or where compulsion is required to enforce, a discovery request in litigation pending in another forum.

The Republic of France strongly believes that the language and negotiating history of the Convention demonstrate that it

---

the internal law or procedures of the state of execution. Hague Convention art. 9. In revising its own civil procedure code to be consistent with Hague Convention procedures, France deliberately denied to its courts the right to refuse execution of letters of request on such grounds of incompatibility. See *infra* pp. 19-20. Absent a request that a special procedure be followed, the judicial authority to which the request is made "shall apply its own law as to the methods and procedures to be followed." Hague Convention art. 9. Article 10 requires the authorities in the state executing a letter of request to apply the same measures of compulsion to ensure compliance with the foreign request as are available to ensure the execution of domestic orders. The enforcement measures that may be imposed by a French judge include: ordering the disclosure and production of documents, Nouv. C. Pr. Civ. arts. 133, 139, 142; imposing a daily fine for non-compliance with an order to produce documents, Nouv. C. Pr. Civ. arts. 134, 139; ordering the personal appearance of a party or witness to testify, Nouv. C. Pr. Civ. arts. 184-186, 222, *et seq.*, drawing adverse inferences from the failure to produce evidence or appear when ordered, Nouv. C. Pr. Civ. art. 198; or assessing a fine against a person who refuses to testify when ordered, Nouv. C. Pr. Civ. art. 207.

8    Hague Convention arts. 15-17. Parties to an American litigation may obtain evidence from American parties in France by addressing themselves directly to an American diplomatic or consular official without going through French judicial channels. *See infra* pp. 24-25. Where evidence is sought from a French national or other non-American, discovery before such an official must be, and is as a matter of routine, authorized by the Civil Division of International Judicial Assistance of the Ministry of Justice. The available evidentiary procedures are virtually identical to those that may be carried out if discovery were to occur in the United States: depositions, written interrogatories, and production and inspection of documents or other physical items. Article 17 authorizes the appointment of a commissioner who has been approved by the appropriate authority in the state where discovery is to occur. If permitted by American law, a French or American lawyer could be appointed as a commissioner and conduct evidence-gathering procedures in France. Bœuf & Lloyd, *supra* p. 6, at 42.

---

9

sets forth mandatory procedures by which evidence located abroad may alone be sought, unless the foreign sovereign permits otherwise. Article 27 provides, in pertinent part:

The provisions of the present Convention shall not prevent a Contracting State from . . .

(b) permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions;

(c) permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.

The negative wording of Article 27 indicates that discovery by procedures not set forth in the Convention may occur only upon the consent of the state in which the evidence or witness is located.[9] *See also* Hague Convention art. 28 (a Contracting State may ease its procedures in separate bilateral or multilateral agreements). Procedures for seeking evidence not expressly detailed by the Convention or by the laws of the state wherein evidence is sought are not permitted.[10]

9    The first time that the Solicitor General of the United States was asked to advise this Court if the executive branch's view on the Hague Convention, he stated that it "deals comprehensively with the methods available to United States courts and litigants to obtain proceedings abroad for taking evidence" and that "parties to the Convention . . . contemplated that proceedings not authorized by the Convention would not be permitted." Brief for the United States as *amicus curiae* at 5-7, *Volkswagenwerk A.G. v. Falcon*, 465 U.S. 1014 (1984), *reprinted in* 23 Int'l Legal Materials 412, 414 (1984). *But see subsequent* Brief for the United States as *amicus curiae, Club Mediterranee S.A. v. Dorin*, 105 S. Ct. 265 (1984) (Hague Convention not exclusive) *reprinted in* 23 Int'l Legal Materials 1332 (1984); Brief for the United States as *amicus curiae, Anschuetz & Co., GmbH v. Mississippi River Bridge Authority*, 106 S. Ct. 52 (1985) (Hague Convention not exclusive).

10   *See also* Heck, *U.S. Misinterpretation of the Hague Evidence Convention*, 24 Colum. J. Transnat'l L. 231 (1986) (American courts breach United States international obligations by evading mandates of Convention); Radvan, *The Hague Convention on Taking of Evidence Abroad in Civil or Commercial Matters: Several Notes Concerning its Scope, Methods and Compulsion*, 16 N.Y.U. J. Int'l L. & Pol. 1031 (1984) (American litigants (footnote continued on following page)

11

tion is replete with statements that the Convention establishes minimum standards to which signatory nations must adhere, with the limited exception that a state with more liberal local law may make it available to the requesting court.[11]

Civil law nations participating in the treaty agreed to procedures for securing evidence within their borders which required their courts to use common-law practices alien to them. Article 9, which "impos[es] obligations on civil law courts to take evidence 'common-law style,'"[14] and Articles 15-17, which permit discovery to be conducted before a consular official or commissioner instead of a judge,[15] represented large and unprecedented concessions by civil law countries to the United States' desire to have American-style discovery enforced abroad. As noted by President Nixon upon recommending the Convention to the United States Senate, "ratification of the convention will require many other countries, particularly civil law countries, to make important changes in their judicial assistance practice." Message from the President, *supra* p. 4, at 323. The Republic of France and the other civil law signatories would have had little incentive to agree to these American-style innovations unless the Convention defined and limited the scope of procedures by which American litigants seek discov-

[13] See, e.g., 1969 U.S. Delegation Report, *supra* n. 5, at 808; Rogers Letter, *supra* p. 4, at 324 (1973). According to well settled principles of treaty interpretation, the meaning American negotiators have attributed to the treaty should carry great weight. *See Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961).

[14] Notes & Comments, *United States Ratification of the Hague Convention on the Taking of Evidence Abroad*, 67 Am. J. Int'l L. 104, 105 (1973).

[15] Articles 15-17 introduce "into the civil law world on a limited basis the concept of taking of evidence by [private] commissioners." *Id.*, at 106. *See also* Explanatory Report, *supra* p. 10, at 337-9, and 1969 U.S. Delegation Report, *supra* p. 5 at 807 (the taking of evidence by commissioners or consular officials raises serious questions of intrusion on sovereignty of civil law countries).

---

While Article 23 prohibits a court from requesting discovery abroad by procedures not set forth in the Convention, that provision allows states in which evidence is located discretion to provide to a requesting court broader discovery procedures than those prescribed by the Convention. Philip W. Amram, official *rapporteur* of the Hague Convention and United States representative to the committee that drafted the treaty, indicated in his Report[12] that Article 23 was designed to permit a Contracting State to provide "broader, more generous and less restrictive rules of international cooperation in the taking of evidence for the benefit of foreign courts and litigants." Explanatory Report on the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, S. Exec. Doc. No. A-1, 92nd Cong. 2d Sess. (1972), *reprinted in* 12 Int'l Legal Materials 327, 341 (1973) (hereinafter cited as the "Explanatory Report").[13] Indeed, the negotiating history of the Conven-

---

must follow Convention's binding provisions); Augustine, *Obtaining International Judicial Assistance Under the Federal Rules and the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters: An Exposition of the Procedures and a Practical Example: In re Westinghouse Uranium Contract Litigation*, 10 Ga. J. Int'l & Comp. L. 101 (1980) (Convention provides standardized framework replacing all previous methods for seeking evidence in transnational litigation); Comment, *The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters: The Exclusive and Mandatory Procedures for Discovery Abroad*, 132 U. Pa. L. Rev. 1461 (1984) (minimum standards established by Convention preempt all other forms of discovery); Note, *Gathering Evidence Abroad: The Hague Evidence Convention Revisited*, 16 L. & Pol'y in Int'l Bus. 963 (1984) (same).

[11] "[W]hen the meaning of a treaty is not clear, recourse may be had to the negotiations, preparatory works, and diplomatic correspondence of the contracting parties to establish its meaning." *Arizona v. California*, 292 U.S. 341, 359-60 (1934) (citation omitted).

[12] See also Conférence de La Haye de Droit International Privé, IV *Actes et Documents de la Onzième Session, Obtention des Preuves à l'étranger* 189 (Bureau Permanent de la Conférence ed. 1970) (a state becoming a party to the Convention has freedom to offer unilaterally to any other state, with or without reciprocity, judicial assistance wider than the minimum provided in the Convention).

10

12

cry abroad. *See* Oxman, *supra* p. 7, at 767.[16] The Convention should not be interpreted as if it merely gave the United States new and unilateral privileges without imposing upon it any concomitant obligation of restraint. To the contrary, the Convention should be recognized as a carefully negotiated compromise embodying reciprocal concessions by the United States and civil law countries.

II.  **Under French Law, The Hague Convention Is The Exclusive Means Of Discovery In Litigation Involving Parties From Different Countries**

Although both the Republic of France and the United States were original signatories to the Hague Convention, its procedures were quickly disregarded by many United States litigants, who instead sought to require French persons to submit to discovery in France based solely on American discovery rules. American lawyers practiced "legal tourism" and "fishing expeditions" in France, demanding documents and oral testimony from French citizens without regard to French procedures or the United States' international obligations. *See* Borel & Boyd, *supra* p. 6, at 35. In order to insure the respect of French sovereignty and to underscore the required exclusive use of the Hague Convention procedures, in 1980 France enacted Law No. 80-538, 1980 J.O., 1799, 1980 D.S.L. 285 (the "1980 Law").

Article 1-*bis* of the 1980 Law[17] provides that:

16  Notwithstanding the plain language of Article 23 and the clear history of the article, some American courts have surprisingly interpreted that provision not only to permit a signatory nation to allow more liberal discovery within its borders, but also to permit an American court to order discovery abroad by methods broader than those allowed by the Convention. *See, e.g., Lasky v. Continental Products Corp.*, 569 F. Supp. 1227 (E.D. Pa. 1983). Such an interpretation renders the Convention meaningless and impossibly implies that the major concessions made by France and other signatories were unnecessary and useless gestures.

17  Article 1 of the 1980 Law prohibits communication of documents or information of an economic, technical, financial, commercial or industrial

*(footnote continued on following page)*

13

[s]ubject to any treaties or international agreements and the laws and regulations in force, it is prohibited for any person to request, to investigate or to communicate in writing, orally or by any other means, documents or information relating to economic, commercial, industrial, financial or technical matters leading to the establishment of proof with a view to foreign administrative or judicial proceedings or as a part of such proceedings.[18]

The 1980 Law imposes criminal penalties against persons and entities requesting or disclosing evidence by procedures not expressly permitted by the Hague Convention, other international treaties or French law. Law No. 80-538, art. 3.[19] The 1980 Law provides for the imposition of significant fines on parties complying with such discovery requests, and in the case of individuals, up to six months' imprisonment, or both. Thus, in the case of corporate parties such as the petitioners, the corporation may be liable for fines and any employee who fulfills a discovery request may be subject to fines or imprisonment as well.

The principal purpose of the 1980 Law was to require observance in France of:

[t]he rules which define the procedures for obtaining evidence abroad. These procedures result from . . . the provisions of the New Code of Civil Procedure . . . and those of the Hague Convention of March 18, 1970 . . . , together with the declaration made by the French government at the time of its ratification. . . . The procedures thus defined are aimed at giving full effect to our international relations for judicial cooperation by permitting the carrying out on our territory of letters rogatory . . . , as

nature, where such communication would threaten French sovereign or security interests. It is not at issue here.

18  Reprinted and translated in Toms, *The French Response to the Extraterritorial Application of United States Antitrust Laws*, 15 Int'l Law. 585, 611 (1981).

19  *Id.* at 609 (French original), 611 (English translation).

14

well as the putting into effect . . . of the procedure for obtaining evidence by commissioners. . . .

Response of the Minister of Justice to Question on Article 1-*bis* of Law No. 80-538 in the National Assembly, 1981 J.O.-Déb. Ass. Nat. (Questions), January 26, 1981 at p. 373 (no. 35893), *reprinted and translated in Tonis, supra* p. 13, at 612 (French original), 614 (English translation).[20]

### C. The Eighth Circuit's Decision Erroneously Assumes That The Discovery At Issue Will Not Infringe Upon French Sovereignty Or Violate French Law

The decision of the Eighth Circuit, which holds that an American litigant may disregard the Convention, is based on two fundamental misconceptions. First, the court relied on an artificial and untenable distinction between acts "preparatory" to compliance with a discovery order, and "actual" compliance with such an order, mistakenly concluding that "preparatory" acts do not offend French sovereignty. Second, the court erroneously assumed that the prohibitions of the 1980 Law can be waived.

The court below found that "when the district court has jurisdiction over a foreign litigant the Hague Convention does not apply to the production of evidence in that litigant's possession, even though the documents and information sought may physically be located within the territory of a foreign signatory to the Convention." 782 F.2d at 124. The court based this determination on an artificial distinction between matters "preparatory" to compliance with discovery orders, such as identifying documents and gathering information, and the "actual" production of documents or interrogatory answers in the United States. *Id.* at 124-125. The court concluded that because "preparatory" acts do not require foreign attorneys actually to appear in France, French sov-

[20] Under the French constitution, members of the French Parliament may submit written or oral questions to government ministers. Const. art. 48, *Service Réglement de l'Assemblée Nationale*, 133-139 (1992); *Règlement du Senat*, arts. 74-82 (1992).

15

ereignty was not infringed and the 1980 Law was not violated. *Id.*

The Eighth Circuit's reasoning and holding misconceive the 1980 Law, defy settled notions of international law and significantly offend the sovereignty of the Republic of France. The court below erroneously assumed that the powers flowing from its *in personam* jurisdiction relieved the court of any obligation to respect the territorial integrity and sovereignty of foreign states. The theory that the jurisdiction of a court over a witness places all of the witnesses' property and information, wherever located, under the control of that court without regard to the interest of the discovered party's sovereign transgresses the most elementary notions of international comity.[21] As one American commentator has noted: "The notion that jurisdiction to command appearance before the court 'domesticates' the witness or party for all purposes relevant to the litigation is fallacious." Oxman, *supra* p. 7, at 741.

It is a basic tenet of international law that each state has sovereignty over all activities taking place within its territory. *See The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812). A nation may not, therefore, conduct official

[21]   See Brief for the United States as *amicus curiae* at 7, n.3, *Volkswagenwerk A.G. v. Falcon, supra* p. 9, at 415: "The fact that a state court has personal jurisdiction over a private party . . . does not mean that treaty limits on proceedings for the taking of evidence abroad somehow do not apply to discovery orders addressed to such parties. The Evidence Convention protects the judicial sovereignty of the country in which evidence is taken, not the interest of the parties to the suit. Accordingly, its strictures apply regardless of the existence of personal jurisdiction." *See also* Oxman, *supra* p. 7, at 740: "The most cursory reading of *International Shoe Co. v. Washington* and its progeny should suggest the supremacy of context over rigid preconceived jurisdictional conclusions. *Shaffer v. Heitner*, which requires that the standards for establishing *in personam* jurisdiction apply even where the defendant's property is located within the forum state, is stood on its head by the proposition that *in personam* jurisdiction places all property wherever located under the control of a court that once purported to assert jurisdiction only over that property located within the state."

16

activities in the territory of another nation without the latter's consent. *Id.*[22]

The discovery demanded by the court below clearly requires activities to be conducted on French territory, even accepting the court's contrived distinction between "preparatory" acts and the physical production in the United States of evidence. Documents must be identified, sorted and assembled in France, answers to interrogatories must be developed and sworn to based on information situated in France, and the end result must be forwarded to the United States.[23] International law requires that United States courts refrain from ordering such activities without the consent of the Republic of France.

In the instant case, no such consent has been given. To the contrary, the Republic of France has made a determination

---

[22]   This principle of sovereign equality has been described by the United Nations General Assembly as including the following elements: "(a) States are juridically equal; (b) Each State enjoys the rights inherent in full sovereignty; (c) Each State has the duty to respect the personality of other States; (d) The territorial integrity and political independence of the State are inviolable. . . ." Declaration On Principles of International Law Concerning Friendly Relations and Co-operation Among States in Accordance with the Charter of the United Nations, G.A. Res. 2625, 25 U.S. GAOR Supp. (No. 28) at 21, U.N. Doc. A/5028 (1970), *reprinted in* 9 Int'l Legal Materials 1292 (1970).

[23]   While the court below did not discuss whether a party who is subject to an American court's jurisdiction but is a non-resident of the United States may be ordered not only to produce documents solely pursuant to American rules, but also to appear in the United States for deposition, the Fifth Circuit has addressed this question. In *In re Messerschmitt Bolkow Blohm GmbH*, 757 F.2d 729 (5th Cir. 1985), *cert. granted sub nom. Messerschmitt Bolkow Blohm GmbH v. Walker*, 106 S. Ct. 1633 (1986), the court stated that "[b]ecause the depositions will in fact be taken in the United States, they are not governed by the Hague Convention." *Id.* at 732. *See also Wilson v. Spellman & Haag*, 121 Misc. 2d 374, 467 N.Y.S.2d 764 (Sup. Ct. N.Y.Co. 1982). This conclusion, that ordering a person to travel for a deposition from one nation to the United States does not order an activity to be conducted in the territory of that nation, elevates the geographic fiction of "preparatory acts" to an absurdity.

---

17

consistent with international law and French international obligations that, except in accordance with the Hague Convention, a person may not "communicate in writing, orally or by any other means, documents or information . . . leading to the establishment of proof with a view to foreign . . . judicial proceedings. . . ." 1980 Law art. 1-bis. Absent compliance with the procedures of the Hague Convention—under which all of the information sought by respondents could effectively be gathered—a French person providing such evidence is clearly subject to the 1980 Law's criminal penalties.

Moreover, contrary to the assumption implicit in the lower court's decision, the 1980 Law does not empower the executive branch of the French government to grant waivers from the law's prohibitions against transnational discovery conducted outside the Hague Convention procedures. Indeed, no mechanism for obtaining such waivers exists.[24] The conclusion of the Eighth Circuit that French sovereignty is not offended by the discovery order below, which mandates the violation of the 1980 Law, improperly questions the importance of that law to the Republic of France.[25] For a United States court to require the violation of the 1980 Law, and to determine that French sovereignty is not thereby infringed, gravely offends French sovereignty.

---

[24]   The requirement that some American courts have sought to impose, under threat of sanctions, that a French waiver seek a waiver of the 1980 Law is regarded by the Republic of France as a significant infringement or attempted infringement of its sovereignty and a material interference with its national interests. *See e.g.*, *Graco, Inc. v. Kremlin, Inc.*, 101 F.R.D. 503 (N.D. Ill. 1984); *Wilson v. Spellman & Haag*, Inc., 121 Misc. 2d 374, 467 N.Y.S.2d 764 (Sup. Ct. N.Y. Co. 1983). *See also Jacobs, Extraterritorial Application of Competition Laws: An English View*, 13 Int'l Law. 645 (1979). No such waiver has ever been granted despite the contrary assumption of United States courts.

[25]   *Cf. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 432 (1964) ("[T]he concept of territorial sovereignty is so deep seated, that any state may resent the refusal of the courts of another sovereign to accept validity to acts within its territorial borders.").

18

The Hague Convention was intended to harmonize situations, such as the instant one, where two nations have jurisdiction over a witness in a manner that recognizes both the power of the court before which the litigation is pending and the interests of the foreign witness' sovereign. The Eighth Circuit's view that the Convention does not apply to parties to an action belittles the achievement of its framers, suggesting that they deliberately declined to address the principal sources of conflict in transnational civil litigation. That view is at odds with the language of the Convention, which draws no distinction between parties and non-party witnesses. It is also directly contradicted by the negotiating history of the treaty, which demonstrates that the Convention was intended to provide a comprehensive, far-reaching solution to the evidentiary problems posed by international civil litigation. If that laudable objective is to be achieved, and if the Convention is to be rescued from irrelevance, the Eighth Circuit's order must be reversed.[26]

## POINT II

## THE HAGUE CONVENTION PROCEDURES PROVIDE AMERICAN LITIGANTS WITH A FAIR AND REASONABLE OPPORTUNITY TO GATHER EVIDENCE

A. Compulsory Discovery Is Available Pursuant To Letters Of Request

1. The French government has revised its code of civil procedure to accommodate compulsory discovery pursuant to the Hague Convention

The French procedural rules described in Point I(A), *supra*, at one time precluded such basic American evidentiary procedures as direct and cross-examination of witnesses in the

---

26   In this connection, the Republic of France naturally rejects the Eighth Circuit's conclusion that a first resort to the Hague Convention would somehow be more offensive to French sovereignty than complete disregard of the treaty.

19

context of letters of request to be executed in France. *See, e.g.*, Gavalda, *Les Commissions Rogatoires Internationales en Matière Civile et Commerciale* (hereinafter cited as "Gavalda"), 53 Revue Critique de Droit International Privé, 15, 37 (1964). Accordingly, following ratification of the Hague Convention, the French government included a special set of provisions on international letters of request as part of a revision of the French code of civil procedure. Articles 733 through 748 of the Nouveau Code de Procédure Civile create an exception to French procedural rules in the case of foreign litigants using Hague Convention procedures,[27] and radically depart from traditional French rules by opening the Republic of France's borders to United States-style discovery. As one French author has put it, the new articles were adopted in order

to harmonize [French] rules of procedure with those of the main international treaties in force, especially with the provisions of the [Hague Convention] in order to establish a framework for execution of letters rogatory both "tolerable in the State of execution and utilizable by the court before which the case is being argued," and to confer, therefore, full efficiency on [French] relations of mutual international cooperation.

Chatin, *Régime des Commissions Rogatoires Internationales de Droit Privé*, 66 Revue Critique de Droit International Privé 611 (1977) (translation supplied) *quoting from* Amram, *Rapport Explicatif sur La Convention de La Haye du 18 Mars 1970 sur l'Obtention des Preuves à l'Etranger en Matière Civile ou Commerciale*. So long as foreign litigants comply with the Hague Convention, French courts will make available their coercive powers to enforce compliance with these newly adopted procedures.

As a general matter, Article 739 provides that: "The rogatory commission is executed in accordance with French law unless

---

27   Articles 733 through 748 are translated into English in H. DeVries, N. Galson & R. Loening, *French Law—Constitution and Selective Legislation* (1966).

20

the foreign court has requested that a special form of procedure be followed." Article 739 adopts the text of Article 9 of the Hague Convention but deliberately denies to French courts the option, permitted under Article 9, of refusing to honor the foreign court's request if the "special procedures" are incompatible with local law. Blanc, *supra* p. 6 at discussion under art. 739. Thus, a procedure requested by an American court must ordinarily be followed.

Article 739 further provides that, upon request of a party, a full transcript or recording will be made of any oral examination. This procedure was designed to replace the previous system under which only a summary was prepared, which often turned out to be inadmissible as testimony in proceedings in countries such as the United States. See Gavalda, *supra* p. 19, at 37. Allowing oral examinations to be transcribed was not mandated by the Convention; the provisions of the new procedural rules thus go beyond what is required by the Convention and evidence the Republic of France's good faith in promoting effective international judicial cooperation.

Article 740 provides that the parties and their counsel may, upon authorization of the French judge, question the witness directly, provided that such questions and answers are translated into French. French law thus specifically allows for both direct and cross-examination of witnesses in Hague Convention proceedings, in contrast to the usual domestic rule, *see supra* p. 6, providing that questions may only be asked by the French judge. Chulin, *supra* p. 19, at 619.[29] Moreover, Article 740 expressly permits counsel conducting such direct and cross-examination to be "foreign", *i.e.*, to participate despite lack of admission to any French bar.[29] American litigants may

---

[28]   Although certain French courts had permitted cross-examination of witnesses pursuant to international letters of request prior to adoption of Article 736-748, these cases were qualified as "exceptional." *Commission Rogatoire d'Ordre Civile*, Encyclopédie Dalloz de Droit International, § 40 (1969).

[29]   In this regard, French law appears to go beyond American practice, which would normally permit questioning only by a member of a United *(footnote continued on following page)*

---

21

therefore be accompanied and represented by their American counsel in obtaining evidence pursuant to international letters of request.[30]

The Republic of France has taken all necessary measures to insure the prompt and effective execution of international letters of request. Article 738 requires a judge to commence execution as soon as the letter of request is received. Article 742 adopts the provisions of Article 12 of the Hague Convention. Thus, execution of letters of request may not be refused solely because, under French law, the French courts would normally have exclusive jurisdiction over the subject matter, would not recognize the cause of action alleged, or would refuse to grant the relief sought. A French judge may refuse to execute international letters of request only where the request is outside his or her functions, *e.g.*, enforcing an administrative order or providing a legal opinion, or where French sovereignty or security would be prejudiced thereby. Nouv. C. Pr. Civ. art. 743; Hague Convention art. 12.[31]

Under the revised civil procedure code, American litigants seeking compulsory discovery pursuant to Hague Convention procedures may take discovery by methods comparable to those used in the United States. Documents may be examined, interrogatory answers may be compelled, and oral examinations of witnesses may be taken although they must proceed on

---

Slates bar, and, indeed, sometimes only by a member of the bar of the state in which the examination is conducted. *See e.g.*, Rule 2(a), General, Civil, Criminal, Admiralty & Magistrate Proceedings in the United States District Courts for the Southern and Eastern Districts of New York; N.Y. Jud. Law § 478 (Consol. 1983); Cal. Bus. & Prof. Code § 6125 (1974).

[30]   The French public prosecutors are responsible for insuring that the witnesses' fundamental due process rights are respected in all of the aforementioned proceedings. Nouv. C. Pr. Civ. art. 744.

[31]   In the eleven years since the Hague Convention entered into force in France, there have been no reported cases in which this "sovereignty or security" exception has been raised.

22

French soil before a French judge. There are opportunities for direct and cross-examination and no undue constraints are imposed on the scope of questioning. In deciding that compliance with the Hague Convention would "delay and frustrate the discovery process," 782 F.2d at 125, the court below simply ignored the careful and comprehensive procedures adopted by the Republic of France to insure that letters of request will result in effective discovery for foreign litigants.

2.   The declaration made by the Republic of France pursuant to Article 23 does not apply to reasonably specific requests for documents having a direct and clear nexus with the subject matter of the litigation

Parties to the Hague Convention may declare that they "will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries." Hague Convention art. 23. The Republic of France has made such a declaration.

In formulating it declaration under Article 23, the Republic of France intended to prohibit "legal tourism," i.e., unfocused demands for documents by foreign lawyers acting without court supervision.[32]  See Gougenheim, Convention sur

[32]  Recent steps to curb abuses of United States discovery procedures—even in wholly domestic cases—anticipate a more active role for the trial judge in scrutinizing discovery requests. See Fed. R. Civ. P. 26(b)(1), 26(f), 26(g) and the 1983 advisory committee notes thereto. Moreover, the draft Restatement requires that

[B]efore issuing an order for production of documents, objects, or information located abroad, the court, or where authorized the agency, should 'scrutinize a discovery request more closely than it would scrutinize comparable requests for information located in the United States. Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, discovery (including requests for documents) may extend to any matter not privileged which is relevant to the subject matter of the action, even if the information sought would be inadmissible at trial, if it appears reasonably calculated to lead to the discovery of admissible evidence. However, the second paragraph of that Rule, added in 1983, calls for imposition by the court of limits on the extent of discovery compatible to those set out in Subsection 1(c). Given the degree of difficulty in obtaining compliance, and the amount of assistance that

(footnote continued on following page)

---

23

l'Obtention des Preuves à l'Etranger en Matière Civile et Commerciale, 96 Journal de Droit International 315, 319 (1969). As the Republic of France and the United States delegations to the Convention well understood, Article 23 was not intended to preclude American litigants from obtaining necessary evidence from abroad, but rather to prevent discovery in the nature of a "fishing expedition." See Report of the United States Delegation to the Special Commission on the Operation of the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, reprinted in 17 Int'l Legal Materials 1417, 1421 (1978). The French declaration pursuant to Article 23 does not apply to letters of request seeking the discovery of documents, provided that the documents requested are enumerated in the letter of request and have a direct and clear nexus with the subject matter of the litigation. The request must, of course, also be consistent with the Convention's general requirements regarding the nature of the requesting authority and respect for the requested state's public policy. See August 19, 1986 Letter from the Minister of Justice to the Minister of Foreign Affairs, annexed hereto as Appendix B.

The French declaration under Article 23 does not impede international judicial assistance. The curbs that it imposes on "fishing expeditions" will not result in an ineffective system of justice. As recognized by these American state courts that require discovery demands to specifically identify the evidence sought to be examined,[33] "fishing expeditions" are not essential to achieving justice even in common law systems.

In any event, the Article 23 declaration of the Republic of France does not change the treaty from a mandatory to a

has developed in foreign states to discovery demands originating in the United States, it is ordinarily reasonable to limit foreign discovery to information necessary to the action typically, evidence not otherwise readily obtainable and directly relevant and material.

Restatement of Foreign Relations Law of the United States (Revised) § 437(2)(I) comment a (Tent. Draft No.7, 1986).

[33]  E.g., N.Y. Civ. Prac. R. 3120(a)(cKinney 1970).

24

permissive pact; the treaty contains no language permitting any such construction and evinces no such intent by its signatories.[34] To the contrary, Article 23 and the resulting curbs upon overseas "fishing expeditions" by a few overzealous American litigants should be recognized as a small price that the United States paid in exchange for the broad benefits conferred by the Convention on the vast majority of Americans involved in international litigation.

**B. France Permits A French Party Or Witness To Comply Voluntarily With A Discovery Request Pursuant To The Hague Convention**

Far more frequent and important in practice than compulsory discovery pursuant to letters of request is voluntary discovery in France pursuant to Articles 15-17 of the Hague Convention. The overwhelming majority of discovery requests by American litigants for evidence in France are satisfied willingly in accordance with procedures before consular officials and, occasionally, commissioners, and without the need for involvement by a French court or use of its coercive powers. Indeed, the United States Embassy in Paris will facilitate such requests to discover evidence and does so on a regular basis.

An information sheet prepared by the Office of American Services of the United States Embassy in Paris (the "Information Sheet"), which explains the elements of voluntary proceedings before consular officials or commissioners,[35] is readily available to the general public at the Embassy in Paris and has been available for years. (The current form is annexed as Appendix B hereto.) As explained therein, the United States

---

[34]  Indeed, each of the signatories to the Convention, with the exception of the United States, Barbados, Israel and Czechoslovakia, exercised to some degree its right to make an Article 23 declaration.

[35]  The Information Sheet also describes the Hague Convention procedures for use of letters of request.

---

25

court in which the action is pending initially issues an order designating any diplomatic or consular officer of the United States stationed in Paris to take evidence. Information Sheet at A6. Oral examination of American parties or witnesses may occur before such officers at the Embassy without any further steps. If evidence is sought from French nationals or other non-Americans, and in any case where a commissioner has been named pursuant to Article 17, the Civil Division of International Judicial Assistance of the Ministry of Justice (the "Civil Division") must authorize the discovery. Information Sheet at A6-7. While the Embassy will obtain authorization from the Civil Division at no charge for any party requesting it to do so, the Civil Division will also entertain requests made directly by an interested party or its counsel. Authorization is routinely granted and requests are handled in an expeditious manner; depending on the urgency of the request, authorization has been granted within one to two days. *See* Borel & Boyd, *supra* p. 6, at 42.[36]

Under the declarations of the Republic of France made pursuant to Articles 16 and 17, the texts of which are reprinted in Appendix C hereto (the "Declarations"), such authorization is conditioned on the evidence being taken at the Embassy. In practice, this condition is easily satisfied since, as the Information Sheet points out, the Embassy will provide the use of a hearing room free of charge.[37] The Embassy itself notifies the parties and the Civil Division of the room, date and time for the oral examination.

---

[36]  While the Embassy is unable to arrange for court reporters, the parties are free to make such arrangements. The Embassy will provide to litigants wishing to make such arrangements a list of qualified stenographers and, if necessary, interpreters.

[37]  While a United States statutory fee for the presence of a consular officer will be charged if the proceeding occurs under Articles 15 or 16, this is not true if a commissioner has been appointed pursuant to Article 17. Information Sheet at A7, 9.

26

While the Information Sheet does not refer to requests for interrogatory answers or documents, it is the long-standing practice, approved of by both the Embassy and the Civil Division, to handle such requests in the same expeditious manner. Once a discovery request is authorized by the Civil Division, the documents or interrogatory answers are brought to the Embassy. There, a consular official supervises the packing and sealing of documents, takes the oath of the person answering the interrogatories, and arranges for the evidence to be sent by United States Armed Forces Mail to the court that issued the production order appointing the consular official or commissioner to take evidence. The United States judge then makes the documents or interrogatory answers available to the party requesting production. Under these well-settled procedures, the full panoply of American-style discovery devices are available and may promptly be obtained.[38]

The willingness of the Republic of France to cooperate in litigation involving parties from another country is sincere. France has taken substantial measures to accommodate the interests of United States litigants, even though permitting American-style discovery is alien to domestic litigation in France. Under the Hague Convention and the subsequent implementing legislation enacted in France, United States-style discovery is available on both a compulsory and voluntary basis. The lower court's decision ignores the effect of these significant accommodations and, unless reversed, destroys the

---

38  Appearance pursuant to Articles 16 and 17 is voluntary and, pursuant to the Declarations, non-American parties from whom discovery is sought must be informed in advance that failure to appear will not give rise to criminal proceedings in the state from which evidence is requested. However, as the Republic of France recognizes, French parties subject to a United States court's jurisdiction have a strong incentive to cooperate with American discovery requests pursuant to Articles 16 and 17; their own case could be transferred by imposition of the civil sanctions permitted under *Société Internationale v. Rogers*, 357 U.S. 197 (1958), and its progeny if they do not make good faith efforts to comply with American discovery requests, since France provides mechanisms for such discovery to occur.

27

principal achievement of the Hague Convention—the establishment of comprehensive methods for international judicial cooperation that respect the sovereignty of the signatory nations.

## CONCLUSION

The order of the Court of Appeals should be reversed and the case remanded to the district court with instructions that demands for evidence situated in France be in accordance with Hague Convention procedures.

*Respectfully submitted,*

CLEARY, GOTTLIEB, STEEN & HAMILTON
One State Street Plaza
New York, N.Y. 10004
(212) 344-0600
   PETER S. PAINE, JR.
   GEORGE J. GRUNDBACH, JR.*
   MITCHELL A. LOWENTHAL
   JESSICA SPORN TAVAKOLI

CLEARY, GOTTLIEB, STEEN & HAMILTON
41, Avenue de Friedland
75008 Paris, France
(1)45 63 14 94
   WILLIAM B. MCGURN, III
   MARTIN GDANSKI

Attorneys for *Amicus Curiae*
*Counsel of Record

# APPENDICES

A1

## APPENDIX A

REPUBLIQUE FRANCAISE
MINISTÈRE DE LA JUSTICE
Direction des Affaires Civiles et du Sceau
13, place Vendôme
75042 Paris Cedex 01
Tel. 261.80.22

19 Aout 1986

Le Garde des Sceaux, Ministre de la Justice à
Monsieur le Ministre des Affaires Etrangères
Direction des Affaires Juridiques
37, quai d'Orsay
75007 Paris

OBJET: Application de la Convention de la Haye du 18 mars 1970 sur l'obtention des preuves à l'étranger en matière civile ou commerciale.

Vous avez bien voulu me faire part des difficultés que l'application de la réserve de l'article 23 soulève dans les relations avec certains Etats parties à la Convention de la Haye du 18 mars 1970 sur l'obtention des preuves à l'étranger en matière civile et commerciale.

J'ai l'honneur de vous faire savoir que l'autorité centrale, désignée conformément à l'article 2 de la Convention et qui relève du Ministère de la Justice, ne s'oppose pas à la transmission auprès de la juridiction française compétente d'une commission rogatoire qui a pour objet la procédure de "pre-trial discovery of documents" lorsque celle-ci présente les garanties suivantes: les documents demandés sont énumérés dans la commission rogatoire et ont un lien direct et précis avec l'objet du litige. Il va de soi que les conditions prévues de manière générale par la Convention en ce qui concerne la nature de l'Autorité requérante et le respect de l'ordre public de l'Etat requis doivent avoir été observées.

## A2

Je vous suggère à cette occasion le dépôt par le gouvernement français auprès du gouvernement des Pays-Bas, déposi-taire du traité, d'une déclaration interprétative de la précédente dans le sens indiqué ci-dessus afin d'améliorer la coopération judiciaire internationale.

Pour le Garde des Sceaux, Ministre de la Justice
Pour le Directeur des Affaires Civiles et du Sceau
Le Sous-Directeur

Christian ROEHRICH

## A3

REPUBLIC OF FRANCE
MINISTRY OF JUSTICE
Office of Civil Affairs and of the Seal
13, place Vendôme
75042 Paris Cedex 01
Tel. 261.80.22

August 19, 1986

*Le Garde des Sceaux*, Minister of Justice
to
The Minister of Foreign Affairs
Office of Legal Affairs
37, quai d'Orsay
75007 Paris

RE: Application of the Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters.

You have informed me of the difficulties that the application of the reservation under article 23 raises with respect to relations with certain States that are signatories of the Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters.

I have the honor of advising you that the Central Authority designated pursuant to article 2 of the Convention, which is under the jurisdiction of the Ministry of Justice, does not object to transmission to the competent French court of a letter of request whose purpose is "pre-trial discovery of documents" so long as such letter of request presents the following assurances: the requested documents must be enumerated in the letter of request and have a direct and clear nexus with the subject matter of the litigation. It goes without saying that the conditions generally provided in the Convention regarding the nature of the requesting authority and respect for the requested State's public policy must have been observed.

A4

I suggest on this occasion that the French government deposit with the Dutch government, the depository of the treaty, a declaration interpreting the prior one as indicated above in order to improve international judicial cooperation.

For le Garde des Sceaux,
Minister of Justice
For the Director of Civil Affairs
and of the Seal
The Assistant Director

Christian ROEIRICH

---

A5

## APPENDIX II

## INFORMATION CONCERNING DEPOSITIONS AND LETTERS ROGATORY IN FRANCE

Since October 1974 The Hague Convention of 1970 on Taking of Evidence Abroad in Civil and Commercial Matters has been in force in France. Arrangements to take evidence in France for use in civil cases before courts in the United States must therefore be made in accordance with the general provisions of that Convention, and subject to certain specific provisions established by the French Government.

The Convention of 1970 provides three means by which evidence may be taken:

1. *LETTERS ROGATORY.* By letters rogatory (letters of request) from a judicial authority in the United States to the competent authority in France requesting that authority to obtain evidence or to perform some other judicial act. (Article 1-14.) Such letters of request should be addressed by the court in the United States to the Bureau de l'Entraide Judiciaire Internationale, Direction des Affaires Civiles et du Sceau, Ministère de la Justice, 13, place Vendôme, 75042 Paris, Cedex 01, France. *Letters of request must be written in French or accompanied by a translation into French.* A letter of request should specify:

(a) the authority requesting its execution and the authority requested to execute it (name of the court, or "the appropriate judicial authority of France");

(b) the names and addresses of the parties to the proceedings, and their representatives;

(c) the nature of the proceedings, and all necessary information pertaining to it;

(d) the evidence to be obtained;

A6

(e) the names and addresses of the persons to be examined;

(f) the questions to be put to the witnesses or a statement of the subject matter on which they are to be examined;

(g) the documents or other property to be inspected;

(h) whether the evidence is to be given under oath or affirmation, and any specific form of oath that must be used;

(i) whether any special procedure or method should be followed in taking the evidence.

In the absence of special instructions under items (h) and (i), the French court executing the letter of request will follow its own normal procedures.

The court issuing the letter of request may request to be informed of the date and place of the proceedings, and parties to the case and their representatives may be present. Judges of the requesting court may also be present at the proceedings.

There are no fees required for the execution of letter [sic] of requests; however, the French court may require reimbursement for any fees paid to experts or interpreters, or expenses incurred as a result of use of special procedures requested by the U.S. court.

2. *DEPOSITIONS BEFORE A DIPLOMATIC OR CONSULAR OFFICER.* By deposition before a diplomatic or consular officer of the United States (Articles 15 and 16 of the Convention and Title 28 United States Code, Section 2072). Depositions may only be taken by commission issued by the competent court. The commission should be issued to "any consular officer of the United States stationed at Paris, France" rather than to any specific name or title of consular officer.

American consular officers may take depositions from witnesses, of American nationality on Embassy premises without

A7

special restrictions. However, before evidence may be taken from French nationals or nationals of third countries, authorization must be obtained in advance from the Bureau de l'Entraide Judiciaire Internationale of the Ministry of Justice. The following specific provisions must be met:

(a) the deposition must be held on the Embassy premises;

(b) the hearing must be open to the public;

(c) the date and time of the hearing must be notified to the Ministry of Justice in advance;

(d) the witnesses must be summoned by written notice in French in advance of the hearing date (15 days advance notice). The written notice must include assurances that appearances are voluntary, that the witness may be represented by a lawyer, and that the parties to the case have consented to the deposition, or, if opposed, the reasons for their opposition.

The Embassy will obtain authorization from the Ministry of Justice. There is no charge for the use of the hearing room or for advance preparations. However, there is a statutory fee of $90.00 an hour for the deposition or fraction thereof. *The estimated fee must be deposited in advance* in the form of a certified check payable to the American Embassy, Paris, France. Any balance remaining after the service has been performed will be refunded.

The Embassy is unable to provide the service of stenographers or interpreters. It is therefore necessary for the interested parties to arrange for a court stenographer to take down the testimony and transcribe it, unless the answers are of the "Yes and No" type, and space is provided on the interrogatories for the witness to write in his own brief replies. If the testimony is to be taken in any language other than English, the interested parties must arrange for a court interpreter. A list of qualified stenographers and interpreters is attached. The Embassy will not act as agent in arranging for services of stenographers and interpreters.

A8

## IMPORTANT - PLEASE NOTE:

In all cases involving witness [sic] of French nationality or third country nationality, the Embassy must have the information or documents listed below *at least 45 days before the deposition* is to be held. This timing is necessary in order to allow sufficient time to obtain authorization from the Ministry of Justice and provide the required advance notice to witnesses.

(a) Commission to take deposition, referring to The Hague Convention, and precise information on name of court, name of judge or issuing authority, the names of parties to the case and their representatives;

(b) The names and addresses (telephone numbers, if available) of all witnesses to be summoned;

(c) The questions to be put to the witnesses or a statement of the subject matter on which they are to be examined;

(d) The names of any of the parties or their representatives who plan to attend the hearings;

(e) The name, address, and telephone number of the stenographer and interpreter who have been selected (if any);

(f) Whether the parties to the case have consented to the deposition, and if not, the reasons for any objection which has been made;

(g) A certified check for the estimated consular fee;

(h) A suggested date for the hearing (if there are preferences), not less than 45 days after Embassy receives the above information;

(i) All documents listed above must be accompanied by a translation in French, for the Ministry of Justice.

A9

The Embassy will notify all parties planning to attend the hearing of the date set as soon as authorization has been received from the Ministry of Justice.

## 3. DEPOSITIONS BEFORE A PERSON COMMISSIONED BY THE COURT

Evidence may be taken in France by deposition before any competent person commissioned by a court in the United States. Authorization must be obtained in advance from the Bureau de l'Entraide Judiciaire Internationale of the Ministry of Justice. The hearing must be held within the Embassy property. All of the other provisions and the general procedure described above for depositions before a consular officer must be followed, except that there is no consular fee because the services of a consular officer are not required. In addition, the request for authorization from the Ministry of Justice must include:

(a) an explanation of the reasons for choosing this method of taking evidence, taking into account the judicial costs involved; and

(b) the criteria for designating the individual commissioned to take evidence.

The information required under (a) and (b) above must be supplied to the Embassy (along with the other information listed under 2, above) at least 45 days before the hearing will be held.

OAS/NOT Rev. Jan 86

A10

## APPENDIX C

### Declarations of the Republic of France
### With Respect to the Hague Evidence Convention

In conformity with the provisions of Article 16, the Ministry of Justice, Civil Division of International Judicial Assistance, 13 Place Vendôme, Paris (1er), is designated as the competent authority to give permission to diplomatic officers or consular agents of a Contracting State to take the evidence, without compulsion, of persons other than nationals of that State in aid of proceedings commenced in the courts of a State which they represent.

That permission, which shall be given to each specific case and shall be accompanied by special conditions when appropriate, shall be granted under the following general conditions:

1. Evidence shall be taken only within the confines of the Embassies or Consulates;

2. The date and time of taking the evidence shall be notified in due time to the Civil Division of International Judicial Assistance so that it may have the opportunity to be represented at the proceedings;

3. Evidence shall be taken in premises accessible to the public;

4. Persons requested to give evidence shall be served with an official instrument in French or accompanied by a translation into French, and that instrument shall mention:

   a. That evidence is being taken in conformity with the provisions of The Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters and relates to legal proceedings pending before a jurisdiction specifically designated by a Contracting State;

   b. That appearance is voluntary and failure to appear will not give rise to criminal proceedings in the State of origin;

A11

   c. That the parties to the trial are consenting or, if not, the grounds of their objections;

   d. That in the taking of evidence the person concerned may be legally represented;

   e. That a person requested to give evidence may invoke a privilege or duty to refuse to give evidence.

A copy of these requests shall be transmitted to the Ministry of Justice.

5. The Civil Division of International Judicial Assistance shall be kept informed of any difficulty.

In conformity with the provisions of Article 17, the Ministry of Justice, Civil Division of International Judicial Assistance, 13 Place Vendôme, Paris (1er), is appointed as the competent authority to give permission to persons duly appointed as commissioners to proceed, without compulsion, to take any evidence in aid of proceedings commenced in the courts of a Contracting State.

This permission, which shall be given for each specific case and shall be accompanied by special conditions when appropriate, shall be granted under the following general conditions:

1. Evidence shall be taken only within the Embassy confines;

2. The date and time of taking the evidence shall be notified in due time to the Civil Division of International Judicial Assistance so that it may have the opportunity to be represented at the proceedings;

3. Evidence shall be taken in premises accessible to the public;

4. Persons requested to give evidence shall be served with an official instrument in French or accompanied by a translation in French, and that instrument shall mention:

A12

a. That evidence is being taken in conformity with the provisions of The Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters and relates to legal proceedings pending before a jurisdiction specifically designated by a Contracting State;

b. That appearance is voluntary and failure to appear will not give rise to criminal proceedings in the State of origin;

c. That the parties to the trial are consenting and, if not, the grounds of their objections;

d. That in the taking of evidence the person concerned may be legally represented;

e. That a person requested to give evidence may invoke the privilege and duty to refuse to give evidence.

A copy of these requests shall be transmitted to the Ministry of Justice.

5. The Civil Division of International Judicial Assistance shall be kept informed of any difficulty.

The request for permission transmitted by the requesting authority to the Ministry of Justice shall specify:

1. The motives that led to choosing this method of taking evidence of preference to that of a Letter of Request, considering the judiciary costs incurred;

2. The criteria for appointing commissioners when the person appointed does not reside in France.

# APPENDIX D

**Appendix D**

**Relevant articles of the French Civil Procedure Code**[1]

*Article 734.* The judge may, at the request of the parties or sua sponte, cause to carry out in foreign State inquiries as well as other legal matters that he will deem necessary by giving letters rogatory either to a competent judicial authority in the State concerned or to French diplomatic or consular authorities.

*Article 734-1.* The clerk of the commissioning court will transmit to the public prosecutor a certified copy of the decision that gives letters rogatory, unless the transmission is to be made directly to the competent foreign court or authority.
Shall be attached to the decision that gives letters rogatory a translation done upon the request of the parties, unless its transmission in the French is authorized.

*Article 734-2.* The public prosecutor of the commissioning court will transmit the letters rogatory immediately to the Minister of Justice for the purpose of transmission, unless by virtue of a Treaty the transmission may be effected directly to the foreign authority.

*Article 735.* The judicial court has sole jurisdiction to hear letters rogatory.
The territorially competent court is the court of the district in whose jurisdiction the letters rogatory is to be executed.

*Article 736.* The Minister of Justice will transmit to the public prosecutor in whose jurisdiction they must be implemented, the letters rogatory transmitted to him by foreign States.

*Article 737.* The public prosecutor will transmit the letters rogatory immediately to the president of court having jurisdiction to implement them.

*Article 738.* On receipt of the letters rogatory, the prescribed procedures will be carried out at the initiative of the judge whom the president of that court will appoint for that purpose.

*Article 739.* The letters rogatory will be implemented in accordance with French law unless the foreign court has requested that it should be implemented in a particular manner.
Where so requested in the letters rogatory, the questions and answers will be transcribed or recorded in full.

*Article 740.* The parties and their representatives, even where they are aliens, may, on leave of the judge, ask questions; the question must be asked in or translated into French; similar provisions will apply to the answers given thereto.

*Article 741.* The commissioned judge will be bound to inform the commissioning court, which so requests, of the venue, date and time at which the implementation of the letters rogatory will be carried out; the foreign commissioning judge may attend the same.

*Article 742.* The judge may not refuse to implement letters rogatory on the sole ground that French law claims exclusive jurisdiction over the matter, or that it does not recognize the legal

---

[1]   Official   English   Translation   of   the   French   Civil   Procedure   Code   provided   by   Legifrance :
https://www.legifrance.gouv.fr/Traductions/Liste-des-traductions-Legifrance

remedy sought in pursuance of the claim brought before the commissioning court, or that it does not approve of the end to which the letters rogatory is directed.

**Article 743.** The commissioned judge may refuse sua sponte or at the request of any interested person, to implement the letters rogatory where he considers that it does not fall within his duties. He must refuse the same where it is of a nature that adversely affects the sovereignty or the security of the French State.

Interested persons may likewise, in the same cases, request the commissioned judge to cancel the direction he has already given and to annul the documents recording the implementation of the letters rogatory.

**Article 744.** The public prosecutor must supervise the compliance with the fundamental principles of a trial in the implementation of the letters rogatory.

Where there is a violation of these principles, the public prosecutor or an interested party may request the commissioned judge to cancel the directions that he has already given and to annul the documents recording the implementation of the letters rogatory.

**Article 745.** If the letters rogatory was irregularly transmitted, the commissioned judge may sua sponte or at the request of the public prosecutor refuse to implement the same; he may likewise, at the request of the public prosecutor cancel the directions that he has already given and annul the documents recording the execution of the letters rogatory.

**Article 746.** The judge must give reasons for the decision whereby he refuses to implement the letters rogatory, annul the documents recording their implementation, cancel the directions that he has already given.

The parties and the public prosecutor may lodge an appeal against this decision.

The time-limit for the appeal will be fifteen days; it may not be extended on grounds of remoteness.

**Article 747.** The documents recording the implementation of letters rogatory, or the decision whereby a judge refuses to implement the same, will be transmitted to the commissioning court in the same way as the letters rogatory was transmitted to the commissioned court.

*[...]*

**Article 748**. The implementation of the letters rogatory will take place without expenses or taxes.

However, the sums due to witnesses, experts, interpreters as well as to any person participating in the implementation of the letters rogatory will be at the expense of the foreign authority. The same will apply to the expenses resulting from the application of a particular form of procedure at the request of the commissioning court.

# APPENDIX E

# APPENDIX E

**Relevant articles of the General Data Protection Regulation of April 27, 2016[1]**

I.        **Recitals of the GDPR**

### Recital n°39

Any processing of personal data should be lawful and fair. It should be transparent to natural persons that personal data concerning them are collected, used, consulted or otherwise processed and to what extent the personal data are or will be processed. The principle of transparency requires that any information and communication relating to the processing of those personal data be easily accessible and easy to understand, and that clear and plain language be used. That principle concerns, in particular, information to the data subjects on the identity of the controller and the purposes of the processing and further information to ensure fair and transparent processing in respect of the natural persons concerned and their right to obtain confirmation and communication of personal data concerning them which are being processed. Natural persons should be made aware of risks, rules, safeguards and rights in relation to the processing of personal data and how to exercise their rights in relation to such processing. In particular, the specific purposes for which personal data are processed should be explicit and legitimate and determined at the time of the collection of the personal data. The personal data should be adequate, relevant and limited to what is necessary for the purposes for which they are processed. This requires, in particular, ensuring that the period for which the personal data are stored is limited to a strict minimum. Personal data should be processed only if the purpose of the processing could not reasonably be fulfilled by other means. In order to ensure that the personal data are not kept longer than necessary, time limits should be established by the controller for erasure or for a periodic review. Every reasonable step should be taken to ensure that personal data which are inaccurate are rectified or deleted. Personal data should be processed in a manner that ensures appropriate security and confidentiality of the personal data, including for preventing unauthorised access to or use of personal data and the equipment used for the processing.

### Recital n° 111

Provisions should be made for the possibility for transfers in certain circumstances where the data subject has given his or her explicit consent, where the transfer is occasional and necessary in relation to a contract or a legal claim, regardless of whether in a judicial procedure or whether in an administrative or any out-of-court procedure, including procedures before regulatory bodies. Provision should also be made for the possibility for transfers where important grounds of public interest laid down by Union or Member State law so require or where the transfer is made from a register established by law and intended for consultation by the public or persons having a legitimate interest. In the latter case, such a transfer should not involve the entirety of the personal data or entire categories of the data contained in the register and, when the register is intended for consultation by persons having a legitimate

---

[1] Official English Translation of the Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC (General Data Protection Regulation): https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32016R0679&from=FR&lang3=EN&lang2=EN&lang1=EN

interest, the transfer should be made only at the request of those persons or, if they are to be the recipients, taking into full account the interests and fundamental rights of the data subject.

**Recital n° 115**

Some third countries adopt laws, regulations and other legal acts which purport to directly regulate the processing activities of natural and legal persons under the jurisdiction of the Member States. This may include judgments of courts or tribunals or decisions of administrative authorities in third countries requiring a controller or processor to transfer or disclose personal data, and which are not based on an international agreement, such as a mutual legal assistance treaty, in force between the requesting third country and the Union or a Member State. The extraterritorial application of those laws, regulations and other legal acts may be in breach of international law and may impede the attainment of the protection of natural persons ensured in the Union by this Regulation. Transfers should only be allowed where the conditions of this Regulation for a transfer to third countries are met. This may be the case, inter alia, where disclosure is necessary for an important ground of public interest recognised in Union or Member State law to which the controller is subject.

## II.    **Articles of the GDPR**

**Article 5**
**Principles relating to processing of personal data**

1.  Personal data shall be:

    a)  processed lawfully, fairly and in a transparent manner in relation to the data subject ('lawfulness, fairness and transparency');

    b)  collected for specified, explicit and legitimate purposes and not further processed in a manner that is incompatible with those purposes; further processing for archiving purposes in the public interest, scientific or historical research purposes or statistical purposes shall, in accordance with Article 89(1), not be considered to be incompatible with the initial purposes ('purpose limitation');

    c)  adequate, relevant and limited to what is necessary in relation to the purposes for which they are processed ('data minimisation');

    d)  accurate and, where necessary, kept up to date; every reasonable step must be taken to ensure that personal data that are inaccurate, having regard to the purposes for which they are processed, are erased or rectified without delay ('accuracy');

    e)  kept in a form which permits identification of data subjects for no longer than is necessary for the purposes for which the personal data are processed; personal data may be stored for longer periods insofar as the personal data will be processed solely for archiving purposes in the public interest, scientific or historical research purposes or statistical purposes in accordance with Article 89(1) subject to implementation of the appropriate technical and organisational measures required by this Regulation in order to safeguard the rights and freedoms of the data subject ('storage limitation');

2

f)  processed in a manner that ensures appropriate security of the personal data, including protection against unauthorised or unlawful processing and against accidental loss, destruction or damage, using appropriate technical or organisational measures ('integrity and confidentiality').

2.  The controller shall be responsible for, and be able to demonstrate compliance with, paragraph 1 ('accountability').

### Article 48
### Transfers or disclosures not authorised by Union law

Any judgment of a court or tribunal and any decision of an administrative authority of a third country requiring a controller or processor to transfer or disclose personal data may only be recognised or enforceable in any manner if based on an international agreement, such as a mutual legal assistance treaty, in force between the requesting third country and the Union or a Member State, without prejudice to other grounds for transfer pursuant to this Chapter.

### Article 49
### Derogations for specific situations

1. In the absence of an adequacy decision pursuant to Article 45(3), or of appropriate safeguards pursuant to Article 46, including binding corporate rules, a transfer or a set of transfers of personal data to a third country or an international organisation shall take place only on one of the following conditions:

a)  the data subject has explicitly consented to the proposed transfer, after having been informed of the possible risks of such transfers for the data subject due to the absence of an adequacy decision and appropriate safeguards;

b)  the transfer is necessary for the performance of a contract between the data subject and the controller or the implementation of pre-contractual measures taken at the data subject's request;

c)  the transfer is necessary for the conclusion or performance of a contract concluded in the interest of the data subject between the controller and another natural or legal person;

d)  the transfer is necessary for important reasons of public interest;

e)  the transfer is necessary for the establishment, exercise or defence of legal claims;

f)  the transfer is necessary in order to protect the vital interests of the data subject or of other persons, where the data subject is physically or legally incapable of giving consent;

g)  the transfer is made from a register which according to Union or Member State law is intended to provide information to the public and which is open to consultation either by the public in general or by any person who can demonstrate a legitimate interest, but only to the extent that the conditions laid down by Union or Member State law for consultation are fulfilled in the particular case.

Where a transfer could not be based on a provision in Article 45 or 46, including the provisions on binding corporate rules, and none of the derogations for a specific situation referred to in the first subparagraph of this paragraph is applicable, a transfer to a third country or an international organisation may take place only if the transfer is not repetitive, concerns only a limited number of data subjects, is necessary for the purposes of compelling legitimate interests pursued by the controller which are not overridden by the interests or rights and freedoms of the data subject, and the controller has assessed all the circumstances surrounding the data transfer and has on the basis of that assessment provided suitable safeguards with regard to the protection of personal data. The controller shall inform the supervisory authority of the transfer. The controller shall, in addition to providing the information referred to in Articles 13 and 14, inform the data subject of the transfer and on the compelling legitimate interests pursued.

2. A transfer pursuant to point (g) of the first subparagraph of paragraph 1 shall not involve the entirety of the personal data or entire categories of the personal data contained in the register. Where the register is intended for consultation by persons having a legitimate interest, the transfer shall be made only at the request of those persons or if they are to be the recipients.

3. Points (a), (b) and (c) of the first subparagraph of paragraph 1 and the second subparagraph thereof shall not apply to activities carried out by public authorities in the exercise of their public powers.

4. The public interest referred to in point (d) of the first subparagraph of paragraph 1 shall be recognised in Union law or in the law of the Member State to which the controller is subject.

5. In the absence of an adequacy decision, Union or Member State law may, for important reasons of public interest, expressly set limits to the transfer of specific categories of personal data to a third country or an international organisation. Member States shall notify such provisions to the Commission.

6. The controller or processor shall document the assessment as well as the suitable safeguards referred to in the second subparagraph of paragraph 1 of this Article in the records referred to in Article 30.

# APPENDIX F



# Deliberation No. 2009-474 of 23 July 2009 concerning recommendations for the transfer of personal data in the context of American court proceedings known as "Discovery"

NOR: CNIA0900018X

The National Commission on Data Processing and Liberties,

Considering Convention No. 108 of the Council of Europe of 28 January 1981 concerning the protection of individuals with regard to automated processing of personal data;

Considering Directive 95/46/CE of the European Parliament and of the Council of Europe of 24 October 1995 concerning the protection of individuals with regard to processing of personal data and the free circulation of such data;

Considering Article 1bis of Law No. 68-678 of 27 July 1968, created by Law No. 80-538 of 16 July 1980 concerning the transmission of documents or information of an economic, commercial or technical character to foreign individuals or legal entities;

Considering Article 23 of the Hague Convention of 18 March 1970;

Considering Law No. 78-17 of 6 January 1978 concerning data processing, computer files and liberties, amended by Law No. 2004-801 of 6 August 2004 concerning the protection of individuals with regard to processing of personal data;

Considering Decree No. 2005-1309 of 20 October 2005 adopted in application of Law No. 78-17 of 6 January 1978 concerning data processing, computer files and liberties, amended by Law No. 2004-801 of 6 August 2004;

Considering the deliberation of the National Commission on Data Processing and Liberties No. 2005-213 of 11 October 2005 regarding the adoption of a recommendation concerning the methods of electronic archiving of personal data in the private sector;

Considering Opinion WP 158 of the working group known as "Article 29" adopted on 11 February 2009;

After having heard the report of Mssrs. Bernard Peyrat and Georges de La Loyère and the observations of Ms. Elisabeth Rolin, Commissioner of the Government,

The National Commission on Data Processing and Liberties notes an increase in the number of matters concerning the transfer of personal data to the United States, filed principally either by French subsidiaries of American companies or by French companies that have commercial ties with the United States, in the context of "Discovery" proceedings before American courts.



It shall be recalled that the proceedings known as "Discovery" or "pre-trial Discovery" are a phase of inquiry and investigation prior to a civil or commercial trial, which are essential for all judicial actions in the United States and which require each party to reveal to the other all the evidence that it possesses relevant to the dispute, even if such information is contrary to its interests and regardless of the location or form of the evidence.  The disclosure of information in the context of criminal cases is thus excluded.

The scope of such exchanges of information may be very wide, and a refusal to disclose may lead to an unfavorable judgment for the party opposing such disclosure.

The Hague Convention provides for the transmission between Contracting States of evidence located abroad in the context of national court proceedings.  This Convention provides that "*in civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the laws of that State, request the competent authority of another Contracting State, via means of a Letter of Request, to obtain evidence, or to perform some other judicial act (...)*" (Article 1).

The Hague Convention is the sole international agreement connecting France and the United States and constitutes a bridge between the Romano-Germanic legal systems and those deriving from the Common Law.

In particular, as concerns relations with the United States, it is provided that "a Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries." (Article 23).

In France, the execution of Letters of Request in the case of "pre-trial Discovery of documents" is authorized only "if the documents are enumerated limitatively in the letter of request and have a direct and specific connection with the subject of the dispute" (declaration made by France on 19 January 1987 in the context of Article 23 cited above).

In such a situation, the court to which the Letter of Request is transmitted must rule on the admissibility of the requests to obtain evidence, in accordance with the provisions of Articles 743 *et seq.* of the Code of Civil Procedure.

It is then up to the judge to rule, in accordance with Articles 138 *et seq.* of the New Code of Civil Procedure, on the production of the documents (including non-tangible documents) held by a third party or by a party, by ordering the production of the act or the document "*under the conditions and subject to the guarantees which he shall set, subject to penalty*" (1).

The majority of the countries that have ratified the Hague Convention have also issued reservations or have refused to transmit information in the context of "pre-trial Discovery" (Article 23).

Where this procedure has not been respected in France, the orders issued by American authorities concerning evidence located in France are thus without force.

---

[1] Article 139 of the NCPC [New Code of Civil Procedure].

CNIL - 8 rue Vivienne –CS 30223 - 75083 Paris Cedex 02 France

phone : +33 (0)1 53 73 22 22 - Fax : +33 (0)1 53 73 22 00

RÉPUBLIQUE FRANÇAISE



Indeed, the failure to observe the Hague Convention will, in France, cause the application of Law No. 68-678 of 26 July 1968 concerning the transmission of documents and information of an economic, commercial, industrial, financial or technical nature to foreign individuals or legal entities.

The Law of 26 July 1968 is a "shielding" law adopted to defend French economic interests and to protect strategic data of companies against abusive actions undertaken by foreign authorities to collect economic information.

This law provides that "subject to treaties or international agreements and applicable laws and regulations, it is prohibited for any party to request, seek or disclose, in writing, orally, or otherwise, economic, commercial, industrial, financial or technical documents or information leading to the constitution of evidence with a view to foreign judicial or administrative proceedings or in connection therewith." The failure to observe this provision is sanctioned by a penalty of six months imprisonment and/or a fine of € 18,000.

Since the transmission of personal data in the context of a foreign proceeding may cause the summons of the person in question before a foreign court, it is essential to ensure that all of the legal rules applicable to this type of situation, and particularly the conflict-of-laws rules of international private law, are observed in order to better protect French citizens and to guarantee them due process.

In this regard, the Hague Convention and Law No. 68-678 of 26 July 1968, concerning the transmission of documents or information of an economic, commercial or technical nature to foreign individuals or legal entities, which govern the transmission of information to foreign authorities, must be observed in the case of a search for information on French territory. Any transmission of information in the context of a "Discovery" procedure must be conducted in accordance with the Hague Convention.

Further, the CNIL does not have the authority to evaluate the compliance of a "Discovery" transfer with regard to the Hague Convention or the Law of 1968 known as the "Blocking Statute".

Similarly, obtaining an authorization from a French judge to send documents to the United States (the "letter of request" procedure addressed to the Minister of Justice) does not release the French entity from the obligation to observe the provisions of the Law on Data Processing and Liberties, particularly as regards the question of the flow of personal data outside of the European Union, as the two regulations are complementary. We recall that, in France, criminal sanctions are provided for failure to observe the principles of the Law of 6 January 1978 as amended, which are significantly more serious than those provided for in the case of a failure to observe the Blocking Statute of 1968.

The transmission of personal data in the context of "Discovery" proceedings, which are necessarily conducted in the context of the Hague Convention, must also be in accordance with the principles of the Law of 6 January 1978, as amended. However, any requests for the transmission of personal data must not lead to the creation of databases intended to respond specifically to American proceedings. Indeed, they must be dealt with as operations with specific purposes, such as human resource management or files on prospective clients.

The Law of 6 January 1978, as amended, applies to "Discovery" proceedings when they involve transfers of personal data; however, it is not necessary to make specific "Discovery" notifications if these data were previously subject to notifications for their principal purposes in which a period of



retention by type of data collected and processed was stated.  Finally, technical applications intended to select data in the context of "Discovery" procedures do not have to be subject to notifications.

Nevertheless, the international flow of data must be subject to notifications to the CNIL, which may re-classify such notifications as requests for authorization on the basis of the legal framework of such transfers.

Finally, the Commission notes that companies have an interest in having "data protection officers" appointed to assist them in resolving these types of problems.

This recommendation does not deal with cases connected with investigations conducted by the American federal authorities, such as the Securities and Exchange Commission (SEC) or the Federal Trade Commission (FTC); further, it does not consider issues connected with sanctions by the American authorities concerning the premature destruction of data.

1. Controllership of the Processing

In accordance with Article 5 of the Law on Data Processing and Liberties, the data controller is the legal entity or the individual that decides to transmit the personal data in the context of an American court proceeding and, therefore, the purpose and means of processing.

The data controller may be a French or foreign entity established on French territory or a foreign entity using processing means on French territory, according to Article 5 of the Law on Data Processing and Liberties.

2. Legitimacy of Processing and Purposes

Concerning the legitimacy of processing:

In addition to observance of the Hague Convention and the Law of 1968, the CNIL considers that the legitimate interest of the data controller is a ground for allowing processing of personal data as long as personal rights are observed.

Indeed, in accordance with Article 7-5 of the Law on Data Processing and Liberties, the transmission of personal data for the legitimate interest of the data controller may occur only if the fundamental interests or rights and liberties of the person concerned are ensured.  Thus, the observance of international agreements and applicable national provisions, such as the Hague Convention and the Law of 26 July 1968, is necessary in order to protect the fundamental rights of the person concerned.

Further, in accordance with Article 38 of the Law on Data Processing and Liberties, the person concerned has, in all circumstances, a right to object on the basis of legitimate grounds concerning the transmission of his personal data in the context of a legal proceeding in the United States.

In exceptional cases, the Commission recognizes that there may be situations when the person has the possibility to grant free, informed and specific consent and is himself involved in the litigation procedure. His consent may then constitute a legal basis in the sense of Article 7 of the Law on Data Processing and Liberties.  However, proof of such free, informed and specific consent must be provided.  Consent



will be considered to have been freely given when it was obtained without pressure or risk of repercussions for the person concerned.

Concerning processing of sensitive data:

According to Article 8 of the Law on Data Processing and Liberties, processing of sensitive data is prohibited in principle and may not be carried out unless the person concerned has given his specific consent or if it is necessary to establish, safeguard or defend a right in legal proceedings for the data controller. Specific measures, particularly as regards security, must be implemented in order to appropriately protect such information.

As concerns consent for processing of sensitive data, proof of free, specific and informed consent must be provided.

3. Quality and Proportionality of the Data

In accordance with Article 6 of the Law on Data Processing and Liberties, the data collected in the context of a "Discovery" proceeding must be appropriate, relevant and not excessive with regard to the purposes for which processing was implemented.

A serious verification of the proportionality and the quality of the data collected and transmitted is fundamental and must be carried out objectively in order to guarantee that only the information legally authorized is transmitted to the adverse party and to the foreign judge in the framework of the proceeding. This may be done by implementing a filter using key words defined in partnership with the legal department and specialized advisors. This filtering operation must take place at the local level, *i.e.*, in the country where the personal data are located.

This balance of interests must take into consideration issues of proportionality and relevance of the data in the context of the proceeding and the consequences for the persons concerned.

The transmission may take place only in observance of legal obligations of secrecy and confidentiality such as professional secrecy and the Law of 26 July 1968.

The CNIL also recommends relying on a trusted third party in evaluating the proportionality of the data processed in the context of the proceedings.

Finally, in numerous cases, the transmission of information does not require the transmission of personal data. In this regard, the team responsible for finding and transmitting the information must implement procedures to anonymize and pseudonymize (which allow later re-identification) the data in order to avoid transmitting personal data that are unnecessary or ancillary to the proceeding.

If the transmission of data is limited, the anonymization of the data will not be necessary. On the other hand, if there is a large transmission of data, the anonymization of the data must be considered.

It has occurred, in the course of hearings, that an American authority (in this instance, the Securities and Exchange Commission) had requested a French company to transmit a very large amount of personal data. After discussion with the SEC, it came out that the SEC did not need the personal data; the French company was able to send the SEC redacted data.



If, however, personal data are necessary, the categories of personal data that may be transmitted must be limited to:

the identity, responsibilities, and contact information of the person concerned;

information that is strictly related to the litigation in progress.

Moreover, the data must be exact and complete.

The American proceeding includes the principle of proportionality.  Indeed, when an American judge issues "*stipulative court orders*", he does so by assessing the quality of the data that are necessary in the context of the proceeding in question.

"*Stipulative court orders*" are orders issued by an American judge, which guarantee that the documents transmitted in the context of the "Discovery" proceeding shall be used according to conditions defined by the parties and retained in a confidential manner.  They may limit the scope of the documents to be disclosed and may be used to limit the collection of personal data, depending on the specific case; specify the conditions connected with the use and transmission of the personal data collected to third parties; and provide terms for security and confidentiality to be observed.

4.  Retention Period

In accordance with Article 6 of the Law on Data Processing and Liberties, data relating to the person in question may be retained only for a period that is relevant to the purpose of processing that justified the procedure.

Therefore, the data used in the context of a "Discovery" proceeding shall be retained for the duration of the proceeding.  It is thus recommended not to create a new limitations period.

5. Recipients of the Data

In accordance with Articles 6 and 34 of the Law on Data Processing and Liberties, the persons within the adverse party who are specifically assigned by the data controller to collect or process the personal data in the context of the "Discovery" proceeding are only the recipients of all or part of the data cited above to the extent that such data are necessary to accomplish their assignments and for the purpose of processing.

6. Informing the Persons Concerned

General, clear and complete information to any person who is potentially concerned, must be provided prior to the implementation of data processing that may be subject to a transfer of his personal data abroad in the context of court procedures.  Moreover, specific information must be provided at the time of a transfer of data outside of the European Union.

Consequently, according to Articles 6 and 32 of the Law of 6 January 1978, the person who is the subject of a search is to be informed by the data controller as soon as the data concerning him are recorded, whether in computerized form or not, in order to allow him to object on legitimate grounds to the processing of his data.



This provision of information, which is conducted in a way that ensures its correct delivery to the person concerned, must specify in particular the entity responsible for processing, the facts of the proceedings and the existing connection that requires the transmission of his personal data, whether or not processing is optional, the consequences for the person in question in the case of a refusal to disclose, the departments that may be assigned to the search, the possible transfer of personal data to a State that is not a member of the European Community as well as the methods for exercising his rights to access, opposition and correction.

Except in exceptional cases as provided in Article 32-III of the Law on Data Processing and Liberties, the persons must also be informed when the data are collected by a third party and indirectly. In such a case, the persons concerned must be informed by the data controller as soon as circumstances allow, following processing of the data.

An exception to the principle of transparency must however be taken into account in certain exceptional cases. Indeed, when there is a risk that informing the person concerned will endanger the ability of the party to the proceedings to conduct an investigation or to assemble proof, the provision of information to the person concerned may be conducted after this risk has been averted.

Therefore, when conservatory measures are necessary, particularly in order to prevent the destruction of evidence, the person may be informed after the adoption of these measures.

7. Observance of Rights of Access and Correction

According to Articles 39 and 40 of the Law of 6 January 1978, as amended, the data controller must guarantee any person concerned the right to access to the data concerning him and to request, if the data are inexact, incomplete, ambiguous or out-of-date, the right to correct or delete them. However, a judge, including a judge deciding emergency interim proceedings, may be requested to prohibit the transmission and/or the destruction of such information in order to preserve the confidentiality of an investigation.

8. Security Measures

According to Articles 34 and 35 of the Law on Data Processing and Liberties, access to personal data must be limited to only the persons who may, in the framework of their responsibilities, have legitimate knowledge with regard to the purpose of processing.

The data controller must therefore take all necessary precautions to preserve the security of these data.

In this regard and in accordance with Recommendation No. 2005-213 of 11 October 2005 relating to the adoption of a recommendation concerning the methods of electronic archiving of personal data in the private sector, the CNIL recommends:

as concerns intermediary archives (data that still have an administrative interest for the departments in question), the access to such data must be limited to a specific department (for example, a litigation department) and, at least, be isolated from archived data by means of a logical separation (management of access rights and authorizations);



as concerns final archiving (exclusively for data presenting a historical, scientific or statistical interest that justifies their not being destroyed), such data must be preserved on a separate medium that is not accessible by production systems, thus authorizing only separate, occasional and specifically justified access by a department specifically authorized to consult this type of archives (for example, the company's head of archiving).

Moreover, in order to guarantee the reliability of the archived data, the CNIL recommends implementing security measures at the time of any change of media for storing the archived data.

Finally, it recommends implementing measures to allow record-keeping of the consultations of the archived data.

Where a service-provider is employed to manage all or part of this process, the data controller must, by contractual means, prevent the service provider from using the data for other purposes, ensure the confidentiality of the data, observe the limited retention period for the data and undertake the destruction or the return of any manual or computerized media containing personal data following the expiration of its service contract.

In all cases, the persons responsible for collecting and processing the data are to be limited in number, specifically trained and subject to a strict obligation of defined contractual confidentiality.

9. Formalities Regarding the Transfer of Personal Data to the United States

The transfer of personal data must take place in accordance with the specific provisions of the Law of 6 January 1978, as amended, concerning the international transfer of data, and in particular with its Articles 68 and 69.  On this point, it must be recalled that the United States does not provide an adequate level of protection in terms of the protection of personal data within the meaning of the European Directive of 24 October 1995.

Two cases must be distinguished:

1.  The case where the personal data are located in France and directly transferred to the United States for purposes of litigation:

As concerns a one-time and non-massive transfer of relevant information, the exception of Article 69-3° may be used to justify the transfer of personal data for purposes of findings, safeguard or defense of a legal right for the data controller.  To the extent that this transfer is covered by the exception set out in the Article noted above, the transfer need not be authorized by the CNIL, but it must, nonetheless, be notified.

When the transfer is massive and recurring, *the transfer of personal data may take place*:

when the recipient of the personal data is an entity established in the United States that adheres to the principles of Safe Harbor;

when the recipient of the personal data has signed standard contractual clauses, as adopted by the European Commission, with the data controller in France;



when the recipient of the personal data has implemented strict internal regulations (or "*Binding Corporate Rules*") within its group.

2. The case where the personal data have already been transferred to American territory or to a territory that does not offer adequate protection for a legitimate previously authorized purpose (e.g., the centralization of a human resources data base of a French subsidiary of an American group):

*When the data are subject to an onward transfer to a judicial authority*, the data controller must provide adequate protection for the data transmitted to the American authorities and to the adverse party by implementing appropriate limitative tools such as entering into a "stipulative court order", which takes into consideration the protection of personal data.

*When the data are subject to an onward transfer to a party to the proceeding or to a third party*, appropriate contractual clauses must be signed with the party receiving the information, or, if necessary, an undertaking by the party to observe the principles concerning onward transfers such as are provided by the Safe Harbor agreement.

Indeed, the Safe Harbor program provides that in order to disclose information to a third party in the context of an onward transfer, companies are required to apply principles of notification and choice. Organizations that wish to do so may transfer information to a third party acting as an agent if they certify in advance that the third party has adhered to the principles of Safe Harbor or is subject to the provisions of the directive or to another mechanism that attests to the adequate level of protection or if it has concluded a written agreement with the third party by which the third party undertakes to ensure at least the same level of protection as provided by the principles.

According to the provisions of the standard contractual clauses adopted by the European Commission and the principles of Safe Harbor, it is essential that thorough work be carried out by a data controller that is located abroad as concerns the relevance, the legitimacy and the accuracy of the data that must be transferred in the context of the proceedings.

Moreover, the person concerned must be informed of this in a clear manner and must have the possibility to refuse the transfer on the basis of legitimate grounds.

The present deliberation shall be published in the Official Journal of the French Republic.

The Chairman: A. TÜRK

