# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KRISTEN BEHRENS, ESQ.,** as Administratrix, et al.<br><br>v.<br><br>**ARCONIC, INC.,** et al. | CIVIL ACTION<br><br>NO. 19-2664 |

## MEMORANDUM RE FRENCH BLOCKING STATUTE DISCOVERY DISPUTE

**Baylson, J.**                                                                                                                                                **March 13, 2020**

## I. Introduction

This action arises out of the Grenfell Tower fire that occurred in England in 2017. The parties are currently engaged in limited discovery on Defendants' pending Motion to Dismiss for Forum Non Conveniens ("FNC" or the "FNC Motion"). A major discovery issue that has arisen in this FNC discovery is whether the French Blocking Statute ("FBS") prevents defendant Arconic from producing documents that were created by Arconic's French subsidiary, AAP SAS. Many of these documents were transferred electronically to the Relativity databases of DLA Piper, which are maintained in the United States. The Court appointed Noëlle Lenoir, an expert in French law, former Justice of the French Constitutional Court, and current partner at a major law firm in Paris, as a combination expert and master to prepare a report about the relevance of the FBS to this dispute.

For the reasons stated at the March 11, 2020 hearing and discussed in this Memorandum, the Court will require Plaintiffs to utilize the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention") to obtain the FBS documents.

## II. The French Blocking Statute and the Hague Convention

The French Blocking Statute provides that

> Subject to any treaties or international agreements and the laws and regulations in force, it is prohibited for any person to request, to investigate or to communicate in writing, orally or by any other means, documents or information relating to economic, commercial, industrial, financial or technical matters leading to the establishment of proof in light of foreign administrative or judicial proceedings or as a part of such proceedings.

(ECF 142-1, Expert Report ¶ 26 (quoting Article 1bis of Law No. 80-538).) Violation of the FBS is punishable by a fine of up to €18,000 for an individual or €90,000 for a legal entity, and/or six months imprisonment. (Id. ¶ 28.)

Since France and the United States are both signatories to the Hague Convention, production that occurs pursuant to Hague Convention procedures does not violate the FBS. See id. ("Subject to any treaties or international agreements …") (emphasis added); see also Expert Report ¶ 39 (noting that the "subject to" clause "was designed to give effect to the processes provided by the Hague Convention for cross-border discovery in civil litigation").

The Hague Convention outlines three methods for production of evidence:[1]

***Letter of Request.***[2] Under this method, the requesting party asks the court in the country where the action is pending to transmit the Letter of Request specifying the evidence to the central authority of the country where the evidence is located.[3] (Expert Report ¶ 52.) In France, the Letter of Request is sent to the Ministry of Justice, which will either approve or deny it. (Id. ¶ 53.) If the request is approved, it is transmitted to the relevant court and the judge oversees the

---

[1] These methods are commonly grouped into two categories: Chapter I, which refers to Letters of Request; and Chapter II, which refers to the taking of evidence by Diplomatic Officers, Consular Agents, and Commissioners.
[2] See generally Hague Convention, Arts. 2–14.
[3] The Office of International Judicial Assistance, which is the Central Authority for the United States under the Hague Convention, provides a Model Letter of Request, https://www.justice.gov/civil/evidence-requests.

taking of discovery. (Id. ¶ 54.) Discovery through the Letter of Request process generally takes "between four weeks to a year." (Id. ¶ 55.)

*Appointment of American diplomatic or consular officer.*[4]  Under this method, an American diplomatic or consular officer accredited in France is appointed to take the evidence in France. (Id. ¶ 56.)

*Appointment of Commissioner.*[5] Under this method, a litigant may request that a French or foreign lawyer be appointed as Commissioner. (Id. ¶ 57.) The appointment must receive authorization from France's Ministry of Justice.[6] (Id.) The duly appointed Commissioner will receive and review the produced documents in France.

### III. Procedural History

#### A. The Court's Decision to Appoint Combination Expert and Master

This discovery dispute and the role of the FBS was summarized in the Court's December 2019 Memorandum re: French Blocking Statute and Appointment of Noëlle Lenoir. (ECF 106.) In deciding to appoint an expert and master, the Court relied on Federal Rule of Civil Procedure 53, Federal Rule of Evidence 706, and Federal Rule of Civil Procedure 44.1 as interpreted by the Supreme Court in Animal Science. (Id. at 7-8.) The Court also highlighted three Sedona Conference principles that provide guidance on navigating complex cross-border discovery disputes. (Id. at 10.) The Court's direction to Ms. Lenoir was to "prepare a Report and

---

[4] See generally Hague Convention, Arts. 15–16.
[5] See generally Hague Convention, Art. 17.
[6] A federal district court in Arizona recently granted a motion to appoint a commissioner pursuant to Chapter II, Article 17 of the Hague Convention. Salt River Project Agric. Improvement & Power Dist. v. Trench France SAS, 303 F. Supp. 3d 1004, 1005 (D. Ariz. 2018). The order that was entered following the decision appointed the commissioner pending approval of France's Ministry of Justice. See Salt River Project Agric. Improvement & Power Dist. v. Trench France SAS, No. CV17-01468 PHX DGC, ECF 91 (Mar. 19, 2018) (Order). Attached as an exhibit to the order was a Request for Judicial Assistance in the Authorization of a Commissioner, addressed to France's Ministry of Justice. (Id. Ex. 1.)

Recommendation concerning the impact of the French Blocking Statute, if any, on the AAP SAS discovery dispute." (Id. at 11.)

Arconic and Plaintiffs each submitted proposed questions for Ms. Lenoir. (ECF 111 (Plaintiffs' Proposed Questions); ECF 112 (Arconic's Proposed Questions).) Based on the parties' submissions, the Court produced a list of questions for Ms. Lenoir and forwarded the list to her for review. (ECF 114.)

### B. The Expert Report

Ms. Lenoir's Expert and Master Report was filed on February 20, 2020. (ECF 142-1.) The detailed report discussed the background of the FBS, analyzed French case law applying the statute, and opined on the applicability of the FBS to this dispute. The Expert Report concluded "that the fact that the requested documents are stored on the server of the law firm of Arconic in New York should not exempt Arconic from compliance with the FBS." (Expert Report ¶ 78.) Ms. Lenoir recommended that the parties use the methods provided by the Hague Convention, and she concluded that the third method—the appointment of a Commissioner—is a reasonable solution because it both permits timely production of documents and ensures the FBS is followed. (Id. ¶ 83.)

### C. Plaintiffs' Objections to the Expert Report

Following the filing of the Expert Report, the Court invited the parties to submit comments or objections. (ECF 142.) Plaintiffs objected to the Report on two grounds: first, that the Report "fails to consider the body of U.S. case law" on the FBS; and second, that discovery has revealed the AAP SAS documents have always been on servers located in the United States. (ECF 147 at 1-2.) Arconic disagreed with each of Plaintiffs' objections, but did not otherwise object to the Report. (ECF 155.)

Plaintiffs' first objection is overruled. Plaintiffs are correct that the Expert Report did not analyze United States case law, but that was because this analysis was outside the scope of Ms. Lenoir's review. The Court instructed Ms. Lenoir to focus her report on "the relevance and/or impact, if any, of the French Blocking Statute" and that is precisely what she did. (ECF 107.) Further, all of the questions that the Court provided to Ms. Lenoir focused on French law and jurisprudence, and she framed her Report to address these inquiries. Ms. Lenoir appropriately considered and summarized French case law but was never responsible for discussing United States law, so this objection is rejected.

Plaintiffs' second objection concerning the location of the servers will be discussed in subsection V.A.3. That objection will also be overruled because it does not change the balance of the five Aerospatiale factors.

### D. The March 11, 2020 Hearing

The Court heard oral argument on Ms. Lenoir's Report, Plaintiffs' objections, and Arconic's Response on March 11, 2020. During the hearing, the Court emphasized the importance of the principle of comity that is inherent in many Supreme Court opinions dealing with complex cross-border discovery disputes.

The dialogue between the Court and the parties focused on Ms. Lenoir's recommendation that the Hague Convention be used for the discovery related to AAP SAS. Plaintiffs' counsel acknowledged that they likely would not have opposed use of the Hague Convention procedures under different circumstances, but argued that in this case, use of the Convention will impose time delays that make compliance infeasible. The Court advised the parties that although the

briefing and argument on the pending FNC Motion will proceed as planned,[7] the Court likely will delay ruling on FNC as long as Plaintiffs proceed with the Hague Convention procedures expeditiously. Once the Hague Convention documents are obtained, the Court may allow for supplemental briefing so Plaintiffs can discuss relevant information they learn from the AAP SAS discovery.

The Court ordered the parties to discuss the three methods outlined in the Hague Convention and to try to come to an agreement about how they would like to proceed. The parties will submit this update to the Court by Thursday March 19, 2020.

## IV. Legal Standard: Aerospatiale

The leading Supreme Court case on the FBS is Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa, 482 U.S. 522 (1987). In Aerospatiale, the Court recognized that the Hague Convention does not exclusively govern access to evidence located abroad. See id. at 539 (recognizing that a contrary rule "would subordinate the [U.S.] court's supervision of even the most routine … pretrial proceedings to the actions or, equally, to the inactions of foreign judicial authorities"). Rather, Aerospatiale directed courts to engage in a comity analysis by scrutinizing "the particular facts, sovereign interests, and likelihood that resort to [Hague Convention] procedures will prove effective" in deciding whether the Hague Convention or domestic discovery rules apply. Id. at 544; see also In re Automotive Refinishing Paint Antitrust Litig., 358 F.3d 288, 305 (3d Cir. 2004) (citing Aerospatiale for the proposition that there is no requirement of "a first resort to the Hague Convention … to avoid possible burdensome or intrusive discovery practice under United States law"); Salt River, 303 F. Supp. 3d at 1007

---

[7] Because the parties are in the process of rescheduling the deposition of Ms. Perreiah to next week, the Court stated at the hearing that the parties may work out a revised briefing schedule on FNC and submit it to the Court for

("Even where ordering the foreign party to produce discovery will potentially cause the party to violate a blocking statute in its home country, use of Hague procedures is not mandatory.").

Five factors guide the comity analysis mandated by Aerospatiale:

(1) The importance to the litigation of the documents or other information requested;
(2) The degree of specificity of the request;
(3) Whether the information originated in the United States;
(4) The availability of alternative means of securing the information; and
(5) The extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Id. at 544 n.28 (citing Restatement (Revised) of Foreign Relations Law of the United States § 437(1)(c) (Am. Law Inst. 1986)).[8] Although Aerospatiale rejected a blanket rule of adherence to the Hague Convention, the Court noted that "American courts … should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." Id. at 546 (emphasis added).

**V. Discussion**

On balance, the Aerospatiale factors favor compliance with the Hague Convention. In reaching this conclusion, the Court relies, in part, on the research and opinions articulated in the Expert Report. The concept of comity is very important to this discovery dispute and compels the conclusion that going through the Hague Convention is the proper result.

---

approval. However, the Court intends for the oral argument on FNC, scheduled for Thursday May 7, to be held as planned.

[8] These factors are not exhaustive. Other courts consider additional factors in the comity analysis, including the degree of hardship that would be imposed by requiring production and the likelihood that the producing party would comply. Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468, 1475 (9th Cir. 1992). The parties did not brief these factors so the Court will not separately analyze them.

7

A.   **<u>Aerospatiale</u> Analysis**

1.   **Importance to Litigation of Documents or Information Requested**

The first <u>Aerospatiale</u> factor favors the Hague Convention.  Discovery is currently limited to FNC,[9] and Plaintiffs have received ample FNC discovery that will permit them to respond to the pending Motion.  Additionally, the Court will likely postpone ruling on Defendants' FNC Motion until the Hague Convention procedures have been completed, and Plaintiffs will have a chance to supplement their response with any additional information they learn from the AAP SAS documents.  Because it is unlikely that the AAP SAS documents are foundational to the FNC Motion given the FNC discovery that Plaintiffs have already received, and because the Court will likely permit Plaintiffs to supplement their opposition before the Court decides the Motion, the first <u>Aerospatiale</u> factor weighs heavily in favor of utilizing the Hague Convention procedures.  See <u>Richmark</u>, 959 F.2d at 1475 ("Where the outcome of litigation does not stand or fall on the present discovery order, or where the evidence sought is cumulative of existing evidence, courts have generally been unwilling to override foreign secrecy laws") (internal quotation marks and citations omitted).

2.   **Degree of Specificity of the Request**

The second <u>Aerospatiale</u> factor favors the Hague Convention.  Plaintiffs describe the documents implicated by Arconic's invocation of the FBS as documents related to "AAP SAS's communications and interactions with Arconic in the United States and Arconic's role in orchestrating, from the United States, the sale of Reynobond PE for the Grenfell Tower refurbishment." (ECF 99 at 2.)  Arconic previously advised the Court that the specific requests

---

[9] In addition to the FNC discovery, the Court previously permitted discovery on issues of corporate control.  The Court's understanding is that the FBS is implicated only by the requested FNC discovery—not by the corporate control discovery.

8

for production ("RFPs") implicated by the FBS are Nos. 9–14.[10] (ECF 76 at 6.) Arconic contends that these RFPs are "extremely broad" and may hit on "hundreds of thousands of irrelevant documents." (ECF 155 at 5, 6.) Some of these documents were produced as part of the United Kingdom's Public Inquiry into the Grenfell Tower fire. At the March 11, 2020 hearing, Arconic confirmed that Plaintiffs received everything that was produced to the Inquiry in Phase 1, but Arconic needed to confirm whether all of the Phase 2 documents were also produced since separate counsel is handling the productions to the police.

The Court agrees that the RFPs that relate to the AAP SAS documents are very broad, which favors use of the Hague Convention. See Salt River, 303 F. Supp. 3d at 1008 (finding that second Aerospatiale factor favored the Hague Convention because the request was "a broad requirement for the production of relevant information").

### 3. Location of Evidence

The third Aerospatiale factor does not weigh heavily in either direction. The case law reveals that there is a divergence in the treatment of this factor: some courts look to the place where the documents originated, while others look to the place where the documents are stored.

Some cases look to the location where the documents were created to determine how this factor weighs. See, e.g., Trueposition, Inc. v. LM Ericsson Tel. Co., Civil Action No. 11-4574, 2012 WL 707012, at *5 (E.D. Pa. Mar. 6, 2012) (Kelly, J.) ("The majority of the documents at issue, or possibly all of the documents, originated in France because ETSI [the company seeking protection under the FBS]'s only offices and its employees are located in France."). The AAP SAS documents clearly "originated" in France because they were created by French employees at the AAP SAS facility. The Processing Agreement that outlines the rights and obligations of

---

[10] The RFPs are listed at Exhibit A to Plaintiffs' November 20, 2019 Statement Concerning the Status of Discovery,

Arconic and AAP SAS related to Arconic's role as processor supports Arconic because it shows the documents are not controlled by Arconic in any meaningful way. Arconic's position is consistent with the FBS cases that look not to the location of the server or platform that maintains the documents, but rather to the location of the office and individuals who created them. If the location of origin is the guiding consideration, then the documents are "located" in France, which would mean that this factor weighs in favor of the Hague Convention procedures.

However, not all cases look to location of origin as the predominant consideration for this factor; other courts look to the present location of the documents. For example, in discussing the third <u>Aerospatiale</u> factor, the Ninth Circuit explained that "[t]he fact that all the information to be disclosed (and the people who will be deposed or who will produce the documents) are located in a foreign country weighs against disclosure, since those people and documents are subject to the law of that country in the ordinary course of business." <u>Richmark</u>, 959 F.2d at 1475. Indeed, one court noted that it did not know whether the information that undisputedly originated in France was nonetheless available in the United States. See <u>Strauss v. Credit Lyonnais, S.A.</u>, 249 F.R.D. 429, 441 n.12 (E.D.N.Y. 2008) (noting that the defendant failed to address "whether the requested bank records that originated in France could be retrieved electronically … at [the defendant's] Miami location or elsewhere in the United States") (internal quotation marks and citations omitted). According to Plaintiffs, if present location is the focus, then this factor weighs against requiring compliance with the Hague Convention because the documents are accessible to Arconic in the United States. However, Arconic's Response reveals that the "present" location of the documents might not be as simple as Plaintiffs suggest because a

---

available at ECF 87-1.

substantial number of the AAP SAS emails that Plaintiffs seek are hosted on Microsoft-owned servers which may or may not be located in the United States.[11] (ECF 155 at 2 n.2.)

There are countervailing indications on how this factor should weigh in the Aerospatiale analysis. On one hand, the documents were created in France by French employees, which indicates that Hague procedures should be followed. On the other hand, because of the capabilities of global cloud storage, the documents are, in a sense, "located" in the United States, arguably suggesting that this factor does not favor compliance with the Convention. The dichotomy between location of origin and present location that is illustrated by the facts of this case demonstrates one of the many ways that the advent of modern technology has fundamentally changed discovery and litigation practices. This factor is neutral, but even if it favored requiring production, the balance of factors still requires compliance with the Hague Convention.

### 4. Availability of Alternative Means

The fourth Aerospatiale factor favors requiring compliance with the Hague Convention. Although the Convention procedures require an additional step, the process described by the Expert Report is not unreasonably burdensome. Additionally, if the third method discussed in the Expert Report (appointment of a commissioner) is used, the parties likely will be able to commence the process promptly. According to the Expert Report, appointment of a Commissioner requires authorization from the French Ministry of Justice, but this authorization is generally granted within two to six days. (Expert Report ¶ 81.) Finally, the Court likely will permit supplemental briefing once the Hague Convention documents are received, which ensures that Plaintiffs will not be unfairly prejudiced in responding on FNC.

---

[11] Arconic believes that the Microsoft servers are in North America, but they may be in Mexico or Canada. (ECF

In sum, the Hague Convention is a reasonable equivalent to compelling production because, although Plaintiffs likely will not have the Hague Convention documents at the time they file their FNC opposition, they will have an opportunity to supplement their response once the process is complete. Compare Salt River, 303 F. Supp. 3d at 1009 (finding that the fourth Aerospatiale factor favored use of Hague procedures because "utilization of Chapter II procedures [i.e., appointment of a French Commissioner] will allow discovery of all relevant documents and ESI, and will delay disclosure only about 60 days—allowing [the French entity] to produce the documents before the close of fact discovery …."), with Bodner v. Paribas, 202 F.R.D. 370, 376 (E.D.N.Y. 2000) ("[T]he need for information and time pressure on this litigation, pressures caused, in particular, by the fact that potential class members are aged and in some cases infirm, indicate that application of the Federal Rules [as opposed to the Hague Convention] is appropriate."), and In re Cathode Ray Tube (CRT) Antitrust Litig. ("CRT"), No. C-07-5944-SC, 2014 WL 5462496, at *6 (N.D. Cal. Oct. 23, 2014) (concluding that this factor "weigh[ed] strongly in favor of production" because "[a]t this late date, it would be difficult, if not impossible, … to obtain the discovery expeditiously through Hague Convention procedures."). This factor therefore heavily favors the Hague Convention.

### 5. Balance of National Interests

The fifth Aerospatiale factor strongly favors requiring compliance with the Hague Convention. Two interests are relevant to this factor: (1) the interest of France and (2) the interest of the United States. Arconic focuses on France's interest in ensuring that its citizens and companies comply with the FBS, (ECF 155 at 7), while Plaintiffs focus on the United States' interest in ensuring that domestic companies are punished in its courts. (ECF 99 at 9.)

---

151 at 5.)

#### a. France's Interest is Strong

On one side of the balance is the interest of France in controlling access to information created in its country and in protecting its citizens from foreign discovery practices. The Court finds support for this interest from two sources: the thorough summary of France's interest in the Expert Report, and the amicus curiae brief France filed before the Supreme Court in Aerospatiale.

Ms. Lenoir, a well-respected expert in French law (particularly French discovery law and the French Blocking Statute), summarized the history of the FBS at length in her Expert Report. The Report explained that the FBS, which dates back to 1968, was adopted to limit the extraterritorial effect of document requests in investigations involving French shipping companies that were conducted by the Department of Justice and the Federal Maritime Commission. (Expert Report ¶ 37.) The amendment to the FBS that followed twelve years later extended the FBS to private litigation. (Id. ¶ 38.) This amendment occurred about ten years after the Hague Convention was adopted, and the legislative history demonstrates that the intent was for the FBS and the Hague Convention to work in tandem. (Id. ¶ 39.) The Expert Report explains that "[t]he Hague Convention has always been interpreted by the French government as binding," so it is logical that compliance with Hague procedures acts as an exception to the FBS. (Id. ¶ 41.) In the Court's view, Ms. Lenoir's analysis of the FBS, the Hague Convention, and France's interests heavily favors requiring compliance with the Hague Convention.

The sincerity of France's interest in the use of the Hague Convention is confirmed by the amicus curiae brief that it filed before the Supreme Court in Aerospatiale. In that brief, France explained that

> The French Code of Civil Procedure was extensively amended [following ratification of the Hague Convention] in order to make the Convention procedures

13

an integral part of domestic French law. French criminal law was correspondingly revised to prohibit French nationals from complying with foreign demands for evidence situated in France except where the demand is issued in accordance with the Hague Convention or another treaty to which France is a party.

Brief for Republic of France as Amicus Curiae Supporting Petitioners, Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa, 482 U.S. 522 (1987) (No. 85-1695), 1986 WL 727501, at *2.

Plaintiffs suggest that France's interest is "limited" because, as recognized by many United States courts, the FBS is often not enforced. (ECF 99 at 10); see, e.g., Motorola Credit Corp. v. Uzan, 73 F. Supp. 3d 397, 403 (S.D.N.Y. 2014) ("[W]hen a foreign court orders production of French documents even though the producing party has raised the 'excuse' of the [FBS], the French authorities do not, in fact, prosecute or otherwise punish the producing party."); In re Glob. Power Equip. Grp. Inc., 418 B.R. 833, 849 (D. Del. 2009) ("[T]he chance of prosecution under the French Blocking Statute is minimal."); Bodner, 202 F.R.D. at 375 ("[T]he French Blocking Statute does not subject defendants to a realistic risk of prosecution."). The Expert Report paints a slightly different picture of the enforcement landscape: Ms. Lenoir identifies one example of a French court affirming the imposition of criminal sanction for violation of the FBS, (Expert Report ¶ 65), and references five pre-trial French cases where "the courts confirmed that the FBS was applicable, sometimes to reject the request of documents and sometimes to accept it."[12] (Expert Report ¶ 67.) The Court rejects Plaintiffs' suggestion that "no

---

[12] In addition to the five Aerospatiale factors, courts often consider the hardship that would be imposed on a party who is ordered to produce documents in United States litigation. That consideration was not emphasized by the parties here, but it relates logically to how the likelihood of France prosecuting an FBS violation weighs under Aerospatiale, so a brief discussion is warranted.

Regardless of the likelihood of prosecution under the FBS, the fact remains that because of the FBS, required disclosure implicates the possibility of criminal prosecution for Arconic. See Salt River, 303 F. Supp. 3d at 1010 (finding that the fifth Aerospatiale factor "weigh[ed] in favor of utilizing Hague procedures because the [FBS] at

14

harm" will accrue to France if production of the documents is compelled. (ECF 99 at 10.) As demonstrated by the Expert Report and France's amicus brief in Aerospatiale,[13] France has a sincere interest in ensuring compliance with the FBS that is served by requiring the parties to use the Hague Convention.

### b.   United States Interest is Comparatively Weak

On the other side of the balance is the interest of the United States. In many of the FBS cases the United States' interest had clear implications of national importance, often because the interest involved enforcement of domestic antitrust laws. See, e.g., In re Air Cargo Shipping Servs. Antitrust Litig., 278 F.R.D. 51, 54 (E.D.N.Y. 2010) (concluding that the fifth Aerospatiale factor favored production because the case "involve[ed] violations of antitrust laws whose enforcement is essential to the country's interests in a competitive economy"); Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 523 (S.D.N.Y. 1987) ("The United States has a strong national interest in enforcing its antitrust and commodities fraud laws … to ensure the integrity of its financial markets …."); CRT, 2014 WL 5462496, at *6 ("This is a case alleging violations of United States antitrust laws, laws that are of fundamental importance to American democratic capitalism") (internal quotation marks and citations omitted); Trueposition, 2012 WL 707012, at *5 (noting "several strong national interests of the United States," including the "strong national interest in enforcing the policies of free market competition that underlie the

---

least creates a possibility of criminal prosecution"). Plaintiffs also contend that because Arconic is not a French company, Arconic is not subject to the FBS. (ECF 99 at 1). The Expert Report disagrees; it concludes that "the criteria for applying the FBS do not turn on the nationality of the litigant, but rather on the site of the evidence sought." (Expert Report ¶ 75.)

[13] The Court's consideration of the amicus brief and the Expert Report in assessing France's interest is appropriate because, as recognized by the Supreme Court "in ascertaining foreign law, courts are not limited to materials submitted by the parties; instead, they 'may consider any relevant material or source." Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd., 138 S. Ct. 1865, 1873 (2018).

Sherman Act"). Here, by contrast, the United States' interest does not involve federal antitrust statutes; the interest that Plaintiffs seek to vindicate arises under Pennsylvania tort law.

Another national interest that has been recognized as an interest that favors production under this factor is the interest in "protecting [United States] citizens from harmful products." Ney v. Owens-Ill., Inc., Civil Action No. 16-2408, 2016 WL 7116015, at *5 (E.D. Pa. Dec. 6, 2016) (Rueter, M.J.). But here the decedents were citizens or residents of the United Kingdom, not the United States, which may undermine this asserted United States interest. To the extent the United States has a national interest, it is an interest in "fully and fairly adjudicating matters before its courts." Minpeco, 116 F.R.D. at 524.

In sum, the Court finds that the interest of France in the use of the Hague Convention outweighs the interest of this Court in immediately compelling production under the Federal Rules of Civil Procedure. The interest of France as described in the Expert Report and in France's Aerospatiale amicus brief is important and deserving of respect. This importance to France is not outweighed by the interest in ensuring that United States companies are held responsible for their actions in our courts or in adjudicating matters. Therefore, the fifth Aerospatiale factor weighs heavily in favor of utilizing Hague procedures.

### B. General Comity Discussion

The Supreme Court recognized in Aerospatiale "the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation." 482 U.S. at 546. Analysis of the Aerospatiale factors reveals that those comity "demands" justify requiring Plaintiffs to go through the Hague Convention for the AAP SAS documents they seek.

Justice Ginsburg, writing for the Court in another case involving cross-border discovery, observed that "comity … concerns may be important as touchstones for a district court's exercise

of discretion in particular cases." Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 261 (2004). There are many unique aspects of the AAP SAS discovery dispute that implicate comity here. For example, AAP SAS—the company that is responsible for producing the disputed documents—is not a litigant before the Court. Moreover, recent legal developments discussed in the Expert Report confirm that France is committed to ensuring citizens and companies respect the terms of the FBS. (Expert Report ¶¶ 44–49.) Additionally, the location of some of the documents on United States servers implicates an intersection between well-settled judicial doctrine on discovery and the capabilities of modern technology. Finally, the recently published Gauvain Report,[14] which was submitted to the French Prime Minister, demonstrates that at least some French officials are interested in reinvigorating the FBS. It is unknown what result, if any, the Gauvain Report will have, but considered against a backdrop of other actions that demonstrate France's commitment to the FBS, the Gauvain Report provides yet another reason to defer to the Hague Convention. All of these considerations support prioritizing comity in this case.

The guidance of the Sedona Conference, which was discussed in the Court's previous Memorandum on the FBS, confirms that deferring to the Hague Convention is the best result. That guidance states as follows:

> **Principle 1**
> With regard to data that is subject to preservation, disclosure, or discovery in a U.S. legal proceeding, courts and parties should demonstrate due respect to the Data Protection Laws of any foreign sovereign and the interests of any person who is subject to or benefits from such laws.

---

[14] The Expert Report explains that the Gauvain Report "recommends modernizing the FBS in order to strengthen its application." (Expert Report ¶ 49 n.45.)

17

>**Principle 2**
>Where full compliance with both Data Protection Laws and preservation, disclosure, and discovery obligations presents a conflict, a party's conduct should be judged by a court or data protection authority under a standard of good faith and reasonableness.
>
>**Principle 3**
>Preservation, disclosure and discovery of Protected Data should be limited in scope to that which is relevant and necessary to support any party's claim or defense in order to minimize conflicts of law and impact on the Data Subject.

Sedona Conference Traditional and Rationally-Issued Principles on Discovery Disclosure and Data Protection (Transitional Edition, Jan. 2017).

In summary, the Supreme Court's rejection of exclusive adherence to the Hague Convention in Aerospatiale does not mean that these procedures are entirely irrelevant. To the contrary, the Hague Convention was "adopted by the President and approved by a unanimous vote of the Senate in 1972." Automotive Refinishing, 358 F.3d at 306 (Roth, J., concurring). This means that the Hague Convention coexists with the discovery rules in the Federal Rules of Civil Procedure—it is not inferior nor is it superior. Id. In an appropriate case—that is, a case where the balance of the Aerospatiale factors favors the Hague Convention—a court may require that a party in United States litigation seek discovery through the Hague Convention. For the reasons detailed in this Memorandum, the Court concludes that this is such a case.

## VI.    Conclusion

On balance, the five Aerospatiale factors favor use of the Hague Convention. The Court takes seriously the concept of comity as it applies in this case and finds that it requires deference to the procedures of the Hague Convention. Therefore, Plaintiffs must first utilize the Hague Convention processes to obtain the AAP SAS documents they seek.[15]

---

[15] At the hearing on March 11, 2020, the Court clearly stated that if the Hague Convention procedures do not result in complete production of the documents that are located in France, Plaintiffs are welcome to seek further relief in this Court.

18

An appropriate order follows.

O:\CIVIL 19\19-2664 Behrens v Arconic\19cv2664 Memorandum re FBS Discovery Dispute.doc