**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KRISTEN BEHRENS, ESQ.,** as Administratrix, et al.<br><br>      **v.**<br><br>**ARCONIC, INC.,** et al. | **CIVIL ACTION**<br><br>**NO. 19-2664** |

**MEMORANDUM RE: DEFENDANTS' MOTION TO DISMISS**
**FOR FORUM NON CONVENIENS**

**Baylson, J.**                                              **September 16, 2020**

### TABLE OF CONTENTS

I.   Introduction ........................................................................................................ 3

II.  Factual Background: The Grenfell Tower, the Fire, and the Aftermath ............... 5
   A.  The Grenfell Tower and Refurbishment ....................................................... 5
   B.  June 14, 2017 Grenfell Tower Fire ............................................................... 6
   C.  The Public Inquiry ....................................................................................... 7
   D.  Grenfell Litigation in the UK ....................................................................... 8

III. Overview of Behrens Litigation ......................................................................... 9
   A.  The Complaint ............................................................................................. 9
   B.  Theories of Liability .................................................................................... 11
   C.  Prior Procedural History .............................................................................. 14

IV.  *Forum Non Conveniens* Discovery, Briefing, and Argument ............................. 15
   A.  FNC Discovery ............................................................................................ 15
      1.  FNC Discovery From Arconic ................................................................ 17
         a.  Arconic's Corporate Structure and the BCS Reporting Chain............ 21
         b.  Arconic's Control Over AAP SAS's Capital Expenditures ................. 22
         c.  Post-Fire Behavior of Arconic, Inc. ................................................... 22
      2.  FNC Discovery From Whirlpool .............................................................. 23
   B.  FNC Briefing ............................................................................................... 23
   C.  FNC Argument ............................................................................................ 24

V.   Expert Evidence ................................................................................................ 25
   A.  Defendants' Experts .................................................................................... 25
      1.  Declaration of Andrew Prynne, QC ........................................................ 25
      2.  Declaration of Paul Darling, QC ............................................................ 27
      3.  Affidavit of Professor Adrian Briggs ...................................................... 28
   B.  Plaintiffs' Experts ....................................................................................... 28
      1.  Declaration of Professor Dan Sarooshi, QC (UK Expert)........................ 28

2. Declaration of Phillippa Kaufmann, QC (UK Expert) ............................................ 29
3. Declaration of Joel Donovan, QC (UK Expert) ................................................... 30
4. Report of Manny D. Pokotilow, Esq. (US Expert) .............................................. 30
5. Report of Mary Frantz (US Expert) ................................................................... 31
6. Report of Professor Kenneth Lehn, Ph.D (US Expert) ........................................ 31

VI. Legal Standard ........................................................................................................ 32

VII. Discussion ................................................................................................................ 34
    A. *Forum Non Conveniens* Analysis .......................................................................... 34
        1. Availability of Adequate Alternative Forum ................................................... 35
            a. Defendants Are Amenable to Process in England: Conditions on Dismissal ..... 36
            b. Plaintiffs' Claims are Cognizable ........................................................ 38
            c. Differences Do Not Render English Courts Inadequate ........................... 38
                i. Differences in Discovery ................................................................ 38
                ii. Differences in Damages and Punitive Damages ................................ 40
        2. Amount of Deference to Accord Plaintiffs' Choice of Forum ............................ 46
        3. Private and Public Interest Factors ................................................................ 49
            a. Relative Ease of Access to Sources of Proof (Private Interest) ...................... 49
                i. US-Based Evidence ...................................................................... 50
                ii. UK-Based Evidence .................................................................... 52
            b. Availability of and Cost of Obtaining Witnesses (Private Interest) ................. 56
            c. View of Premises (Private Interest) .......................................................... 62
            d. Other Practical Problems (Private Interest) ................................................ 63
                i. Absent Third-Parties ..................................................................... 63
                ii. The Timeline for the Public Inquiry ............................................... 69
                iii. Parallel Civil Litigation in the UK ................................................ 71
            e. Administrative Difficulties (Public Interest) ............................................... 73
            f. Local Interest (Public Interest) ................................................................ 73
            g. Issues With Regard to Choice of Law (Public Interest) ................................ 80
            h. Jury Duty (Public Interest) ..................................................................... 84
        4. FNC Discovery In This Court ...................................................................... 85
    B. Summary of *Forum Non Conveniens* Analysis .......................................................... 91
    C. Dismissal Is Consistent with Outcomes in Leading International Accident Cases ..... 93
        1. Piper .......................................................................................................... 93
        2. Other Leading International Accident Cases ................................................... 96
    D. Whirlpool and the Possibility of Severance ............................................................ 99

VIII. Conclusion ............................................................................................................. 101

## I.      Introduction[1]

In the early morning hours of June 14, 2017, a fire was sparked in Flat 16 of the Grenfell Tower, a high-rise apartment building in West London.  The fire started in a fridge-freezer located in the kitchen of Flat 16.  Kitchen fires are not uncommon, and this fire should have been contained within the apartment.  Firefighters responded quickly and extinguished the flames in Flat 16 within minutes.  Unfortunately, by that time the fire had already escaped and reached the combustible cladding that covered the outer façade of the entire Tower.  Once the fire was established in the cladding, it quickly raced up the east side of the building and got to the roof.  The flames then spread down and back up the outer walls of the structure.  In under three hours, the entire Grenfell Tower was engulfed in flames.

Seventy-one people perished in the Grenfell Tower fire the night of June 14, 2017.  An additional resident who escaped the fire and suffered from smoke inhalation died months later.  Hundreds of residents and visitors present in the Tower the night of the fire experienced profound physical, psychological, and emotional injuries.  The fire burned for more than sixty hours before firefighters were able to completely extinguish the flames.  When the fire finally stopped burning and the sprawling damage was assessed, it was determined that the fire at the Grenfell Tower was Britain's deadliest residential fire since World War II.

Public outcry was swift.  The morning after the fire, then-Prime Minister Theresa May commissioned a Public Inquiry to investigate the fire and its causes.  The Public Inquiry, which is chaired by Sir Martin Moore-Bick, divided its work into two phases.  Phase 1 was completed in October 2019 and examined the events that occurred the night of June 14, 2017.  Phase 2 is

---

[1] The following narrative is drawn from the Phase 1 Report published by the Public Inquiry on October 30, 2019.  (ECF 74.)

currently underway and will focus on the decisions that led to the installation of highly combustible cladding on the Grenfell Tower. The Public Inquiry has proceeded in parallel with criminal investigations conducted by the Metropolitan Police Service ("MPS").

Civil complaints arising out of the Grenfell Tower fire have also been filed—both in the United States and in the United Kingdom. This case is a products liability action brought by the estates of sixty-nine individuals who perished in the Grenfell Tower fire and 177 injured survivors (both individuals who experienced injuries as a result of the fire and individuals whose spouses lost their lives in the fire). Plaintiffs allege that various American companies—Arconic, Inc. (formerly Alcoa Inc.); Arconic Architectural Products, LLC; and Whirlpool Corporation (collectively, "Defendants")—supplied defective products to the Grenfell Tower that exacerbated the severity of the fire. Plaintiffs seek compensatory and punitive damages under Pennsylvania law.

Before this Court is Defendants' Motion to Dismiss for *Forum Non Conveniens* (or "FNC").[2] Defendants argue this case should be dismissed and should instead be litigated in the United Kingdom (or "UK"),[3] which is where the fire occurred, where the Plaintiffs resided, where a large trove of the relevant evidence and witnesses are located, and where personal injury actions have been and will be filed against other potentially responsible parties. Plaintiffs resist dismissal for FNC, arguing that this case should be litigated here because, among other reasons,

---

[2] The doctrine of *forum non conveniens* permits dismissal where "the forum chosen by the plaintiff is so completely inappropriate and inconvenient that it is better to stop the litigation in the place where brought and let it start all over again somewhere else." Norwood v. Kirkpatrick, 349 U.S. 29, 31 (1955) (internal quotation marks and citation omitted).

[3] References to the courts of the UK are to English courts. The UK legal system comprises courts in England & Wales, Scotland, and Northern Ireland. Litigation related to the Grenfell Tower has been filed in English courts that are located in London, which is where the fire occurred. (ECF 202, Defs' Supp. Mem. at 1 n.1.)

Pennsylvania and the United States have an interest in punishing and deterring the tortious corporate conduct of American companies. The parties have exhaustively, and admirably, litigated this difficult and complex motion.

From the outset of this case, Plaintiffs have been given considerable leeway in securing discovery that is relevant to *forum non conveniens*. The Court has thoroughly reviewed the evidence that was produced during FNC discovery and considered all of the arguments made by the parties in the extensive FNC briefing and at oral argument. For the reasons that follow, the Court concludes that the UK is the proper forum to adjudicate Plaintiffs' claims. Therefore, Defendants' Motion to Dismiss for *Forum Non Conveniens* will be **granted** subject to specific conditions and Plaintiffs' Complaint will be **dismissed** without prejudice.

## II.    Factual Background: The Grenfell Tower, the Fire, and the Aftermath[4]

### A.    The Grenfell Tower and Refurbishment

The Grenfell Tower, which was built in 1974, stands at over 220 feet tall. (ECF 74, Phase 1 Report ("P1R") ¶¶ 3.1; 3.9.) The Grenfell Tower is owned by the Royal Borough of Kensington and Chelsea ("RBKC") and managed by the RBKC Tenant Management Organization ("TMO"). (Id. ¶¶ 3.1; 3.8.) Most of the residential flats in the Grenfell Tower were occupied by participants in the RBKC's social housing program. (Id. ¶ 3.6.) Some of these tenants had grown up in North Kensington and others came to Britain as refugees. (Id. ¶ 3.7.)

The Grenfell Tower underwent a significant refurbishment from 2012–2016. The client for the refurbishment was the TMO, and the funds were provided by the RBKC. (Id. ¶ 6.4.) The

---

[4] The factual background is drawn from Plaintiffs' Complaint as well as various exhibits submitted by the parties in this litigation. See, e.g., In re Air Crash Over S. Indian Ocean, 352 F. Supp. 3d 19, 24 n.3 (D.D.C. 2018) (noting that a court considering a *forum non conveniens* motion may consider not only the allegations in the complaint, but all filings before it).

architect for the main refurbishment was Studio E.  (Id. ¶ 6.3.)  Rydon Maintenance Limited ("Rydon") was appointed as the "design and build contractor" for the project.  (Id.)  The cladding subcontractor to Rydon was Harley Facades Ltd ("Harley").  (Id. ¶ 6.2.)  CEP Architectural Facades Ltd ("CEP") was the fabricator for the refurbishment, and as fabricator CEP was responsible for cutting and shaping the aluminum sheets used for the cladding into the specifications provided by the architect.  (Id. ¶ 6.12.)  Exova provided specialist fire engineering services.  (Id. ¶ 6.3.)

One of the main components of the refurbishment program was the installation of a new rainscreen cladding system on floors four to twenty-three of the Tower.  (Id. ¶ 6.7.)  The rainscreen panels "were manufactured as plain sheets by [AAP SAS]" and were known as "'Reynobond 55 PE' Aluminum Composite Panels (ACP)."  (Id. ¶ 6.12.)  Each panel "consisted of a 3mm thick core of polyethylene bonded between two 0.5mm thick sheets of aluminum."  (Id.)  The aluminum panels were "fabricated into cassettes for use at Grenfell Tower by CEP."  (Id.)

Other changes that were part of the refurbishment included the installation of new insulation, specifically Celotex RS5000 polyisocyanurate (PIR) polymer foam, (id. ¶ 6.17), new windows, (id. ¶ 6.24), and new window infill panels, (id. ¶ 6.29).

**B.    June 14, 2017 Grenfell Tower Fire**

At 12:54 AM on June 14, 2017, one of three tenants residing in Flat 16, which was on the fourth floor of the Grenfell Tower, called 999 to report a fire in the unit.  (Id. ¶ 10.15; ECF 1, Compl. ¶ 218.)  During the exchange with the control operator, the tenant reported that the fire was coming from the fridge.  (P1R ¶ 10.15.)  Although London Fire Brigade ("LFB") firefighters reached the Tower within five minutes of the call, they were not able to extinguish the fire before it broke out of the flat and reached the building's external cladding.  (P1R ¶ 10.22.)  Based on

photographs taken contemporaneously with the incident, it appears that the fire reached the cladding at around 1:14 AM.  (Compl. ¶ 282.)  Within twelve minutes of reaching the external façade, the fire had travelled up nineteen floors.  (Compl. ¶ 285.)

As the fire was spreading up and down the Grenfell Tower, numerous residents called 999 for assistance.  These residents were told to "stay put" in their flats.  The stay put strategy is a standard procedure when fires break out in high-rise residential buildings.  (P1R ¶ 4.1.)  This strategy is based on the design principle of "compartmentation," which involves "creating within the building a series of self-contained living spaces (usually individual flats) which are separated from all other similar spaces and from the common parts by fire-resisting barriers (walls, floor and ceiling), so that if a fire breaks out within one space it can be contained within that space for long enough to enable the fire and rescue service to extinguish it before it spreads to other parts of the building."  (Id. ¶ 4.2.)  In the case of the Grenfell Tower fire, the "stay put" advice was not revoked until after 2:30 AM.  (Id. ¶ 2.11.)

A total of 227 people escaped from the Tower the night of the fire.  (Id. ¶ 1.3.)  Seventy-one people lost their lives, and an additional resident who escaped died months later.  (Id.)

## C.    The Public Inquiry

The day after the fire, then-Prime Minister Theresa May established a Public Inquiry pursuant to the Inquiries Act 2005 to investigate the cause and origin of the Grenfell Tower fire.  (Id. ¶ 1.4.)  The Public Inquiry was split into two phases.

**Phase 1.**  Phase 1, which was completed in October 2019, identified "exactly how the fire started, how it escaped from the flat of origin and how fire and smoke was able to spread throughout the building in a manner and at a speed that prevented many people from escaping, despite the prompt attendance of the emergency services" and examined "the response of the

emergency services" the night of the fire.  (Id. ¶ 1.7.)  The Phase 1 proceedings involved eighty-eight days of fact-finding, during which the Inquiry panel "heard evidence from many of those who had been directly involved in the fire or the circumstances surrounding it," including "former residents of the [T]ower who had survived the blaze, firefighters, control room officers and senior officers of the LFB, two officers of the MPS, . . . the Director of Operations of the London Ambulance Service (LAS), many of whose members attended to treat casualties, and employees of RBKC and the TMO."  (Id. ¶ 1.13.)

These proceedings culminated in the publication of a 787-page report.  The Phase 1 Report concludes that the fire was started by an electrical fault in the fridge-freezer in the kitchen of Flat 16, and that the principal reason the fire spread so rapidly was the composition of the Tower's external cladding which acted as fuel for the fire.  (Id. ¶¶ 2.12; 2.13(a).)

**Phase 2.**  Phase 2, which is ongoing, is designed to "ascertain the underlying causes of the disaster, including the decisions made in relation to critical aspects of the design and construction of the cladding system, the adequacy of the regulatory regime and the response of central and local government."  (Id. ¶ 1.7.)  Phase 2 will consider decisions relating to the design of the refurbishment and choice of materials, the regime for testing the materials for fire safety, the performance of fire doors in the Grenfell Tower, the warning of potential hazards given to the local community, and the adequacy of the response to the disaster.  (Id. ¶ 2.29.)

### D.      Grenfell Litigation in the UK

There have been at least nine personal injury lawsuits filed in the UK arising out of the Grenfell Tower fire.  (Defs' Supp. Mem. at 12.)  These lawsuits are brought by over one hundred plaintiffs against at least twelve entities, including the RBKC, the TMO, the London Fire Commissioner, Arconic Architectural Products SAS, Celotex Ltd., CEP, Exova, Harley, Rydon,

and Studio E.  (Id. at 12–13.)  However, none of the Defendants in this case have been sued in the

UK.  (Id. at 12.)

Additionally, several prospective defendants (though none of the Defendants in this case)[5]

have signed standstill agreements with putative plaintiffs in the UK.  (Id. at 14.)  According to

Defendants, 117 of the Plaintiffs in this lawsuit are represented by the UK counsel who negotiated

the standstill agreements.  (Id. at 14 n.4.)  Once those standstill agreements expire, litigation will

be filed.  Therefore, it is likely that more Grenfell personal injury cases will be filed in the UK

(and the new actions will likely include some of the Plaintiffs in this case).

## III.   Overview of Behrens Litigation

On June 6, 2019, Plaintiffs filed their Complaint against Defendants in the Court of

Common Pleas of Philadelphia County.  (ECF 1, Ex. 1 at 417.)  On June 19, 2019, Defendants

removed Plaintiffs' lawsuit to this Court on the basis of diversity jurisdiction.  (ECF 1.)

### A.   The Complaint

**Plaintiffs** include the following: the estates of sixty-nine of the individuals who perished

in the Grenfell Tower fire, represented by Kristen Behrens;[6] individuals who were injured in the

fire;[7] and individuals whose spouses lost their lives in the fire (the "Consortium Plaintiffs").[8]  All

---

[5] Plaintiffs criticize Defendants for refusing to agree to standstill agreements.  (ECF 210, Pls' Opp'n at 83.)  However, the standstill correspondence is directed to "Arconic Architectural Product SAS," (ECF 212-9 at 5), and to "Whirlpool Financial Corporation International," (id. at 26).  Neither of these entities are Defendants in this action.

[6] The names of the individuals whose estates Behrens has been appointed to represent are listed in paragraph 27 of the Complaint.  Exhibit A to the Complaint consists of the letters of administration appointing Behrens as the Administratix of the estates of the sixty-nine individuals listed in paragraph 27.

[7] The names of these Plaintiffs are listed in paragraphs 385–556 of the Complaint.

[8] The names of these Plaintiffs are listed in paragraph 557 of the Complaint.

of the Plaintiffs are UK residents or were UK residents at the time of their death.  Some of these Plaintiffs are represented separately by UK counsel in litigation that has been or will be filed in England.

The Defendants are Whirlpool and Arconic.[9]

**Whirlpool.**   Defendant Whirlpool Corporation ("Whirlpool") maintains its corporate headquarters in Benton Harbor, Michigan and is registered to do business in Pennsylvania.  In 2014, Whirlpool acquired the company that allegedly manufactured the fridge-freezer that initially started the Grenfell Tower fire.

**Arconic.**   There are three entities associated with the Arconic family that are Defendants in this action: Arconic, Inc.; Alcoa Inc.; and Arconic Architectural Products, LLC ("AAP LLC").[10] Defendant Arconic, Inc. (formerly Alcoa Inc.) is the parent company of a number of entities that manufacture a variety of products including cladding for the external façade of buildings.  Arconic, Inc. has its corporate headquarters in Pittsburgh, Pennsylvania.  (Compl. ¶¶ 150.)  There are two Arconic, Inc. subsidiaries that are relevant to this litigation: Defendant AAP LLC, which has its main facility in Eastman, Georgia,[11] and non-party Arconic Architectural Products SAS ("AAP SAS"), which has its main facility in Merxheim, France.   Both AAP LLC and AAP SAS manufacture versions of cladding, though it appears that AAP SAS manufactured, in France, the specific cladding that was used on the Grenfell Tower.  The cladding is important to this litigation

---

[9] Plaintiffs originally sued a third defendant, Saint-Gobain Corporation.   Saint-Gobain was voluntarily dismissed by Plaintiffs pursuant to Federal Rule of Civil Procedure 41.  (ECF 156.)

[10] The parties and the Court have collectively referred to these Defendants as "Arconic" or "Arconic US" or the "Arconic Defendants."  This Memorandum follows that convention and will distinguish between the various Arconic Defendants only when the distinction is relevant.

[11] Defendants state that AAP LLC is incorporated in Delaware and headquartered in Georgia. (ECF 49-1, Defs' Rule 12 Mot. to Dismiss at 39 n.23.)

because the particular version that was supplied to the Tower was highly flammable and allegedly contributed to the severity and rapid spread of the fire.

The crux of Plaintiffs' Complaint is that "[e]ach Defendant chose to supply the United Kingdom and/or specifically the Grenfell Tower with the cheaper, highly flammable versions of their respective products in order to achieve higher profits." (Compl. ¶ 303.)  In their 143-count Complaint, Plaintiffs state the following claims to relief:

- **Count I:** Products Liability, asserted by Plaintiffs against the Arconic Defendants;

- **Count II:** Products Liability, asserted by Plaintiffs against Whirlpool;

- **Count III:** Products Liability, asserted by Plaintiffs against Saint-Gobain;

- **Counts IV through CXLI:** Claims brought by Behrens on behalf of the estates she represents for violations of the Wrongful Death Act and the Survival Act, asserted against Defendants;

- **Count CXLII:** Loss of Consortium, asserted by the Consortium Plaintiffs against Defendants; and

- **Count CXLIII:** Punitive Damages, asserted by Plaintiffs against Defendants.

## B.      Theories of Liability

This subsection contains a summary of the tortious conduct allegedly committed by each Defendant and Plaintiffs' primary theories of liability.

**Whirlpool and the Fridge-Freezer.**  Plaintiffs allege that the Grenfell Tower fire "began when a Whirlpool fridge-freezer, model number FF175BP . . . malfunctioned causing its plastic backing to ignite." (Compl. ¶ 6.)  According to Plaintiffs, Whirlpool's "defective and dangerous crimp connector, JDG/6B" caused "the energized wire within the subject Fridge-Freezer's compressor relay compartment [to] overheat[] and ignite[]." (Compl. ¶ 243.)  Plaintiffs allege that

the fire escaped the compressor relay compartment as a "direct result" of "highly flammable plastic casing" used on the rear of the fridge-freezer. (Compl. ¶ 247.)

The fridge-freezer in question had been manufactured and sold by Indesit Company in 2008 under the brand name "Hotpoint." (Compl. ¶¶ 181–82; 228.)  Whirlpool acquired Indesit Company in 2014. (Compl. ¶ 182.)  Plaintiffs allege that "[t]hrough proper due diligence, Defendant Whirlpool did or should have become aware of the numerous prior incidents with Hotpoint products, including the Model FF175BP fridge-freezer at issue in this case." (Compl. ¶ 183.)  According to Plaintiffs, Whirlpool had "direct knowledge" that this fridge-freezer "was susceptible to causing fires" because there were five reported fires involving the product between 2011 and 2015. (Compl. ¶¶ 369; 370 .)  Despite this knowledge, Whirlpool failed to take corrective action and/or warn customers of the danger associated with their product. (Compl. ¶¶ 372; 376.)

To the extent Whirlpool did not commit these tortious acts, Whirlpool was "acting by and through its agents, servants, and/or employees, who were acting within the course and scope of their agency, service and/or employment." (Compl. ¶ 188.)  The decisionmaking related to the fridge-freezer allegedly occurred at Whirlpool's corporate headquarters in Michigan. (Compl. ¶ 306.)

In summary, Plaintiffs are pursuing two theories of liability against Whirlpool: (1) a theory of successor liability based on Whirlpool's acquisition of Indesit Company; and (2) a theory of strict products liability based on the allegedly defective fridge-freezer. (Pls' Opp'n at 8.)

**Arconic and the Reynobond PE Cladding.**  Plaintiffs allege that the Grenfell Tower fire "was dramatically exacerbated by the [T]ower's external cladding, the exposed core of which was polyethylene, a highly flammable and combustible material." (Compl. ¶ 7.)  According to Plaintiffs, Arconic and/or its "subsidiaries, sister corporations, predecessor entities, and/or

successor entities" "designed, manufactured, conceived and/or sold" the cladding to the Grenfell Tower, which is known as "Reynobond PE." (Compl. ¶ 9.) Because of its "highly flammable polyethylene core and insulation," Reynobond PE cladding should not be used in buildings that exceed forty feet—the maximum reach of a firefighter's ladder. (Compl. ¶ 310.) In the United States, Reynobond PE is not permitted on buildings that exceed forty feet in height. (Compl. ¶ 331.)

The Grenfell Tower stood at approximately 220 feet—well above the forty-foot threshold at which Reynobond PE is safe to use. (Compl. ¶ 313.) Plaintiffs allege that Arconic had "direct knowledge" that the Grenfell Tower exceeded forty feet in height and was therefore "wholly unfit" to be covered in Reynobond PE cladding. (Compl. ¶¶ 315; 317.) They further allege that Arconic's employees and agents in the United States (and in Pennsylvania specifically) were aware of the specifics of the Grenfell purchase (including the product to be supplied and the necessary quantity), (Compl. ¶¶ 319–321), but nonetheless "provided the defective Reynobond PE cladding to the Tower," (Compl. ¶ 329). Arconic allegedly makes a more fire resistant version of the Reynobond product, known as Reynobond FR, but decided not to use that product for the Grenfell Tower in order to reduce expenses and increase profits. (Compl. ¶ 15.)

Although not identified in the Complaint or named as a Defendant, Arconic's French subsidiary AAP SAS is crucial to this case and to Plaintiffs' theories of Arconic's liability. According to Arconic, AAP SAS was the actual supplier of the Reynobond PE that was used on the Grenfell Tower. This is supported by the purchase order for the Grenfell Tower Reynobond PE,[12] (ECF 51-3 at 63–73), and by defense declarant Kevin Juedeman, who explains that since at

---

[12] Before Reynobond PE can be installed on a building, a fabricator cuts the raw Reynobond PE sheets into the sizes and shapes requested by the architect. (ECF 51-6 ¶ 4.) The fabricated panels

least 2001 AAP SAS in France has been solely responsible for manufacturing the version of Reynobond PE that was installed on the Grenfell Tower and for marketing the product in the United Kingdom, (ECF 51-6 ¶ 6).

Plaintiffs allege that "the decisions made by the Arconic Defendants to knowingly supply the flammable Reynobond PE cladding to the Tower were orchestrated, made and carried out through the Arconic Defendants' headquarters in Pittsburgh, Pennsylvania and . . . in defiance of the safety information learned by the US testing of its product."  (Compl. ¶ 333.)  To the extent Arconic did not directly commit the allegedly tortious acts, the acts were committed by Arconic's "agents, servants, and/or employees, who were acting within the course and scope of their agency," (Compl. ¶¶ 151; 155; 159), or were committed by "sister companies, subsidiaries, parent companies and/or [otherwise related entities acting] . . . at the direction and command of, and under the supervision of, the American-based Arconic Defendants," (Compl. ¶ 165).

In summary, Plaintiffs are pursuing two theories of liability against Arconic: (1) a theory of strict products liability for Arconic, Inc.'s defective design of Reynobond PE; and (2) an agency theory based on Arconic, Inc.'s control over the manufacture and sale of Reynobond PE by AAP SAS for installation on the Grenfell Tower.  (Pls' Opp'n at 7–8.)

As the subsections that follow will demonstrate, Plaintiffs view Arconic as the primary cause of the harm, and Arconic therefore has been the main protagonist in this litigation.

## C.    Prior Procedural History

After Defendants removed this case to federal court, they filed two motions: a Motion to Dismiss pursuant to various subsections of Federal Rule of Civil Procedure 12 (the "Rule 12

---

are then installed on the external façade of the building.  (Id.)  The fabricator for the Grenfell Tower refurbishment was CEP, which is presumably why CEP is listed on the purchase order.

Motion"), (ECF 49), and a Motion to Dismiss for *Forum Non Conveniens* (the "FNC Motion" or the "Motion to Dismiss for FNC"), (ECF 50).  Defendants filed a joint appendix that contained fifty-two exhibits in support of the motions.  (ECF 51.)

Because Defendants' Rule 12 Motion raised legal issues implicating Pennsylvania law, the Court determined that it was appropriate to address that motion before the FNC Motion.  Following oral argument and briefing on the Rule 12 arguments, the Court concluded that Plaintiffs alleged sufficient facts to state claims against Defendants, that Defendants' foreign subsidiaries were not necessary parties under Rule 19, and that the Court had personal jurisdiction over Whirlpool.  The Court therefore denied Defendants' Rule 12 Motion in its entirety.  (ECF 104 (Memorandum); (ECF 105 (Order).)  Arconic and Whirlpool then each answered the allegations in the Complaint. (ECF 123 (Arconic's Answer); ECF 124 (Whirlpool's Answer).)

In the order denying Defendants' Rule 12 Motion, the Court directed that Plaintiffs and/or any Defendant could move for partial summary judgment on issues of corporate structure and/or Whirlpool's liability as a "successor" to Indesit Company.  (ECF 105.)  Saint-Gobain was the only party to file a Motion for Partial Summary Judgment, (ECF 115), but its Motion was mooted by Plaintiffs' voluntary dismissal of Saint-Gobain, (ECF 156).

With the Rule 12 Motion decided and the partial summary judgment motion resolved, the Court turned to Defendants' pending Motion to Dismiss for FNC.

## IV.   *Forum Non Conveniens* **Discovery, Briefing, and Argument**

### A.   **FNC Discovery**

The Court determined that limited discovery on Defendants' FNC Motion was necessary to gather information about the types and location of evidence that would be relevant to Plaintiffs' "cause[s] of action and to any potential defenses."  Van Cauwenberghe v. Biard, 486 U.S. 517,

528 (1988); see, e.g., Farmanfarmaian v. Gulf Oil Corp., 588 F.2d 880, 881 (2d Cir. 1978) (noting that the plaintiff was permitted to take discovery on *forum non conveniens*, "including efforts to assess whether relevant evidence and witnesses" were present in the United States); In re Bridgestone/Firestone, Inc. ATX, ATX II & Wilderness Tires Prods. Liab. Litig., 131 F. Supp. 2d 1027, 1030–31 (S.D. Ind. 2001) (permitting limited discovery on FNC but imposing limits on scope).

The vast majority of FNC discovery focused on Arconic. There were a number of disputes that required the Court's involvement because Arconic consistently opposed and resisted the scope that Plaintiffs sought. In resolving the numerous motions to compel discovery from Arconic, (ECF 52; ECF 143; ECF 184), the Court focused on allowing discovery that was relevant to topics and issues that bear on *forum non conveniens*, including the following: (1) Which witnesses will be relevant to Plaintiffs' claims and Defendants' defenses, and where they are located? (2) To what degree did Arconic US control AAP SAS, specifically AAP SAS's decisions regarding the design of Reynobond and the decision to supply the product to the Grenfell Tower? (3) Where is the evidence on corporate control located? (4) What is the connection between this dispute and the United States?

Because of the seriousness of the tragedy, the Court tended to allow most of the discovery Plaintiffs sought (provided there was a connection between the requested discovery and topics relevant to FNC), realizing that it might sometimes cross over into the merits. That Plaintiffs secured some evidence that they can use on the merits is not necessarily problematic. However, the Court's decision on the pending Motion is limited to the evidence that is relevant on *forum non conveniens*.

16

### 1.    FNC Discovery From Arconic

Early in the litigation, a dispute arose concerning Arconic's obligation to produce documents that were in the possession of AAP SAS, Arconic's French subsidiary.  These documents had been collected by AAP SAS's UK and French counsel, who worked in DLA Piper's UK and Paris offices.  (ECF 76 at 6.)  AAP SAS's UK and French counsel transferred the electronic documents to the US which is where DLA Piper's global server is hosted.[13]  (Id.)  Plaintiffs argued that the AAP SAS documents could be produced in this litigation since they were "located" in the US, but Arconic contended that the French Blocking Statute ("FBS")—which prohibits communication of economic, commercial, industrial, financial or technical documents for use in legal proceedings outside of France—prevented production since the documents were owned and controlled by a French company.  (ECF 106 at 4.)

The Court appointed Noëlle Lenoir, a former member of the French Constitutional Court with extensive expertise in French law and discovery issues,[14] to act as a master and expert and to prepare a report on how the French Blocking Statute applied to this dispute.  (ECF 106 (Memorandum); ECF 107 (Order).)  Following an exhaustive discussion of the FBS and its applicability to this case, Ms. Lenoir determined "that the fact that the requested documents are stored on the server of the law firm of Arconic in New York should not exempt Arconic from compliance with the FBS."  (ECF 142-1 ¶ 78.)  Ms. Lenoir recommended that Plaintiffs utilize the procedures of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial

---

[13] DLA Piper's Philadelphia office is one of the law firms representing Arconic in this case.

[14] The undersigned knows Ms. Lenoir from a joint appearance at Georgetown Law School celebrating the 75th anniversary of the Hague Convention and from speaking at a conference hosted by the Sedona Conference in Ireland about cross-border discovery.  (ECF 97, Nov. 25, 2019 Hr'g Tr. at 60:13–22.)

Matters (the "Hague Convention") to obtain the AAP SAS documents, and she opined that the third Hague Convention method (the appointment of a commissioner) would allow for timely production and also allow AAP SAS to comply with its FBS obligations.  (Id. ¶ 83.)

The Court applied the comity analysis set forth in Societe Nationale Industrielle Aerospatiale v. U.S. District Court for the Southern District of Iowa, 482 U.S. 522 (1987), to determine whether to require compliance with the Hague Convention.  (ECF 163.)  The Aerospatiale analysis was informed by the research and opinions included in the Expert Report.  (Id. at 7.)  The Court also considered principles that have been developed by the Sedona Conference to aid courts in navigating complex cross-border discovery disputes.  The Sedona guidance states as follows:

> **Principle 1**
> With regard to data that is subject to preservation, disclosure, or discovery in a U.S. legal proceeding, courts and parties should demonstrate due respect to the Data Protection Laws of any foreign sovereign and the interests of any person who is subject to or benefits from such laws.
>
> **Principle 2**
> Where full compliance with both Data Protection Laws and preservation, disclosure, and discovery obligations presents a conflict, a party's conduct should be judged by a court or data protection authority under a standard of good faith and reasonableness.
>
> **Principle 3**
> Preservation, disclosure and discovery of Protected Data should be limited in scope to that which is relevant and necessary to support any party's claim or defense in order to minimize conflicts of law and impact on the Data Subject.

Sedona Conference Traditional and Rationally-Issued Principles on Discovery Disclosure and Data Protection (Transitional Edition, Jan. 2017).

Ultimately, the Court approved Ms. Lenoir's recommendation and ordered Plaintiffs to utilize the procedures of the Hague Convention to obtain documents Arconic asserted were

protected by the FBS.  (ECF 164.)  Plaintiffs and Arconic agreed to utilize the third method under

the Hague Convention—appointment of a commissioner—and agreed to seek appointment of Ms.

Lenoir given her familiarity with the facts of this case.  A Request for International Judicial

Assistance, drafted in conformity with Hague Convention requirements, was submitted to the

French Ministry of Justice.  (ECF 175.)  The French Ministry of Justice authorized the appointment

of Ms. Lenoir as Commissioner on April 6, 2020.[15]

The Court determined that there were two independent categories of documents that were

responsive to the FNC issue:

> **Category 1**: All communications concerning the extent, if any, of
> involvement of U.S.-based Arconic officers, employees, or agents in the
> design, recommendation, implementation, and/or decisionmaking
> concerning the use of Reynobond PE in the Grenfell Tower building in
> London.

> **Category 2**: All communications relating to oversight, if any, exercised by
> U.S.-based Arconic officers, employees, or agents over AAP SAS.

(ECF 206 at 1–2.)

Commissioner Lenoir was responsible for reviewing the AAP SAS documents for

responsiveness to this scope of FNC discovery and for compliance with French law.  The collection

of documents reviewed by Commissioner Lenoir resulted from the application of search terms that

were agreed upon by the parties with some guidance by the Court.  (ECF 188; ECF 206.)  A total

of 43,303 documents were made available to Commissioner Lenoir by AAP SAS on the Relativity

platform used to facilitate her review.  Commissioner Lenoir completed her review on July 31,

2020.  She determined that of the documents that were produced, 3,118 were not relevant to the

---

[15] An amended Request for International Judicial Assistance was submitted to the French Ministry
of Justice.  (ECF 199.)  The amended request received authorization on July 20, 2020.

FNC issue as the scope was defined by the Court and certain others contained personal data that implicated the GDPR.

In addition to the AAP SAS discovery, Plaintiffs pursued and obtained discovery from Arconic in the United States. Plaintiffs obtained certain admissions from Arconic, including that all documents related to the original design of Reynobond PE are located in the US. (Pls' Opp'n at 12.) Discovery also demonstrated that the trademarks related to Reynobond PE are owned by Defendant Arconic, Inc., which is headquartered in Pennsylvania. (Id. at 14.)

However, the vast majority of the discovery centered on the extent to which Arconic officials and employees in the United States controlled Arconic's subsidiaries, specifically Arconic's French subsidiary AAP SAS, which is the entity that provided the Reynobond PE to the Grenfell Tower. The sections that follow summarize the most relevant control facts construed in the light most favorable to Plaintiffs. Undoubtedly, Arconic has a response to Plaintiffs' version of events, some of which is detailed in the thirty-seven page appendix Arconic attached to its reply. However, to resolve Defendants' FNC Motion, this Court will not make a final decision on these contested merits issues. See, e.g., Otto Candies, LLC v. Citigroup, Inc., 963 F.3d 1331, 1342 (11th Cir. 2020) (noting that on a motion to dismiss for *forum non conveniens*, the court should consider "whether the facts *as alleged* should be litigated in the United States" and should not wade into arguments on the merits); (see also Aug. 19, 2020 Hr'g Tr. at 24:3–4 ("I'm not deciding the merits.").)

### a.      Arconic's Corporate Structure and the BCS Reporting Chain

Prior to April 1, 2020,[16] Arconic's operations consisted of three groups: Engineered Products and Solutions; Transportation and Construction Solutions ("TCS"); and Global Rolled Products ("GRP").  (ECF 210-1 ¶ 6.)  The TCS group consisted of three units: Arconic Wheel and Transportation Products ("AWTP"); Building and Construction Systems ("BCS"); and Latin American Extrusions ("LAE").  (Id.)  BCS was comprised of two business segments: Architectural Systems, "which provides façade solutions under the Kawneer brand name;" and Architectural Products, frequently referred to as Arconic Architectural Products ("AAP"), "which markets and sells exterior and interior cladding and coil sheet products under the Reynobond and Reynolux brands."  (Id. ¶ 7.)  The only two companies under Architectural Products are AAP LLC, which has its manufacturing plant in Eastman, Georgia; and AAP SAS, which has its manufacturing plant in Merxheim, France.  (Id.)

The BCS group was led by Glen Morrison until May 2015, at which point Diana Perreiah assumed the role of BCS President.  (Pls' Opp'n at 31.)  Ms. Perreiah was deposed by Plaintiffs twice (for a total of nine hours) over the course of FNC discovery in this case.  Ms. Perreiah explained that the "center of gravity" for BCS's operations is in the United States, and in her role as BCS President she was officed here.  (June 10, 2020 Perreiah Dep. Tr. at 283:17.)  She confirmed that the "business leaders" of each BCS entity reported to her, so Claude Schmidt, the General Manager of AAP SAS at the time of the sale of Reynobond PE to the Grenfell Tower, would have been under her supervision.  (Id. at 25:3–8.)  Ms. Perreiah stated that her "oversight is

---

[16] On April 1, 2020, Arconic spun off certain of its businesses, including the BCS unit, into a new company, Arconic Corp.  (ECF 210-1 ¶ 6.)  Arconic, Inc. was renamed "Howmet Aerospace Inc." (Id.)  (See generally ECF 179 (Arconic, Inc. Amended Rule 7.1 Disclosure); ECF 180 (AAP LLC Amended Rule 7.1 Disclosure).)  The post-fire restructuring activities of Arconic are not relevant to Defendants' FNC Motion and are not discussed in this Memorandum.

limited to . . . financial performance of the business" and that she is "not responsible for all of the activities and responsibilities of each one of those businesses inside of BCS."  (Id. at 24:12–14; 24:21–23.)

### b.      Arconic's Control Over AAP SAS's Capital Expenditures

Ms. Perreiah testified that Arconic, Inc. controlled the budget of BCS (and therefore the budget of AAP SAS).  (Id. at 97:17–24; 98:2–13.)  One important piece of evidence in relation to Arconic's control over AAP SAS's budget is the Request for Authorization ("RFA") that was submitted by AAP SAS seeking approval from BCS managers in the United States to develop a more fire-retardant version of Reynobond PE known as "A2."  (Pls' Opp'n at 67.)  The A2 RFA describes a change in fire laws and a desire to shift to safer versions of the Reynobond product. (Id.)  The RFA was not approved by the necessary BCS managers in the US until well after Reynobond PE had been supplied to the Grenfell Tower. (Id. at 68.)  When the RFA was eventually approved, the approval was communicated by Arconic officials in the US to AAP SAS.  (Id. at 69.)

### c.      Post-Fire Behavior of Arconic, Inc.

The behavior of Arconic, Inc. following the fire demonstrates the degree of control it exercised over the Reynobond PE product, according to Plaintiffs.  They point to the press release issued by Arconic, Inc. shortly after the fire confirming that Reynobond PE had been supplied to the Grenfell Tower and announcing the decision to ban the sale of the product to high-rise buildings.  (Id. at 18–19.)  Plaintiffs emphasize the language of the press release stating that "Arconic supplied one of *our* products, Reynobond PE" to a fabricator who supplied it to the Grenfell Tower.  (Id. at 19 (emphasis added).)  Plaintiffs also identify a customer bulletin issued

eight months after the fire announcing that Arconic, Inc. would be banning the sale of Reynobond PE for all architectural applications (not just sales to high rise buildings). (Id. at 21.)

### 2.    FNC Discovery From Whirlpool

The discovery obtained from Whirlpool is far less in volume and far different in nature. The evidence related to Whirlpool focuses on whether it assumed the liabilities of Indesit, the Italian company that manufactured the fridge-freezer that sparked the fire. (Id. at 73.) According to Plaintiffs, the Share Purchase Agreement between Whirlpool and Indesit is located in the United States, as are witnesses with information relevant to the transaction. (Id. at 74.)

### B.    FNC Briefing

Defendants originally filed their Motion to Dismiss for *Forum Non Conveniens* on August 29, 2019. (ECF 50.) Because the Court determined that it would first resolve the Rule 12 Motion, the FNC briefing was delayed until the Rule 12 Motion was decided and Saint-Gobain's Motion for Partial Summary Judgment on the limited issue of corporate structure was resolved.

The initial briefing schedule directed that all FNC discovery would be completed by March 16, 2020, the final briefing on the FNC motion would be completed by April 13, 2020, and oral argument would be held on May 7, 2020. (ECF 127 ¶¶ 3–7.) This briefing schedule was informed, in part, by the fact that the statute of limitations for Plaintiffs' claims would run on June 14, 2020.

However, the COVID-19 pandemic and the Hague Convention proceedings discussed in subsection IV(A) caused significant delays in the resolution of the FNC Motion. These delays were not the fault of either party. The Court adjusted the original schedule, ordering that the final briefing would be completed by August 14, 2020 and that oral argument would be held on August 19, 2020. (ECF 211 ¶ 2 (Briefing Schedule);[17] ECF 195 (Notice of Hearing).)

---

[17] This briefing schedule amended a previous briefing schedule set forth in ECF 188 ¶ 8.

The parties have submitted extensive and voluminous briefing on the FNC Motion.  This briefing includes (A) Defendants' Motion to Dismiss for *Forum Non Conveniens*, (ECF 50); (B) Defendants' supplemental memorandum re FNC, (ECF 202); (C) Plaintiffs' response in opposition, (ECF 210); (D) Plaintiffs' supplemental memorandum re FNC discovery, (ECF 226); (E) Whirlpool's Reply, (ECF 227); (F) Arconic's Reply, (ECF 228), and (G) Plaintiffs' supplemental brief following the second deposition of Diana Perreiah, (ECF 231).  Some of this briefing was devoted to answering questions submitted to counsel in a letter dated July 30, 2020.

The merits briefing totals approximately 332 pages.  Hundreds more pages of supporting exhibits were submitted in connection with the parties' various FNC merits briefs.

## C.   FNC Argument

The Court held a three-hour oral argument regarding Defendants' FNC motion on August 19, 2020.  (ECF 232.)  Counsel for all parties attended the hearing in person, and approximately eighty individuals watched and listened to the hearing through a livestream.

The first half of the argument was a dialogue with the parties about specific questions that had been submitted in advance of the hearing.  During the second half of the argument, each party was permitted to make whatever points they felt had not been adequately covered.  The Court took the FNC Motion under advisement without permitting further supplemental briefing.[18]

---

[18] Because the Hague Convention production occurred close in time to the deadline for Plaintiffs' supplemental memorandum re FNC discovery, the Court gave Plaintiffs the opportunity to supplement their exhibits.  Plaintiffs' counsel declined, explaining that the majority of the documents that were recently produced "only enhance[d]" the arguments they made in their briefs. (ECF 233, Aug. 19, 2020 Hr'g Tr. at 98:3.)

## V.      Expert Evidence[19]

There have been a number of reports, declarations, and affidavits submitted by experts in connection with Defendants' Motion to Dismiss for FNC.  This section summarizes the expert evidence.

### A.      Defendants' Experts

Defendants submitted two declarations and one affidavit in support of their Motion to Dismiss for FNC: (1) the Declaration of Andrew Prynne, QC, (ECF 51-1);[20] (2) the Declaration of Paul Darling, QC, (ECF 51-2);[21] and (3) the Affidavit of Professor Adrian Briggs, (ECF 51-4).[22]

#### 1.      Declaration of Andrew Prynne, QC[23]

Andrew Prynne is a practicing barrister in England and Wales.  (ECF 51-1, Prynne Decl. ¶ 2.)  Prynne was retained to "provide expert evidence as to the English law and procedure relevant to tortious claims for product liability" insofar as they relate to the issues in this case.  (Id. ¶ 4.)

---

[19] A motion to dismiss based on *forum non conveniens* "may be resolved on affidavits presented by the parties."  Van Cauwenberghe, 486 U.S. at 529; see also Copia Commc'ns, LLC v. AMResorts, L.P., No. 16-5575, 2017 WL 4012687, at *8 (E.D. Pa. Sept. 11, 2017) (Baylson, J.) ("Courts often decide the issue of *forum non conveniens* based only on affidavits submitted by the parties").  Thus, this Court may consider these reports, declarations, and affidavits without converting the Motion to Dismiss for FNC into a Motion for Summary Judgment.

[20] As an exhibit to its Reply, Whirlpool submitted (on behalf of both Defendants) an additional declaration prepared by Prynne, (ECF 227-2), as did Arconic, (ECF 229-12).

[21] As an exhibit to its Reply, Whirlpool submitted (on behalf of both Defendants) an additional declaration prepared by Darling.  (ECF 227-4.)

[22] As an exhibit to its Reply, Whirlpool submitted (on behalf of both Defendants) an additional affidavit prepared by Briggs.  (ECF 227-3.)

[23] Prynne's declaration raises a number of questions regarding the effect of Britain's exit from the European Union.  Because the parties agree that Brexit is unlikely to affect Plaintiffs' ability to bring their claims in the UK, the Court will not analyze this issue.  (ECF 226, Pls' Supp. Mem. re FNC Discovery at 12; ECF 227, Whirlpool Reply at 18; ECF 228, Arconic Reply at 21.)

Prynne first summarizes the relevant substantive law.  The Consumer Protection Act 1987 ("CPA") "places no fault [i.e., strict] liability for any damage caused wholly or partly by a defect in a product" upon the producer, any entity who held itself out as the producer, or anyone who imported the product from outside the European Union to supply it in the course of business.  (Id. ¶¶ 17; 18.)  The Limitation Act 1980 provides the basic statute of limitations for claims brought under the CPA: three years from the date on which the cause of action accrued, which is the date the damage occurred or the date the claimant had knowledge.  (Id. ¶ 41.)  Section 33 of the Limitation Act permits a court to "disapply" the statute of limitations if warranted by the particular circumstances of the case.  (Id. ¶ 46.)  More specific regulations apply to electrical equipment, including the fridge freezer that allegedly started the fire.  (Id. ¶ 28.)  The relevant law for electrical equipment is the Electrical Equipment (Safety) Regulations 1994, which provides a civil cause of action against anyone who contravenes their obligation to provide safe equipment.  (Id. ¶¶ 28; 54.) The common law also recognizes the tort of negligence.  (Id. ¶ 69.)

Prynne next discusses the damages regime under the law of England and Wales.  There are two main categories of damages that may be relevant here: compensatory damages and exemplary damages.  Compensatory damages are intended to compensate the claimant for pecuniary and nonpecuniary losses.  (Id. ¶ 89.)  Exemplary damages are awarded "with the intent to deter a defendant from misconducting himself so as to cause harm."  (Id. ¶ 120.)  These damages may be awarded where the "conduct giving rise to the cause of action was calculated to result in profit which may exceed the compensation payable."  (Id. ¶ 122(b).)  According to Prynne, the term exemplary damages "could [be] substituted" with the term punitive damages.  (Id. ¶ 120.)

Prynne concludes his declaration by opining that England and Wales have a "mature body of substantive tort law" that would accommodate Plaintiffs' claims; that there is a "comprehensive

set of procedural rules and directions" that would ensure a fair resolution of this case; and that it is "inevitable" that other Grenfell-related proceedings will be brought in England so it is most efficient to resolve all claims in the courts of one country.  (Id. ¶¶ 204; 205; 207.)

### 2.    Declaration of Paul Darling, QC

Paul Darling is a practicing barrister with expertise in "construction and engineering litigation," including "property damage and fire cases."  (ECF 51-2, Darling Decl. ¶ 1.)

Darling's declaration provides general background on the Grenfell Tower Public Inquiry, (id. ¶¶ 18–28), the status of the MPS investigations, (id. ¶¶ 29–32), the various actors who were involved in the Grenfell Tower refurbishment, (id. ¶¶ 35–49), and the applicable building regulations, (id. ¶¶ 52–55).  He then describes the law applicable to contribution and opines that the Grenfell Tower fire litigation would "almost certain[ly] . . . give rise to a multi-party litigation." (Id. ¶ 70.)  According to Darling, the courts in England possess the expertise to competently handle this litigation and the various relevant parties.  (Id. ¶ 77.)

Darling next considers the volume of evidence that has been collected by the MPS (the MPS has removed roughly 14,500 physical samples from the Tower) and notes that parties litigating in England would be able to obtain this evidence more easily than parties litigating in the United States.  (Id. ¶¶ 80; 86–88.)

Finally, Darling explains that the Grenfell Tower fire, the events leading up to it, and the current government investigations are of "substantial public significance."  (Id. ¶ 89.)  Darling opines that determining the liability of the various parties for the roles they played in the Grenfell Tower fire will play a "real part" in the development of future regulation, which further supports litigating this case in the UK.  (Id. ¶ 92.)

### 3.      Affidavit of Professor Adrian Briggs

Adrian Briggs is a professor of private international law at the University of Oxford with expertise in conflict of laws.  (ECF 51-4, Briggs Affid. ¶¶ 1–2.)  Briggs was retained to "consider and explain the principles of choice of law which would be applied" if Plaintiffs' claims were brought in an English court.  (Id. ¶ 6.)

Briggs describes two choice of law provisions that may apply: the Rome II Regulation and the Private International Law (Miscellaneous Provisions) Act of 1995 ("PILA").  (Id. ¶¶ 9–25.)  According to Briggs' analysis, whether the Rome II Regulation or PILA provides the relevant rule, an English court presiding over this dispute would apply English law.  (Id. ¶ 32.)

### B.      Plaintiffs' Experts

Plaintiffs submitted three expert declarations and three expert reports in support of their opposition to Defendants' Motion to Dismiss for FNC: (1) the Declaration of Professor Dan Sarooshi, QC, (ECF 210-4); (2) the Declaration of Phillippa Kaufmann, QC, (ECF 210-6); (3) the Declaration of Joel Donovan, QC, (ECF 210-5);[24] (4) the Report of Manny D. Pokotilow, Esq., (ECF 210-2); (5) the Report of Mary Frantz, (ECF 210-3); and (6) the Report of Professor Kenneth Lehn, Ph.D., (ECF 210-1).

### 1.      Declaration of Professor Dan Sarooshi, QC (UK Expert)

Dan Sarooshi is a professor of public international law at the University of Oxford and a published author of numerous books and academic papers.  (ECF 210-4, Sarooshi Decl. ¶¶ 1–2.)  Sarooshi was asked to comment on whether litigating Plaintiffs' products liability claims in this Court would negatively impact the UK's regulatory or sovereign interests.  (Id. ¶¶ 5.)

---

[24] As an exhibit to their supplemental memorandum re FNC discovery, Plaintiffs submitted an additional declaration prepared by Donovan.  (ECF 226-4.)

In his declaration, Sarooshi opines that the UK's interests will not be harmed or otherwise negatively impacted by the adjudication of Plaintiffs' claims in Pennsylvania federal court. Sarooshi explains that there is no "interference" between this litigation and the Public Inquiry because the Inquiry "will be examining the tragedy from a different perspective and for a different purpose." (Id. ¶ 7.1.) Sarooshi posits that "the US proceedings may in fact further the administration of justice insofar as disclosure or testimony obtained in the US sheds further light on the causes of the tragedy and the steps that ought to be taken to prevent a similar tragedy from happening in [the] future." (Id.)

### 2.    Declaration of Phillippa Kaufmann, QC (UK Expert)

Phillippa Kaufmann is a practicing barrister with experience in inquiries conducted pursuant to the Inquiries Act 2005. (ECF 210-6, Kaufmann Decl. ¶¶ 1–2.) Kaufmann was asked to describe the general nature and operation of public inquiries and to address specific questions related to the Grenfell Tower Public Inquiry. (Id. ¶ 4.)

Kaufmann begins by explaining that the purpose of a public inquiry is to address three key questions: what happened; why did it happen and who is to blame; and what can be done to prevent a recurrence. (Id. ¶ 11.) Public inquiries are not concerned with apportioning civil or criminal liability. (Id. ¶ 12.) Kaufmann opines that the Inquiry is "a very different legal forum for the [Grenfell] victims than the adversarial discovery process common in US litigation." (Id. ¶ 44.)

According to Kaufmann, "the US litigation [does not] present[] any obstacle to the Grenfell Tower Fire Inquiry, nor does it interfere with it." (Id. ¶ 61.) Her conclusion is premised on the fact that "the Inquiry will not and cannot address the extent to which the US defendants bear any legal liability in connection with this tragedy." (Id. ¶ 62.) Kaufmann explains that the issues covered by the Inquiry are distinct from the question of Defendants' liability that is at issue in this

litigation, so there is no interference from allowing this case to proceed while the Public Inquiry continues its work.  (Id. ¶¶ 61; 63.)

### 3.  Declaration of Joel Donovan, QC (UK Expert)

Joel Donovan is a barrister in London who focuses his practice on personal injury and medical malpractice.  (ECF 210-5, Donovan Decl. ¶¶ 1–2.)  Donovan's declaration first discusses the likely availability of damages.  He opines that under England's damages regime, "there is no jurisdiction to award punitive/exemplary damages in fatal cases" and that for those who were "injured but not killed, general damages [will] depend on the severity of the burns or psychiatric trauma and the complexity and duration of their impacts."  (Id. ¶¶ 17; 19.)  Donovan states that injured survivors of the Grenfell Tower fire "have a potential entitlement to punitive/exemplary damages for negligence, but the relevant standard sets a high bar."  (Id. ¶ 22.)

Donovan concludes his declaration with his opinion that, "[a]lthough the victims of the Grenfell fire have the ability to assert claims against (at least some) Arconic and Whirlpool entities, practical considerations and limitations imposed by the UK legal system provide limited 'reward' for the plaintiffs who bring the claims and the attorneys who represent those plaintiffs.  These same considerations provide little financial deterrence for product designers, manufacturers or sellers who place their products into the UK marketplace."  (Id. ¶ 50.)

### 4.  Report of Manny D. Pokotilow, Esq. (US Expert)

Manny Pokotilow is an intellectual property attorney registered before the United States Patent and Trademark Office and a member of the Pennsylvania bar.  (ECF 210-2, Pokotilow Report at 1.)  Pokotilow's Report focuses on the "meaning and significance of a trademark in the use and marketing of products sold under the mark" and the relevance of these concepts to this case.  (Id. at 3.)

Pokotilow explains that Arconic, Inc. is "the owner of United States certificate of Registration No. 1,506,804 for the mark REYNOBOND for ALUMINUM COMPOSITE PANELS HAVING AN ALUMINUM SKIN AND A PLASTIC CORE FOR USE IN THE CONSTRUCTION INDUSTRY."  (Id. at 5.)  Arconic, Inc.'s French subsidiary AAP SAS manufactured and sold the cladding that was eventually installed on the Grenfell Tower under Arconic, Inc.'s "REYNOBOND" mark.  (Id.)  Because AAP SAS was not operating pursuant to a licensing agreement, but was instead using Arconic, Inc.'s REYNOBOND mark as a "related company," federal law required Arconic to "control the nature and quality of the products produced and sold by AAP SAS" using the REYNOBOND mark.  (Id. at 5–6.)

### 5.  Report of Mary Frantz (US Expert)

Mary Frantz is a cybersecurity and IT expert.  Frantz was tasked with summarizing the location of digital evidence relevant to this case and determining where that information is managed and controlled.  (ECF 210-3, Frantz Report at 3.)[25]

Frantz opines that "the systems that store the evidence, data and information related to this matter are located in the United States."  (Id. at 6.)

### 6.  Report of Professor Kenneth Lehn, Ph.D (US Expert)

Kenneth Lehn is a professor of finance at the University of Pittsburgh with expertise in various corporate topics including corporate ownership and control.  (ECF 210-1, Lehn Report ¶ 1.)  Lehn was retained "to assess whether, from an economics perspective, AAP LLC and AAP SAS operate as separate and independent entities from Arconic."  (Id. ¶ 11.)

---

[25] The pages of Frantz's Report are not numbered.  The pincite reference refers to the pagination of the PDF file on ECF.

Based on his review of Arconic's public filings and other corporate documents, Lehn concludes that "AAP LLC and AAP SAS were controlled by Arconic, through the BCS unit, and were acting as agents of Arconic." (<u>Id.</u> ¶ 14.) Lehn identified a number of considerations supporting his conclusion. First, in both public and internal communications, Arconic consistently acknowledged Reynobond PE was an Arconic product, not an AAP LLC or AAP SAS product. (<u>Id.</u> ¶ 21.) Second, AAP SAS did not "independently" market the Reynobond product and brand; instead, AAP SAS's marketing was "essentially identical and consistent to that of Arconic and Architectural Products." (<u>Id.</u> ¶ 25.) Third, the economic relationship between Arconic, Inc. and its subsidiaries indicates that Arconic, Inc. exerted control because AAP SAS did not have its own board of directors, it was not financially independent, and it was not recognized as a separate actor. (<u>Id.</u> ¶¶ 34–36.) Fourth, Arconic, Inc.—not AAP LLC or AAP SAS—exclusively owned the Reynobond trademarks and therefore controlled decisionmaking with regard to the Reynobond brand. (<u>Id.</u> ¶ 58.) Fifth, AAP LLC and AAP SAS used shared services provided by Arconic and BCS, which would be unusual for an independent company. (<u>Id.</u> ¶ 60.)

According to Lehn, these observations compel the conclusion that, "as a matter of economics, AAP SAS was not 'a separate French company' as of the time of the Grenfell Tower fire, but instead was controlled by Arconic." (<u>Id.</u> ¶ 75.)

## VI.   Legal Standard

*Forum non conveniens* is a common law doctrine that originated in Scotland, <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 248 n.13 (1981), and was designed as an "instrument of justice," <u>Williams v. Green Bay & W.R. Co.</u>, 326 U.S. 549, 554 (1946). The Supreme Court crystallized this doctrine in <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501 (1947), observing that plaintiffs' misuse of venue was a "very old [problem] affecting the administration of the courts as well as the rights

32

of litigants." Id. at 507; see also Dahl v. United Techs. Corp., 632 F.2d 1027, 1029 (3d Cir. 1980) ("Courts know from experience that the selection of a forum is sometimes dictated not only by the search for justice but the temptation of the plaintiff to resort to a strategy of forcing the trial at a most inconvenient place for an adversary, even at some inconvenience to himself." (internal quotation marks and citation omitted)).  At its core, *forum non conveniens* "is nothing more or less than a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined." Am. Dredging Co. v. Miller, 510 U.S. 443, 453 (1994).  These conditions include "the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 723 (1996).

Under the doctrine of *forum non conveniens*, "a federal district court may dismiss an action on the ground that a court abroad is the more appropriate and convenient forum for adjudicating the controversy."[26] Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 425 (2007).  If trial in the plaintiff's chosen forum would "establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience" or if "trial in the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems," dismissal on grounds of *forum non conveniens* may be appropriate. Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947).  "[T]he district court is accorded substantial flexibility in evaluating a *forum non conveniens* motion, . . . and each case turns on its facts." Van Cauwenberghe, 486 U.S. at 529 (internal quotation marks and citation omitted); see

---

[26] This case is brought under Pennsylvania state law and is in federal court on diversity jurisdiction. However, the Court will apply federal law on *forum non conveniens* because "Pennsylvania . . . law on *forum non conveniens* dismissals [is] virtually identical to federal law." Piper, 454 U.S. at 248 n.13; see also Rini v. N.Y. Cent. R.R. Co., 240 A.2d 372, 373–74 (Pa. 1968) (following federal FNC doctrine).

also Piper, 454 U.S. at 257 ("The *forum non conveniens* determination is committed to the sound discretion of the trial court."); Gulf Oil, 330 U.S. at 508 ("The [*forum non conveniens*] doctrine leaves much to the discretion of the court to which plaintiff resorts").

The *forum non conveniens* inquiry is malleable—the Supreme Court itself has recognized that the "flexibility" of the doctrine is one of the characteristics that "makes it so valuable." Piper, 454 U.S. at 250. Gulf Oil provides black letter law on the numerous factors that must be balanced to determine whether a case should be dismissed for FNC. But this list "is by no means exhaustive, and some factors may not be relevant in the context of a particular case." Van Cauwenberghe, 486 U.S. at 528–29; see also Gulf Oil, 330 U.S. at 508 ("Wisely, it has not been attempted to catalogue the circumstances which will justify or require either grant or denial of remedy."). Each case where *forum non conveniens* is implicated will have unique facts and considerations, and the way that any particular district court applies and balances the various factors is unlikely to be duplicated in future litigation. See id. ("[T]he combination and weight of factors requisite to given results are difficult to forecast or state"); Dowling v. Richardson-Merrell, Inc., 727 F.2d 608, 616 (6th Cir. 1984) ("Each application of the doctrine of *forum non conveniens* requires consideration of the factors shown to be relevant to the decision in the particular case.").

**VII.   Discussion**

    **A.**    ***Forum Non Conveniens* Analysis**

The Third Circuit has articulated a three-part test for analyzing *forum non conveniens* motions. *First*, the district court must "determine whether an adequate alternative forum can entertain the case." Windt v. Qwest Commc'ns Int'l, Inc., 529 F.3d 183, 189–190 (3d Cir. 2008). *Second*, "[i]f such a forum exists, the district court must . . . determine the appropriate amount of deference to be given the plaintiff's choice of forum." Id. at 190. *Third*, "the district court must

balance the relevant public and private interest factors."[27]  Id.  Defendants bear the burden of persuasion on each of these elements.  Lony v. E.I. Du Pont de Nemours & Co., 935 F.2d 604, 609 (3d Cir. 1991) ("Lony II").  The Court must "supply specific reasons and develop adequate facts to support its decision."  Lacey v. Cessna Aircraft Co., 862 F.2d 38, 43 (3d Cir. 1988) ("Lacey I").

### 1.    Availability of Adequate Alternative Forum

The first step in the *forum non conveniens* analysis is to determine whether an adequate alternative forum exists.  See Piper, 454 U.S. at 254 n.22 ("At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum.").  An alternative forum will usually be deemed adequate for purposes of *forum non conveniens* if the "defendants are amenable to process and [the] plaintiffs' claims are cognizable" in the other jurisdiction.  Kisano, 737 F.3d at 873.  In the "*rare circumstances . . .* where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative."  Piper, 454 U.S. at 254 n.22 (emphasis added).  An alternative forum may be inadequate where, for example, it lacks subject matter jurisdiction over the action, id., where the plaintiff "cannot access evidence essential to prove" her claims, Eurofins Pharma US Holdings v. BioAlliance Pharma SA, 623 F.3d 147, 161 n.14 (3d Cir. 2010), or where the plaintiff would face "profound and extreme" delay, Bhatnagar v. Surrendra Overseas Ltd., 52 F.3d 1220, 1228 (3d Cir. 1995).  However, "[i]nadequacy of the alternative forum is rarely a barrier to *forum non conveniens* dismissal."  Tech. Dev. Co., Ltd. v. Onischenko, 174 F. App'x 117, 120 (3d Cir. 2006) (nonprecedential).

---

[27] Other Third Circuit cases have presented the sequence of the *forum non conveniens* inquiry in slightly different terms.  See Kisano Trade & Inv. Ltd. v. Lemster, 737 F.3d 869, 873 (3d Cir. 2013).  The Third Circuit recently reiterated the Windt articulation, see Trotter v. 7R Holdings LLC, 873 F.3d 435, 442 (3d Cir. 2017), which is what the Court will apply.

There is no question that England is an adequate alternative forum to adjudicate this case because (a) conditions imposed on the dismissal ensure that Defendants are amenable to process in the English courts; (b) Plaintiffs' claims are cognizable in the English judicial system; and (c) the differences between the US legal system and the UK legal system do not render the latter a clearly unsatisfactory forum.

### a.   Defendants Are Amenable to Process in England: Conditions on Dismissal

First, the Court's FNC dismissal is subject to various conditions that will ensure Defendants are "amenable to process" in England.[28]  Kisano, 737 F.3d at 873.  Those conditions include the following:[29]

- Defendants' agreement to waive statute of limitations defenses in a subsequent proceeding brought in the UK by Plaintiffs in this lawsuit (or the beneficiaries of the decedent-Plaintiffs in this lawsuit) against Defendants arising out of the Grenfell Tower fire that is filed within one year from the date of this *forum non conveniens* dismissal.[30]

---

[28] Because dismissal for *forum non conveniens* completely ends the case, courts commonly impose conditions on the dismissal to ensure the plaintiffs can pursue their claims in the foreign forum. See Zevik v. Reading & Bates Drilling Co., 680 F.2d 1107, 1108 (5th Cir. 1982) ("A conditional dismissal . . . achieves the proper goal of the defendant, litigation in the appropriate forum, without permitting manipulative practices after that is accomplished."); Abiaad v. Gen. Motors Corp., 538 F. Supp. 537, 544 (E.D. Pa. 1982) (Weiner, J.) (attaching conditions to FNC dismissal "in order to preclude the possibility that the defendant would be effectively insulated from plaintiffs' claims"); see, e.g., Lacey I, 862 F.2d at 42 (noting that FNC dismissal was conditioned on the defendants' agreement to waive statute of limitations defenses and to stipulate to the personal jurisdiction of the foreign court, as well as on the plaintiff's filing of suit in the alternative forum within one year).

[29] Each Defendant confirmed to the Court that they agree to the first six of these conditions. (Whirlpool Reply at 16–17; Arconic's Reply at 7; Aug. 19, 2020 Hr'g Tr. at 15:3–25; 16:1–25.)

[30] In an Order dated August 3, 2020, the Court expressed its concern and surprise that Plaintiffs had allowed the three-year statute of limitations ("SOL") to run in the UK without preserving their right to assert claims there (by, for example, filing claims in a UK court or reaching standstill agreements with Defendants).  (ECF 223.)  The Court's inability to resolve Defendants' FNC Motion before the expiration of the UK SOL on June 14, 2020 was due in part to delays caused by the global health pandemic and to the Hague Convention discovery (which resulted from Plaintiffs' desire to obtain the AAP SAS documents).  As a result of the expired SOL, the Court noted that if

- Defendants' agreement to submit to the jurisdiction of the English courts in the subsequent UK proceeding.[31]

- Defendants' agreement to accept the exercise of jurisdiction by the English courts.

- Defendants' agreement to allow Plaintiffs to reinstate this action in this Court if the English courts reject, for jurisdictional reasons, the subject matter of Plaintiffs' claims such that those courts are not an available alternative forum for Plaintiffs.

- Defendants' agreement to abide fully by their obligations in the subsequent UK proceeding, and to make available in England all evidence necessary for a fair and just resolution of this case, including documents and witnesses.

- Defendants' agreement to allow Plaintiffs to use any evidence that they obtained here in the subsequent UK litigation and to make such evidence available to Plaintiffs in the UK litigation.

- All parties' adherence to rulings related to these conditions made by the Court during the August 19, 2020 hearing as stated on the record.

---

the US case were dismissed for FNC and Plaintiffs refiled their claims in the UK, Defendants could seek dismissal on the basis that the claims were time-barred.  (Id. ¶ 4.)  If Defendants asserted this defense, an English court *could* waive the late filing pursuant to Section 33 of the Limitation Act 1980, but there was *no guarantee* an English court would do so.

It appears that both parties engaged in gamesmanship to gain a strategic advantage with respect to the SOL: Plaintiffs decided not to file a claim form in the UK before the SOL expired, and Defendants did not consent to a full waiver of SOL defenses until the Court pressed them on this point at the argument.  Ultimately, this Court need not determine the effect of the UK's now-expired SOL on Defendants' FNC Motion because both Arconic and Whirlpool have agreed to waive limitations defenses in the UK.

One final point on the SOL issue warrants a brief discussion.  Where the statute of limitations is mandatory and nonwaivable in the foreign forum, courts have regarded the defendant's agreement to waive SOL defenses as insufficient.  See, e.g., DiFederico v. Marriott Int'l, Inc., 714 F.3d 796, 801 (4th Cir. 2013).  That issue is not implicated here.  As explained by Defendants' expert Prynne, an English court will not invoke the expired statute of limitations if Defendants do not assert this as a defense.  (ECF 227-2, Prynne Supp. Decl. ¶ 11.)

[31] Even if Defendants contested the exercise of jurisdiction, it is likely that the English courts would be able to assert jurisdiction given that the damage occurred in England.  (Darling Decl. ¶ 73.)

- If the UK court determines that Pennsylvania law (or the law of another state in the United States) applies to damages and that one or both Defendants may be liable for punitive damages, but decides to grant dismissal of the damages phase without prejudice in the UK for determination in the US, Plaintiffs may reinstate this action in this Court.

### b.      Plaintiffs' Claims are Cognizable

Second, the tort claims Plaintiffs assert in this litigation are "cognizable" in the UK. Kisano, 737 F.3d at 873.  Defendants' expert Prynne details, at length, the relevant substantive law that may apply in this case, including the CPA, the Electrical Equipment (Safety) Regulations 1994, and the tort of negligence.  (Prynne Decl. ¶¶ 10–84.)  As explained by Prynne, there is an analogue under English law for the products liability claims Plaintiffs assert in this litigation. Plaintiffs' experts do not dispute this issue.  English law recognizes Plaintiffs' claims, which supports the adequacy of the UK as an alternative forum.

### c.      Differences Do Not Render English Courts Inadequate

Third, although there are differences between the judicial system in the US and the judicial system in the UK in terms of (i) discovery and (ii) damages, these differences do not render England an inadequate forum for purposes of *forum non conveniens*.  The Supreme Court has held that the possibility of an unfavorable change in law in the foreign forum may make that forum inadequate only if "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all."  Piper, 454 U.S. at 254.  For the reasons that follow, neither differences in discovery nor differences in damages rise to this standard.

### i.      Differences in Discovery

The first difference between this Court and the English courts relates to discovery. Plaintiffs and their experts identify a number of ways that discovery in the US varies from discovery in the UK, including differences in the scope of document discovery, in the system for

challenging assertions of privilege, and in the ability to take pre-trial depositions. (Pls' Opp'n at 120–24.) These differences do not render the UK an inadequate forum. The Supreme Court has expressly noted that "discovery is more extensive in American than in foreign courts," but has nonetheless recognized that giving substantial weight to the possibility of an unfavorable change in law (including an unfavorable change in discovery law) would make it difficult for courts to ever grant dismissal for FNC. Piper, 454 U.S. at 252 n.18.

Further, the Third Circuit has explicitly rejected the argument that lesser or different discovery makes a foreign forum inadequate. See Eurofins, 623 F.3d at 160 (finding that even though the foreign forum did not provide for depositions or provide a method to obtain documents over objection, the availability of discovery in that forum satisfied the FNC adequacy test); see also Path to Riches, LLC v. CardioLync, Inc., 290 F. Supp. 3d 280, 287 (D. Del. 2018) ("[T]he fact that the alternative forum provides for only limited discovery relative to that available in [the] United States is not by itself enough to render the forum inadequate."); Copia Communications, 2017 WL 4012687, at *10 ("[T]he law in this Circuit is clear that different discovery procedures— without more—is insufficient to render a foreign forum inadequate."). Instead, differences in the availability of discovery will only make an alternative forum inadequate if the plaintiff is unable to access evidence that is "essential" to her claims. Eurofins, 623 F.3d at 161 n.14. Plaintiffs have not identified any evidence that is "essential" to their claims that would not be avaialble in the UK. Defendants' expert Prynne overviewed the discovery that will be available to Plaintiffs in the English courts, (Prynne Decl. ¶¶ 174–77), and that discovery is sufficient to conclude the UK is available and adequate as an alternative forum. The differences between discovery in the US and discovery in the UK do not render the English courts inadequate.

### ii.        Differences in Damages and Punitive Damages

The second difference between this Court and the English courts relates to the availability of damages.  In the midst of the legal precedents and competing arguments about the law, we must remember that this case is fundamentally about a tragedy in which seventy-two people lost their lives and hundreds more were seriously injured.  The legal system cannot bring back the dead or repair the injured, but it can provide compensation to redress harm that resulted from the torts of others.  The issue of damages is challenging in this case because one form of damages that are available under Pennsylvania law—punitive damages—are likely unavailable under English law.

**Damages in Pennsylvania: Punitive Damages.**[32]    Plaintiffs are pursuing claims for punitive damages, which have long been available under Pennsylvania law if "the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others."  Phillips v. Cricket Lighters, 883 A.2d 439, 445 (Pa. 2005) (internal quotation marks and citation omitted).  These damages "heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious."  Id. at 446. The defendant's conduct must rise to the level of "willful, wanton or reckless" for punitive damages to be warranted.  Hutchison ex rel. Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005).

---

[32] This discussion assumes that Pennsylvania law would apply if this case were to stay here.  As discussed in subsection VII(A)(3)(g), this Court does not make any final ruling as to what law should apply (though it is likely Pennsylvania law would apply to punitive damages in this Court). The Court also does not make any findings as to what law an English court would or should apply. See Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 n.14 (3d Cir. 1991) ("Lacey II") ("[T]he district court is not required to predict what law the foreign court would apply.").

For the reasons explained below, if the UK court concludes that punitive damages are appropriate, the UK court may itself apply Pennsylvania law on punitive damages or may grant dismissal of the damages phase to allow Plaintiffs to reinstate this action for a trial on punitive damages.

These damages are intended "to punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct."  Id.

Plaintiffs have justifiably emphasized that if Arconic (and, possibly, Whirlpool) are liable, then under well-established Pennsylvania law this may be an appropriate case for punitive damages.  The factual foundation for Plaintiffs' position is the fairly substantial evidence that has been uncovered demonstrating that Arconic managers in Pennsylvania and elsewhere in the United States delayed approving a request from Arconic's French subsidiary AAP SAS to develop, manufacture, and sell a more fire-retardant version of Reynobond, specifically Reynobond A2, on grounds that its development was too expensive.  If the factfinder were to adopt Plaintiffs' contentions in this regard, and further find that the more fire-retardant cladding had been made available for the Grenfell Tower and if purchased and installed, would have prevented all or even a considerable part of the deaths and injuries, Arconic would be liable for punitive damages under Pennsylvania law.

Arconic has pointed to facts that in its view would prevent a factfinder from making such a conclusion.[33]  As to Whirlpool, there is far less evidence in the record but if discovery on the merits reveals facts of reckless and intentional decisionmaking, Whirlpool may also be subject to punitive damages under Pennsylvania law as it is registered to do business here.

The Court is not, at this time, finding that punitive damages under Pennsylvania law are appropriate.   The Court is simply recognizing that Plaintiffs' counsel—with outstanding advocacy—have quite properly brought forth significant facts that may, after all evidence is

---

[33] One of Arconic's defenses on this issue is that A2 (and the other fire-retardant version of Reynobond, called "FR") could have been purchased for the Grenfell Tower from either AAP SAS or from a competitor.  (Aug. 19, 2020 Hr'g Tr. at 75:1–22; see also Aug. 12, 2020 Perreiah Dep. Tr. at 598:20–24; 599:2–24; 600:1–24.)

received, warrant a factfinder in concluding that punitive damages are justified. The RFA documents showing that Arconic officials in the US delayed approving AAP SAS's request to develop Reynobond A2, allegedly for cost-saving reasons, is strong evidence of egregious conduct. Against a backdrop of catastrophic loss of life and substantial injuries, Arconic's conduct may appear reckless. These facts may permit a finding that Arconic's conduct was "so outrageous" that under Pennsylvania damages principles, punitive damages may be warranted. Hutchison, 870 A.2d at 770. Arconic, also represented by outstanding counsel, disputes any liability on this issue.

**Damages in the UK: "Exemplary" Damages.**[34] England has a version of damages, which are called "exemplary" damages. (Prynne Decl. ¶ 120.) These damages are intended to "deter a defendant from misconducting himself so as to cause harm." (Id.) Plaintiffs' expert Donovan explains that exemplary damages are only available to injured survivors. (Donovan Decl. ¶ 22.) Although the UK defines exemplary damages somewhat similar to how Pennsylvania defines punitive damages, the application differs drastically.

According to expert reports offered by both Plaintiffs and Defendants, "exemplary" damages are available in two situations: (a) where there has been oppressive, arbitrary or unconstitutional conduct by government servants; and (b) where the conduct giving rise to the cause of action was calculated to result in profit which might exceed the likely compensation. (Prynne Decl. ¶ 122; Donovan Decl. ¶ 22.) Only the second category would arguably apply here, but both experts agree that exemplary damages likely will not be available to Plaintiffs in this case. (See id. ¶ 23 ("Exemplary/punitive damages are in all probability excluded from CPA claims.");

---

[34] This discussion assumes that UK law would apply if this case is dismissed for *forum non conveniens* and is refiled in the UK. The parties' experts disagree on this point. (Compare Briggs Affid. ¶ 32 (concluding that an English court would apply English law to Plaintiffs' claims), with Sarooshi Decl. ¶ 6 (stating that an English court would likely apply Pennsylvania law to Plaintiffs' claims, at least as to Arconic).)

Prynne Decl. ¶ 126 ("I have not seen a single reported case . . . brought under the strict liability provisions of the CPA, where exemplary damages have ever been awarded."); <u>see also</u> Donovan Decl. ¶ 24 (noting that neither Prynne nor Donovan have seen a products liability case where exemplary damages were awarded).)  Thus, if *forum non conveniens* dismissal is denied and this case is retained, it is likely Plaintiffs will be able to pursue punitive damages, but if dismissal is granted and this case is refiled in England, Plaintiffs will be unable to pursue a punitive remedy.[35]

Therefore, the decision on *forum non conveniens* not only determines the location where Plaintiffs will litigate their claims, but it will also impact the damages that Plaintiffs can pursue. If this Court were free to consider, as an important FNC factor, that punitive damages as understood in Pennsylvania law are likely unavailable in England, the decision very well may have been a denial of Defendants' Motion to Dismiss.  However tempting, <u>Piper</u> expressly forecloses reliance on differences in the availability of damages in the FNC analysis.  <u>See</u> 454 U.S. at 255 (holding that although the plaintiffs' potential damages award may have been smaller in the foreign forum, this did not undermine dismissal for FNC because there was "no danger that [the plaintiffs would] be deprived of any remedy or treated unfairly"); <u>see also</u> <u>Jennings v. Boeing Co.</u>, 660 F.

---

[35] The difference in available damages is challenging given the evidence that has been discovered in this case.  One possibility that the Court considered to protect Plaintiffs' ability to pursue a punitive remedy was bifurcating this case into two phases—one for liability and a second for compensatory and punitive damages, with the first phase dismissed for *forum non conveniens* and the second phase retained to be adjudicated in this Court if one or both Defendants were found liable.  At least three cases considered bifurcation in the context of *forum non conveniens*.  <u>See</u> <u>Oxley v. Wyeth Lab'ys, Inc.</u>, No. 91-1285, 1992 WL 185590, at *3 (E.D. Pa. July 23, 1992) (declining to bifurcate the case into issues of liability and damages because doing so would have only complicated the litigation); <u>Myers v. Boeing Co.</u>, 794 P.2d 1272, 1274–75, 1282–84 (Wash. 1990) (finding that the trial court did not abuse its discretion in bifurcating the liability and damages phases because the liability issue was resolved without a trial); <u>Radigan v. Innisbrook Resort & Golf Club</u>, 375 A.2d 1229, 1230–31 (N.J. Super. Ct. 1977) (expressing doubt as to the permissibility of bifurcation).  The Court ultimately decided against this procedure because there is no authority for bifurcating a case between two countries and because all parties opposed it.

Supp. 796, 801 (E.D. Pa. 1987) (Vanartsdalen, J.) ("[T]he possibility that a *forum non conveniens* dismissal . . . would result in the loss of a potential punitive damages award does not, in and of itself, preclude the dismissal of the action."); Valenti ex rel. Valenti v. Marriott Int'l, Inc., No. 10-0758, 2011 WL 869189, at *4 (D.N.J. Mar. 10, 2011) ("[T]he availability of punitive damages is not a requisite to a satisfactory recovery."); Windt v. Qwest Commc'ns Int'l, Inc., 544 F. Supp. 2d 409, 418 (D.N.J. 2008) ("[T]he unavailability of a certain theory for recovery or the possibility of lesser damages cannot render the alternate forum inadequate.").

Because this Court is bound by Piper, the fact that punitive/exemplary damages likely will be unavailable to Plaintiffs in England (unless the UK court determines that Pennsylvania law should be applied) is relevant but does not allow the conclusion that the UK is an inadequate forum. Plaintiffs will be able to seek a fair remedy in the English courts and the fact that their recovery may be less than what it could be in this Court does not defeat FNC dismissal.  See de Melo v. Lederle Laby's, Div. of Am. Cyanamid Corp., 801 F.2d 1058, 1061 (8th Cir. 1986) ("Where the alternative forum offers a remedy for the plaintiff's claims, and there is no danger that she will be treated unfairly, the foreign forum is adequate."); see also Gonzalez v. Chrysler Corp., 301 F.3d 377, 382 (5th Cir. 2002) (holding that a cap imposed by Mexican law on the recovery of tort damages did not render Mexico an inadequate forum for purposes of FNC).

As explained in the sections that follow, the legal principles that have been articulated by the Supreme Court and the Third Circuit require this Court to grant Defendants' FNC Motion. However, the legal system appears to be Plaintiffs' sole source of redress, and we cannot forget one fact that pervades the doctrinal *forum non conveniens* framework: the Grenfell Tower fire was a horrible event that resulted in the loss of many lives and serious injuries to hundreds of people. Under the governing precedents, damages cannot be a leading issue in the *forum non conveniens*

analysis, but they are a prominent and worthy issue in this case because of the horrendousness of the tragedy.  Because the legal system is Plaintiffs' sole source of redress, this Court's FNC dismissal will be without prejudice so that if the UK courts conclude that Arconic and/or Whirlpool are liable and that the conduct of Arconic and/or Whirlpool was "so outrageous" as to be "willful, wanton or reckless," the UK court may grant FNC dismissal on the issue of damages.  Plaintiffs may then seek to reinstate this action.  If, instead, the UK court applying English choice of law principles determines that Pennsylvania law on punitive damages should apply and decides to allow punitive damages itself, reinstating this action would not be necessary.[36]

In summary, although there are differences between the legal system in this country and that in the UK, these differences are not such that the remedy that would be provided in a UK court is tantamount to "no remedy at all."  Piper, 454 U.S. at 254.  To the contrary, the UK has a viable and well-respected legal system, and the English courts will permit meaningful "litigation of the subject matter of th[is] dispute."  Id. at 254 n.22.  As numerous other federal judges have recognized, the courts in England are an adequate alternative to the courts in the US to adjudicate tort (and specifically products liability) claims.  See, e.g., Van Der Velde ex rel. Van Der Velde v. Philip Morris Inc., No. 02-783, 2004 WL 48891, at *2 (S.D.N.Y. Jan. 9, 2004); Jennings, 660 F. Supp. at 800.  Defendants have fulfilled their burden to establish that England is an adequate alternative forum to resolve this case, and have therefore satisfied the first element necessary to obtain dismissal on grounds of *forum non conveniens*.

---

[36] As noted above, the Court does not make any findings as to what law the UK court should or would apply.  The Court also recognizes that its approach—dismissing the case for *forum non conveniens*, but retaining the possibility of adjudicating the damages phase—is novel.

### 2.    Amount of Deference to Accord Plaintiffs' Choice of Forum

The second step in the *forum non conveniens* analysis is to determine the amount of deference that Plaintiffs' choice of forum is entitled to.  When the plaintiff is a domestic resident or citizen, "a strong presumption of convenience exists" in favor of the chosen forum.  Windt, 529 F.3d at 190.  When the plaintiff is foreign, this presumption "applies with less force," because the "assumption that the chosen forum is appropriate is in such cases less reasonable."  Sinochem, 549 U.S. at 430 (internal quotation marks and citation omitted).  In such a case, there is an increased likelihood that the plaintiff's forum selection was motivated by the features that make American courts attractive, including the possibility of higher damages, the availability of jury trials, and more extensive discovery.  Piper, 454 U.S. at 252 n.18.

Here, all of the Plaintiffs are foreign.[37]  Therefore, Plaintiffs' choice of forum is entitled to a lesser amount of deference unless they can make a "strong showing of convenience."  Windt, 529 F.3d at 190; see also Kisano, 737 F.3d at 876 ("[T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*." (internal quotation marks and citation omitted)).

Plaintiffs' first convenience argument is that all Defendants are located in the United States, and Arconic Inc. is headquartered in Pittsburgh, Pennsylvania.  (Pls' Opp'n at 94.)  There is some support for the proposition that if the *defendant* is headquartered in the country and/or

---

[37] Plaintiff Kristen Behrens, the administratrix of sixty-nine decedents who perished in the fire, is a Pennsylvania citizen.  (Compl. ¶ 26.)  However, the estates of the individuals she is representing were all UK residents at the time of their death.  (ECF 50-1, Defs' Mot. to Dismiss for FNC at 22 n.24.)  Ms. Behrens is treated as a citizen of the UK for purposes of jurisdiction, see 28 U.S.C. § 1332(c)(2), and for purposes of FNC, see Piper, 454 U.S. at 242.

forum where the case is brought, the plaintiffs' choice of forum is entitled to deference—*even if*
the plaintiffs are foreign.  See, e.g., Otto, 963 F.3d at 1345 ("[I]t would be ironic to fault the foreign
plaintiffs for their willingness to travel to the United States to sue [the defendant] in its country of
citizenship."); Lony v. E.I. Du Pont de Nemours & Co., 886 F.2d 628, 634 (3d Cir. 1989) ("Lony
I") ("The foreign plaintiff is suing the defendant in the latter's home forum where the latter's
corporate headquarters, headquarters of the division in question, and research laboratories are
located.  That in itself has considerable weight in showing that the plaintiffs' choice was based on
convenience."); Technology Development, 174 F. App'x at 122 ("[A] foreign plaintiff's decision
to sue a defendant in the defendant's home forum . . . suggest[s] that the foreign plaintiff's decision
was based on convenience rather than some ulterior motive."); Incubadora Mexicana, SA de CV
v. Zoetis, Inc., 116 F. Supp. 3d 519, 525 (E.D. Pa. 2015) (Beetlestone, J.) (deferring to foreign
plaintiffs' choice of forum because the defendants' corporate headquarters were located in the
forum state); Lewis v. Lycoming, 917 F. Supp. 2d 366, 371 (E.D. Pa. 2013) (Bartle, J.) (concluding
that "at least some convenience" was demonstrated by the fact that all of the defendants were
located in the United States); see also Lony II, 935 F.2d at 608 (describing the fact that the
defendant was headquartered in the state where the action was brought, but yet sought dismissal
for FNC, as "curiouser and curiouser").  But see Pollux Holding Ltd. v. Chase Manhattan Bank,
329 F.3d 64, 74 (2d Cir. 2003) ("Bearing in mind that litigants rarely are concerned with promoting
their adversary's convenience at their own expense, a plaintiff's choice of the defendant's home
forum over other fora where defendant is amenable to suit and to which the plaintiff and the
circumstances of the case are much more closely connected suggests the possibility that plaintiff's
choice was made for reasons of trial strategy.").  Plaintiffs have shown that it would be at least

somewhat convenient to litigate this case here because Arconic, Inc. is headquartered in Pennsylvania (albeit in the Western District), and all Defendants are located in the United States.

Plaintiffs' second convenience argument is that "the vast majority of witnesses and evidence relevant to Plaintiffs' claims are located in Pennsylvania or elsewhere in the US." (Pls' Supp. Mem. re FNC Discovery at 10.) Given that one of Plaintiffs' main theories is that Arconic, Inc. made decisions regarding the defective design of Reynobond PE from its headquarters in Pennsylvania, there is a natural convenience of litigating here (at least as to Arconic). Cf. DiFederico, 714 F.3d at 807 ("[B]ecause the [plaintiffs'] central theory revolves around [the defendant's] coordination of security from its principal place of business, there is inherent convenience to bringing this case in its legal backyard."). However, Plaintiffs frame their convenience argument in terms of the evidence that is relevant to Plaintiffs' claims, but this Court must also consider the convenience of accessing evidence that is relevant to defenses Arconic and Whirlpool may seek to assert. As discussed in subsection VII(A)(3)(a), much of the defense-related evidence is in the possession of UK-based third-parties, and would be obtainable for use in this litigation only at significant expense (if at all). Further, the overwhelming majority of witnesses, including witnesses on the liability of potentially responsible third-parties and on damages, are located in the UK. Finally, Plaintiffs themselves are located in the UK. These facts suggest it would be inconvenient to litigate here.

The evidence marshaled by Plaintiffs on convenience is not "considerable" and therefore the Court will "refrain from extending full deference to the foreign [P]laintiffs['] choice." Lony I, 886 F.2d at 634. Instead, because of the countervailing indications on convenience, Plaintiffs' choice of forum will be accorded a moderate amount deference (less than what would be due to a domestic plaintiff). To overcome this moderate amount of deference, Defendants must establish

"a strong preponderance in favor of dismissal." Lacey II, 932 F.2d at 175; see also Carl Schroeter.
GmbH & KO., KG. v. Crawford & Co., No. 09-946, 2009 WL 1408100, at *9 (E.D. Pa. May 19,
2009) (Schiller, J.) (holding that the defendant would need to establish dismissal was warranted
"by a fair preponderance of evidence" because the plaintiff's choice of forum was entitled to
considerable deference).

### 3. Private and Public Interest Factors

The third step in the *forum non conveniens* analysis is to assess the convenience of litigating
in the plaintiff's chosen forum by considering the various private and public interest factors that
have been articulated by the Supreme Court.

The **private interests** to be considered include the following: (a) the relative ease of access
to sources of proof; (b) the availability of compulsory process for attendance of unwilling, and the
cost of obtaining evidence of willing, witnesses; (c) the possibility of view of premises, if view
would be appropriate to the action; and (d) all other practical problems that make trial of a case
easy, expeditious, and inexpensive. Gulf Oil, 330 U.S. at 508.

The **public interests** to be considered include the following: (e) administrative difficulties
flowing from court congestion; (f) the local interest in having localized controversies decided at
home; (g) the interest in having the trial of a diversity case in a forum that is at home with the law
that must govern the action and, relatedly, the avoidance of unnecessary problems in conflict of
laws, or in the application of foreign law; and (h) the unfairness of burdening citizens in an
unrelated forum with jury duty. Piper, 454 U.S. at 241 n.6 (referencing Gulf Oil, 330 U.S. at 509).

### a. Relative Ease of Access to Sources of Proof (Private Interest)

Overall, the factor assessing relative ease of access to sources of proof heavily favors
dismissing this case for FNC.

Initially, the Court recognizes that evidence is located both in the US and in the UK.  As Defendants note, the following types of evidence are located in the UK: physical evidence, including photographs and samples taken from the actual site in London where the Tower was located; evidence from third-party witnesses, including first responders, medical professionals, and third-party building owners, architects, contractors, and inspectors; evidence from party witnesses, specifically the 177 Plaintiffs who survived the fire; and documentary evidence, including evidence related to the design, manufacture, marketing, and sale of Reynobond PE and evidence relevant to fire performance tests.  (Defs' Mot. to Dismiss for FNC at 29–34; Defs' Supp. Mem. at 21–24.)  And as Plaintiffs note, the following evidence is located in the US: design evidence; evidence related to Plaintiffs' agency theory; and evidence from witnesses regarding the design and testing of Reynobond PE, as well as the decision to pull the product from the global marketplace following the fire.

However, the fact that evidence is located both in the US and in the UK does not mean this factor is neutral.  Two observations compel the conclusion that it will be easier for the parties to obtain the evidence that is relevant to their claims and defenses in the UK than it would be here: (i) the US-based evidence that is relevant to Plaintiffs' claims is largely in control of the parties and can be electronically transferred to the UK; and (ii) the large volume of UK-based evidence that is relevant to Defendants' defenses is in the possession of nonparties and would only be obtainable in the US at significant cost.

### i.     US-Based Evidence

The evidence located in the US is largely in the control of the parties.  Both Defendants have assured the Court that they will make relevant evidence available to Plaintiffs in the UK litigation, (Whirlpool Reply at 17; Arconic Reply at 7), and that they will make available to

Plaintiffs in England all evidence that was secured while the case was pending here, (Aug. 19, 2020 Hr'g Tr. at 15:12–17).  Therefore, whether this case is litigated here or in the UK, the US-based evidence that is relevant to Plaintiffs' design and agency theories will be accessible to Plaintiffs.

Moreover, to the extent the US-based evidence is electronic,[38] the documents can easily be transferred by Arconic and Whirlpool to Plaintiffs in UK litigation.  As this Court recently recognized, modern technology allows electronically stored information ("ESI") to be transferred seamlessly and instantaneously, which reduces the significance of the specific location of documentary proof in the *forum non conveniens* inquiry.  See Levien v. Hibu Plc, No. 19-3239, 2020 WL 4371790, at *10 (E.D. Pa. July 27, 2020) (Baylson, J.) ("[T]he convenience of engaging in discovery here as compared to England is reduced since the documents can be transferred electronically."); see also Merito (Overseas) Ltd. v. Gen. Elec. Co., No. 05-9478, 2006 WL 3230301, at *6 (S.D.N.Y. Nov. 7, 2006) ("[M]odern technologies can make the location of witnesses and evidence less important to the *forum non conveniens* analysis, particularly where the parties are major corporations.").  Here, too, any evidence that is located in the US and stored electronically can be quickly and easily transferred by Defendants to Plaintiffs in the UK for use in litigation there.

The Third Circuit has cautioned district courts against "disregarding" the fact that "liability evidence predominates in the plaintiff's choice of forum."  Lony II, 886 F.2d at 634.  Here, the Court acknowledges and appreciates that a large volume of liability evidence is located in the US.

---

[38] Not all potentially relevant documents are available electronically.  For example, documents related to the transaction in which Arconic acquired Reynolds Metal Company (the company that initially designed Reynobond) exist primarily in hard copy and in Pennsylvania.  (Pls' Opp'n at 12 n.4.)

However, much of that evidence is in the control of the parties and can easily be made available for use in UK litigation.

### ii.        UK-Based Evidence

In stark contrast to the US-based evidence—most of which could be made available in the UK without much difficulty—it would be burdensome for Defendants to obtain the UK-based evidence that is relevant to their defenses for use in this Court.  This is important because the Supreme Court has instructed that the analysis on the access to proof factor must consider not only evidence related to the plaintiff's claims, but *also* evidence relevant to "any potential defenses to the action."  Van Cauwenberghe, 486 U.S. at 528.  There are two main sources of evidence located in the UK that are relevant to potential defenses: physical evidence in the possession of UK governmental authorities, and third-party evidence.

The first source is the abundant physical evidence currently in the possession of UK governmental authorities.  That evidence includes approximately 14,500 physical samples collected by the MPS from the Grenfell Tower, (Darling Decl. ¶ 80), and a large volume of evidence collected by the Public Inquiry.  Both Arconic and Whirlpool argue this evidence, specifically the MPS physical evidence, is central to their defense that the fire was caused by faulty construction and design, not by defects in their products.  (Arconic Reply at 9; Whirlpool Reply at 2.)

As a practical matter, the physical evidence may only be available to parties litigating in English courts.  If this case proceeds here, Defendants would have to seek the physical evidence from the MPS.  However, the record reveals that may not be possible.  (See Darling Decl. ¶ 88(iv) (opining that it is "questionable whether the English Courts would permit samples . . . to be removed from the territorial jurisdiction of the United Kingdom for presentation at trial in the

United States" because the English courts would be concerned about "forensic disadvantage to parties in criminal civil regulatory or governmental proceedings in England and Wales").)  By contrast, if litigation proceeds in the UK, it is more likely that Defendants will be able to access the physical samples collected by the MPS, at least once the criminal investigations have concluded.  (See id. ¶ 86 ("[P]arties to civil proceedings in an English court would be able to obtain easy access to the relevant physical evidence, at least after criminal proceedings are concluded.").)  The fact that Defendants may be without evidence that is key to their defenses in this Court—but would have access to that evidence in the UK—weighs heavily in favor of dismissal.

Further, even if Defendants could successfully obtain the evidence for use here, the fact remains that it is located in the UK.  It would be easier for parties in UK litigation to seek access to the physical evidence through the appropriate English procedural mechanisms (outlined by Darling at paragraphs 81–83 of his first Declaration) than it would be for parties litigating here to proceed through international discovery treaties.  Compare Lewis, 917 F. Supp. 2d at 371 (finding that the access to proof factor weighed against FNC dismissal because the accident wreckage had been moved to the United States, which "facilitate[d] more convenient inspection and testing by the parties"), with Piper, 454 U.S. at 242 ("Trial would be aided by . . . easy access to the wreckage [in Scotland]."), and In re Compania Naviera Joanna S.A., 531 F. Supp. 2d 680, 688 (D.S.C. 2007) (holding that the fact that "Chinese maritime authorities have already conducted an investigation into the incident [and] the evidence they gathered is in China" favored dismissal for FNC).

The second source is evidence in the possession of third-parties who are located in the UK. This includes evidence in the possession of Exova, Studio E, Rydon, Harley, the RBKC, the TMO, and Celotex—entities who are not defendants in this litigation but who were involved in the Grenfell Tower refurbishment and may have evidence that is relevant to Defendants' defenses.

Further, witnesses who have information relevant to the extent of Plaintiffs' damages—including the medical professionals who treated Plaintiffs' injuries—are located in the UK. All of these entities and individuals are beyond the 100-mile subpoena reach of this Court. Fed. R. Civ. P. 45(c)(1)(A); 45(c)(2)(A).

As a result, to obtain evidence from any of these third-parties who have not voluntarily subjected themselves to discovery in this litigation, Defendants would presumably have to resort to the mechanisms provided by the Hague Convention. See Behrens v. Arconic, Inc., No. 19-2664, 2020 WL 1250956, at *1–2 (E.D. Pa. Mar. 13, 2020) (Baylson, J.) (describing the three methods for production of evidence outlined in the Hague Convention). The Hague Convention methods are time-consuming and resource-intensive, and that cost is magnified here given the substantial amount of third-party evidence. By contrast, if this case proceeds in the UK, Defendants will not have to resort to the Hague Convention to obtain the UK-based evidence; instead, they can make an application pursuant to Section 31.17 of the UK's Civil Procedure Rules ("CPR"). (Prynne Decl. ¶ 174 n.166.) It would be more efficient and cost-effective for Defendants to obtain the UK-based evidence that is relevant to their defenses in the UK through the CPR than in this Court through the Hague Convention. This weighs heavily in favor of FNC dismissal. See In re Air Crash Over the S. Indian Ocean on March 8, 2014, 946 F.3d 607, 613 (D.C. Cir. 2020) ("[T]he private interest factors tilt strongly in favor of trying these cases in Malaysia, given the overwhelming amount of evidence and witnesses located in Malaysia and the potentially insurmountable challenges that would arise from attempting to make that evidence available in a United States court."); Auxer v. Alcoa, Inc., No. 09-995, 2010 WL 1337725, at *11 (W.D. Pa. Mar. 29, 2010) (recognizing that the Hague Convention procedures "would be an incredible strain on the efficiency and resources of the Court as well as the parties," which favored dismissal).

In sum, the evidence relevant to this case spans the Atlantic Ocean. But the fact that evidence relating to design and agency is located in the US does not weigh against dismissal because the US-based evidence that is relevant to Plaintiffs' claims is mostly under party control and is electronically transferrable. Compare Clerides v. Boeing Co., 534 F.3d 623, 629 (7th Cir. 2008) (finding that the district court acted well within its discretion in concluding that the ease of access to proof factor favored dismissal because the US defendant agreed "to produce its documents and witnesses" in the foreign fora and the majority of the other evidence was located in the foreign fora), Dahl, 632 F.2d at 1031 (highlighting the defendant's "offer to provide all relevant materials and witnesses under its control" as one fact that pointed towards dismissal), and Auxer, 2010 WL 1337725, at *10 ("[D]ocumentary evidence from a party is much more accessible than the evidence from Australian non-parties required by Alcoa to defend these actions."), with Lacey II, 932 F.2d at 183 (concluding that because the district court improperly assumed evidence essential to the plaintiff's products liability claim was in the defendants' control, the lower court incorrectly weighed the access to proof factor). Further, there is a significant amount of evidence in the UK relating to Defendants' defenses and to damages that would require resort to the Hague Convention, which would come at great expense to the parties and to the Court. The considerable amount of evidence that is located in the UK (and would be difficult to obtain for trial here) far outweighs the design defect and agency evidence that is located in the US (and is largely in the control of the parties). See Abiaad, 538 F. Supp. at 542 ("True, plaintiffs allege a products liability theory, and any . . . documents of the defendant which bear on the alleged design defect are located in the United States . . . . Nevertheless, the *overwhelming* volume of evidence in Abu Dhabi far outweighs the evidence in this forum, and easily tips the balance of convenience toward the alternative forum." (emphasis added)).

The Court concludes that the private interest factor assessing relative ease of access to sources of proof heavily favors dismissal.

> **b.      Availability of and Cost of Obtaining Witnesses (Private Interest)**

Witnesses relevant to this case are located in both countries that are involved in the FNC analysis (the US and the UK), as well as in France.  However, the number of UK witnesses (many of whom are third-parties) far exceeds the number of US witnesses (many of whom are party witnesses).

Plaintiffs identify the following relevant witnesses:[39]

- **US Witnesses Relevant to Agency:** Diana Perreiah (BCS President; currently employed and represented by Arconic), Tim Myers (TCS President and Ms. Perreiah's supervisor; currently employed and represented by Arconic), Glen Morrison (Ms. Perreiah's predecessor as president of BCS; no longer employed by Arconic but represented by Arconic), Robert Quattrochi (former plant manager at AAP SAS's Merxheim facility; now employed in the US by AAP LLC and represented by Arconic), Kevin Juedeman (Sales Manager at AAP LLC's Eastman facility; currently employed and represented by Arconic), Thomas Rogers (former technical engineer at AAP LLC's Eastman facility; no longer employed by Arconic but represented by Arconic), Nick Randall (former General Manager of AAP LLC's Eastman facility; no longer employed by Arconic), and Brent Johnson (former General Manager of AAP LLC's Eastman facility; currently employed and represented by Arconic).  (Pls' Opp'n at 111–12.)

- **US Witnesses Relevant to Reynobond A2:** Diana Perreiah, Tim Myers, Joseph Moore (VP of Finance for BCS; currently employed and represented by Arconic), Jose Drummond (former President of TCS; no longer employed by Arconic), Paris Watts-Stanfield (former CFO for TCS; no longer employed by Arconic), Marcelo Morgueta (CFO for TCS and for GRP; currently employed and represented by Arconic), and Troy Cofer (Group Finance & Strategy Manager for TCS; currently employed and represented by Arconic).  (Id. at 112.)

---

[39] The description of each employee's job and status comes from Exhibit A to Plaintiffs' Supplemental Memorandum Regarding the Second Deposition of Diana Perreiah.  (ECF 231-1.) The Court acknowledges that Arconic disputes the accuracy of Plaintiffs' chart.  (Aug. 19, 2020 Hr'g Tr. at 73:1–2.)  The Court will evaluate this factor giving Plaintiffs the benefit of their chart because even with it, the availability of witnesses clearly favors Defendants.

- **UK Witnesses Relevant to Liability:** Deborah French (former UK salesperson involved in the sale of Reynobond PE to the Grenfell Tower; no longer employed by Arconic but represented by Arconic), and Vince Meakins (UK salesperson involved in the sale of Reynobond to the Grenfell Tower; currently employed and represented by Arconic).  (Id. at 127.)

- **AAP SAS Witnesses in France:** Claude Schmidt (General Manager of AAP SAS's Merxheim facility; currently employed and represented by Arconic), Claude Wehrle (former technical director at AAP SAS's Merxheim facility; no longer employed by Arconic but represented by Arconic), and Guy Scheidecker (former AAP Global Sales and Marketing Director; no longer employed by Arconic).  (Id. at 113.)

Defendants did not provide a list of UK-based individuals they would need testimony from. Nor did they need to.  See Piper, 454 U.S. at 258 (holding that a defendant seeking FNC dismissal need not "submit affidavits identifying the witnesses they would call and the testimony these witnesses would provide if the trial were held in the alternative forum").  Instead, Defendants identified various UK entities whose testimony will be necessary at the eventual trial in this case. Defendants also submitted transcripts of the testimony some of these entities have given to the Public Inquiry, which has provided context and background for the defenses Arconic and Whirlpool may later seek to assert.  (E.g., ECF 227-5 (Exova Testimony); ECF 229-13 (Excerpts from the RBKC and the TMO Opening Statement); ECF 229-14, ECF 229-15, ECF 229-16, ECF 229-17, ECF 229-18, ECF 229-19 (Excerpts from Studio E Testimony); ECF 229-22 (Excerpts from Rydon Testimony); ECF 229-23 (Excerpts from Celotex Testimony).)  This has given the Court "sufficient information" to balance the parties' interests.  Piper, 454 U.S. at 258.

The relevant witnesses who are located in the UK and were identified by Defendants include the following:

- **Damages witnesses:** Doctors, employers, friends, and family members of each of the 247 Plaintiffs who can testify to the damages suffered;

- **LFB members:** LFB firefighters who responded to the fire and can testify on topics such as the origin and spread of the fire, the "stay put" strategy, and the firefighting efforts;

- **Witnesses from third-parties involved in the Grenfell Tower refurbishment**: Including witnesses from the RBKC, the TMO, Studio E, Rydon, Harley, CEP, and Exova; and

- **Witnesses from Celotex Ltd.:** Including witnesses with knowledge related to the insulation used on the Grenfell Tower.  (Arconic Reply at 9–10.)

In assessing the relative availability and cost of obtaining the attendance of these witnesses in this forum as compared to in the UK, the distinction between party witnesses and nonparty witnesses is relevant.

Many of the **US-based witnesses** identified by Plaintiffs are employed and/or represented by Arconic.  The significance of this fact for *forum non conveniens* is that, as to these witnesses, it is unlikely that resort to the Hague Convention will be necessary if this case is litigated in the UK.  Instead, consistent with their assurances to this Court, Arconic (and Whirlpool, to the extent there are US-based Whirlpool witnesses) will produce the US party witnesses in the UK litigation. (Arconic Reply at 7; Whirlpool Reply at 17.)  For the US witnesses identified by Plaintiffs who are no longer employed or represented by Arconic (and therefore are not party witnesses), cross-border discovery mechanisms including the Hague Convention and 28 U.S.C. § 1782 are available to the English courts.

By contrast, most of the **UK-based witnesses** identified by Defendants are third-parties who are not involved in this litigation.  Thus, if this case stays here and these UK witnesses are unwilling to travel to Philadelphia for trial, Defendants will need to resort to the Hague Convention to secure their testimony.  There are a number of pragmatic problems with this approach.

First, as noted above, the UK witnesses are located outside of the 100-mile subpoena power of this Court, so they cannot be compelled to attend trial in Pennsylvania.  See Tannenbaum v.

Brink, 119 F. Supp. 2d 505, 512 (E.D. Pa. 2000) (Joyner, J.) (explaining that "if any of [the overseas] witnesses were unwilling to appear, a Pennsylvania court could not compel them to do so" because of the geographical limitation of Federal Rule of Civil Procedure 45(c)(1)).  To the extent Defendants seek to depose the UK witnesses through the Hague Convention, depositions are not an "adequate substitute" for live testimony at trial.  Jones v. FC USA, Inc., No. 17-1126, 2017 WL 5453497, at *4 (E.D. Pa. Nov. 14, 2017) (DuBois, J.); see also Gulf Oil, 330 U.S. at 511 (noting that "fix[ing] the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition" is "not satisfactory to court, jury or most litigants").

Second, complying with the Hague Convention would come at excessive cost to Defendants and would put them at a significant, and unfair, disadvantage.  See Doe v. Ritz Carlton Hotel Co., LLC, No. 14-4423, 2015 WL 221106, at *5 (E.D. Pa. Jan. 14, 2015) (Schmehl, J.) ("The cost and time incurred by the Court and parties to follow the Hague Convention to secure the testimony of defendant's nonparty witnesses in this District would likely be prohibitive."); see also Piper, 454 U.S. at 249 ("Under Gilbert, dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant").  True, the cost to Arconic of making the various US-based party witnesses available to Plaintiffs in the UK is greater than the cost of making them available in Philadelphia.  However, that cost pales in comparison to what would be expended if the litigation proceeds in this Court.

The volume of third-party witnesses—including hundreds of damages witnesses, dozens of LFB members who responded to the fire,[40] and many witnesses associated with potentially

---

[40] Plaintiffs attached the declaration of Kathryn Robinson, General Counsel to the London Fire Commissioner, as an exhibit to their supplemental opposition re FNC discovery.  (ECF 226-5.) Robinson represents that "[i]n the event that testimony is required for the United States litigation

responsible third-parties—who are located in the UK is enormous.  Even though the Hague

Convention would be available to Defendants if this case stays, it would be far more convenient

for Defendants (and for the witnesses themselves) for the litigation to be conducted in the UK,

which is where the great majority of third-party witnesses are located.  See LaSala v. Bank of

Cyprus Pub. Co. Ltd., 510 F. Supp. 2d 246, 259–260 (S.D.N.Y. 2007) ("[T]he presence of the vast

majority of witnesses in one forum weighs in favor of that forum, even if the witnesses could be

transported."); see also Kolawole v. Sellers, 863 F.3d 1361, 1372 (11th Cir. 2017) (identifying the

fact that "much of the damages evidence would be located where each decedent lived prior to the

crash, primarily from witnesses who knew the decedent and from the decedent's employment,

school, and tax records" as one private interest factor that favored dismissal).  If the litigation

proceeds in the UK, compliance with the Hague Convention would not be necessary; an English

court would have procedural mechanisms at its disposal to secure the testimony of witnesses within

its jurisdiction.  Further, Plaintiffs themselves are located in the UK.[41]  To the extent Plaintiffs are

---

[41] from the employees of the London Fire Brigade, those individuals who are considered appropriate witnesses will be asked if they are willing to assist in providing such evidence" and if they are, the LFB will use its best efforts to make them available without the need to submit requests through the Hague Convention.  (Id. ¶ 4.)  The inconvenience of resorting to the Hague Convention therefore may not apply to the LFB members.  Nonetheless, even if LFB members testify voluntarily, it would be far more convenient for them to do so in the UK where they live, rather than in a Pennsylvania court that is many miles away.

[41] At oral argument, Plaintiffs' counsel stated that some Plaintiffs (and/or the beneficiaries of the estates represented by Ms. Behrens) are residents of countries other than the UK.  (Aug. 19, 2020 Hr'g Tr. at 87:23–25; 88:1–7.)  This point was also made, briefly, in Plaintiffs' opposition.  (See Pls' Opp'n at 117 ("The Plaintiffs are both UK citizens and immigrants.  They came from countries across Europe, Africa, Asia, and the Middle East.  Th[e] beneficiaries of the Estates are scattered across the globe in at least 17 different countries.").)  The Court's understanding, based on the addresses listed in the Complaint, is that the overwhelming majority of Plaintiffs currently are and/or were at the time of the fire residents of the UK.

required to testify regarding the extent of their damages, it would be far more convenient for them to attend trial in the UK—their home country—than to fly to the US for trial in Pennsylvania.

On the topic of third-parties and their witnesses, a brief discussion of Arconic's French subsidiary AAP SAS is warranted. As the company that manufactured and sold the Reynobond PE that was used on the Grenfell Tower, AAP SAS undoubtedly has evidence and witnesses that will be relevant both to Plaintiffs' claims and to Arconic's defenses. As one example, Plaintiffs' agency claim depends on their ability to prove that AAP SAS was acting as an agent of Arconic when it committed a tort, so AAP SAS will inevitably be involved in this theory of liability. (Aug. 19, 2020 Hr'g Tr. at 54:8–12.)

AAP SAS and its employees are located in France (not the UK). The procedural mechanisms that allow parties in UK litigation to seek evidence from nonparties within the UK do not apply. Further, Plaintiffs have confirmed that as a result of Brexit, the parties can no longer take advantage of favorable discovery mechanisms that apply when a member country seeks evidence from within the EU. (Pls' Supp. Mem. re FNC Discovery at 12.) Therefore, regardless of whether this litigation proceeds in the UK or in Pennsylvania, the parties will need to utilize the Hague Convention to obtain AAP SAS evidence and witnesses. It may be somewhat more convenient for AAP SAS witnesses to travel from France to the UK than from France to the US, but because compliance with the Hague Convention would be necessary either way, this fact is neutral to *forum non conveniens*. No matter where this case proceeds, there will be complicated questions of access to cross-border discovery. The importance of nonparty AAP SAS to Plaintiffs' claims and Arconic's defenses demonstrates one nuance that makes this litigation more complex than a paradigmatic *forum non conveniens* case. Here, in addition to the domestic forum (the US) and the foreign forum (the UK), there is a third forum (France) that is involved.

In sum, there are far more witnesses (both party witnesses and nonparty witnesses) located in the UK than in the US. Further, and significantly, if the UK-based nonparty witnesses are unwilling to testify voluntarily, they would only be reachable through the Hague Convention, which would come at great expense to Defendants. The large number of third-party witnesses who are located in the UK, as compared to the relatively small number of party witnesses who are located in the US, weighs heavily in favor of dismissal for *forum non conveniens*. Compare Kisano, 737 F.3d at 878 (concluding that the availability of witnesses factor favored dismissal because although the plaintiff identified "several witnesses located in the United States with knowledge of the various deals" the defendant identified "nearly twenty witnesses located abroad, the majority of whom live[d] in Israel"), Eurofins, 623 F.3d at 162 ("[T]he location of the great majority of proof and witnesses in France favors dismissal"), and Pollux, 329 F.3d at 75 (holding that the availability of witnesses factor weighed heavily in favor of dismissal because the defendant "identified several key witnesses whose testimony [could] be compelled only in England while [the] plaintiffs have not demonstrated that any material witnesses would be unavailable there"), with Windt, 529 F.3d at 194 (concluding that where it would be no more difficult for parties in the foreign court to obtain the presence of unwilling US witnesses than it would be for parties in the US court to obtain unwilling foreign witnesses, this factor was neutral).

### c.    View of Premises (Private Interest)

This factor is neutral. Neither party argues that it would be necessary for a jury to view the premises where the Grenfell Tower is located, and as Plaintiffs point out, the physical evidence that is relevant to liability issues was removed from the Tower long ago. (Pls' Opp'n at 128.) Because the "view of the premises" factor is relevant only if "view would be appropriate to the action," and because neither party argues that view of the Tower would be appropriate, the Court

will not give any weight to this consideration.  <u>Gulf Oil</u>, 330 U.S. at 508; <u>see also</u> <u>Auxer</u>, 2010 WL 1337725, at *11 ("It is a rare occasion indeed, when the Court finds it necessary to transport a jury and court personnel to the scene of an accident").

### d.   Other Practical Problems (Private Interest)

The substantial practical problems this Court would encounter if this case is retained weigh in favor of dismissal.  Those practical problems include the following: (i) the fact that there are numerous UK-based third-parties who may be responsible for the Grenfell Tower fire but are beyond the reach of this Court; (ii) the timing of the Public Inquiry; and (iii) the fact that there are numerous personal injury cases currently pending in the UK, with more likely to be filed, arising out of the Grenfell Tower fire.

### i.   Absent Third-Parties

The first practical problem inherent in retaining this case is that there numerous UK-based entities who are not parties to this suit but may be responsible for the Grenfell Tower tragedy.  The potentially responsible third-parties identified by Defendants include Exova, Studio E, Rydon, Harley, the RBKC, the TMO, and Celotex.  (Defs' Supp. Mem. at 31.)   As Arconic notes, statements made by some of these entities to the Public Inquiry raise legitimate questions about whether they are responsible, in some form, for the fire.  (<u>See</u> Arconic Reply at 15–16 (discussing statements made by the RBKC, the TMO, Studio E, Exova, Rydon, and Celotex before the Public Inquiry).)  Defendants argue that these entities are "central" to their defense that the fire was caused by faulty design and construction, not by alleged defects in Defendants' products.  (Defs' Supp. Mem. at 30.)  They therefore argue that it would be "fundamentally unfair" to require them to litigate in this Court where, because of jurisdictional limitations, the third-parties cannot be impleaded.  (Arconic Reply at 16.)

Plaintiffs offer a few responses to Defendants' argument regarding the necessity of third-party defendants, none of which are persuasive.

First, Plaintiffs urge the Court to disregard this issue because Defendants never attempted to implead the third-party defendants they argue are necessary for a just resolution of liability for the Grenfell Tower fire.  (Pls' Opp'n at 143.)  However, this argument is foreclosed by binding Third Circuit precedent holding that a "defendant's '*stated* desire' to pursue claims against foreign third parties" is all that is required—the defendant need not *actually* seek to implead the third-parties.  Delta Air Lines, Inc. v. Chimet, S.p.A., 619 F.3d 288, 300 (3d Cir. 2010) (internal quotation marks and citation omitted); see also id. (rejecting the plaintiff's argument that the district court's consideration of the inability to join third-parties in US litigation was undermined by the fact that the defendant did not follow through on its stated desire to pursue claims against the third-parties).  Here, Defendants have stated they would pursue third-party claims against Exova, Studio E, Rydon, Harley, the RBKC, the TMO, and Celotex.  (Defs' Supp. Mem. at 31.)  That statement is enough to permit the Court to consider the effect of these potential actions on Defendants' FNC Motion.

There is no basis for the exercise of jurisdiction over the UK-based entities that Defendants argue are responsible for the Grenfell Tower fire.[42]  Therefore, if dismissal is denied and this case remains here, and if Arconic and/or Whirlpool are found liable, the liable Defendants(s) will be

---

[42] At oral argument, Plaintiffs' counsel highlighted a statement in Whirlpool's Reply that "many of [the foreign parties] will not be subject to jurisdiction in the United States."  (Whirlpool Reply at 7 n.4.)  Plaintiffs' counsel argued that the use of "many" instead of "all" implied that some of the foreign entities may be subject to the personal jurisdiction of this Court.  (Aug. 19, 2020 Hr'g Tr. at 38:23–25; 39:1; 45:7–10.)  Counsel for Arconic and Whirlpool later clarified that they are not aware of a basis for jurisdiction over any of these entities.  (Id. at 47:20–24 (Arconic) 49:6–8 (Whirlpool).)  The Court assumes that the foreign entities cannot be impleaded in Pennsylvania federal court.

forced to pursue contribution or indemnity claims against these parties in the UK. The duplicity of proceedings—first, litigation in the US to determine Defendants' liability and, assuming a finding of liability, litigation in the UK to determine Defendants' entitlement to contribution and/or indemnity—would be inefficient. Supreme Court and Third Circuit precedent confirm that this favors dismissing for *forum non conveniens*.[43]   See, e.g., Piper, 454 U.S. at 259 ("The District Court correctly concluded that the problems posed by the inability to implead potential third-party defendants clearly supported holding the trial in [the foreign forum].");  Dahl, 632 F.2d at 1031 ("Another factor favoring trial in [the foreign forum] is [the defendant's] inability to implead . . . the . . . corporation which owned and operated the helicopter at the time of the crash."); see also Windt, 529 F.3d at 195 ("The Defendants' pursuit of contribution claims would result in additional, related litigation in the Netherlands, and resolving all of these matters in the Netherlands would lead to the most efficient and expeditious resolution of this dispute."); Eurofins, 623 F.3d 162 (recognizing that allowing the action to proceed in the US would not make the trial "easy, expeditious and inexpensive" because the US court lacked personal jurisdiction over one of the defendants, which meant that there would be "the substantial inconvenience of litigating two actions, which involve a common nucleus of operative facts, in two fora" (internal quotation marks and citation omitted)).

Second, Plaintiffs argue that because they only brought strict liability claims, Defendants cannot shift the blame to a potentially negligent party. (Pls' Opp'n at 145.) Initially, it is important to recognize that at this preliminary stage in the litigation, the Court's obligation is not to

---

[43] Plaintiffs identify various cases supporting the proposition that the need to pursue third-party claims in a foreign forum does not necessarily weigh in favor of dismissal. (Pls' Opp'n at 149.) However, on the facts of this case, and consistent with the precedential authority discussed in this subsection, the Court finds that the inability to implead third-parties and the need to litigate separate contribution or indemnity actions in the UK strongly supports dismissal.

definitively determine what defenses would be legally or factually available at trial. Instead, deciding a *forum non conveniens* motion simply requires "delineat[ing] the likely contours of the case by ascertaining, among other things, the nature of the plaintiff's action, the existence of any potential defenses, and the essential sources of proof." Lacey II, 932 F.2d at 181. The contours of this case reveal that there are UK-based third-parties who may bear some degree of culpability for the Grenfell Tower fire and who Defendants may justifiably seek to implead.

In any event, the Court disagrees with Plaintiffs' interpretation of Pennsylvania law on the significance of Plaintiffs' decision to bring only strict liability claims. In support of their argument that "a strictly liable party in a strict liability action cannot point the finger at a potentially negligent party," (Pls' Opp'n at 146), Plaintiffs discuss the Supreme Court of Pennsylvania's recent decision in Roverano v. John Crane, Inc., 226 A.3d 526 (Pa. 2020). The issue in that case was whether Pennsylvania's Fair Share Act requires the jury to apportion liability on a percentage (as opposed to a per capita) basis in strict liability asbestos cases. Id. at 535. The Supreme Court of Pennsylvania held that under the Fair Share Act, liability is apportioned equally among strictly liable joint tortfeasors. Id. at 543. Roverano's holding on the method for apportioning liability amongst strictly liable tortfeasors does not speak directly to the issue here—whether Defendants can implead potentially negligent third-parties.

One basis that would permit Defendants to implead the potentially negligent actors is contribution. Pennsylvania's Uniform Contribution Among Tortfeasors Act gives Defendants the right to seek contribution against joint tortfeasors, defined as "two or more persons jointly or severally liable in tort for the same injury to persons or property." 42 Pa. Cons. Stat. § 8322. Because "[c]ontribution is available whenever two or more persons are jointly or severally liable in tort, irrespective of the theory by which tort liability is imposed," Defendants presumably could

pursue contribution claims not only against strictly liable parties, but also against negligent parties. Svetz for Svetz v. Land Tool Co., 513 A.2d 403, 408 (Pa. Super. Ct. 1986).

Thus, to the extent the UK-based entities are joint tortfeasors who are responsible for Plaintiffs' injuries, Pennsylvania law appears to allow liability to be apportioned to them. The significance of this fact for *forum non conveniens* is that, because of this Court's lack of jurisdiction over the UK-based nonparties, these potentially responsible entities cannot be joined here. Instead, any Defendant that is found liable would have to pursue contribution or indemnity claims in the UK after the conclusion of this litigation. By contrast, English courts would have jurisdiction over the UK-based nonparties, and England's Civil Liability (Contribution) Act 1978 would permit Defendants to pursue a claim for contribution if litigation is filed in the UK. (Prynne Decl. ¶¶ 184–192.) Resolving these claims in the courts of one country is much more efficient for the judicial systems of the US and the UK, is more convenient for the parties, and is fairer to Defendants. See Piper, 454 U.S. at 259 ("It is true, of course, that if [the defendants] were found liable after a trial in the United States, they could institute an action for indemnity or contribution against [the potential third-party defendants] in Scotland. It would be far more convenient, however, to resolve all claims in one trial."); Lewis, 917 F. Supp. 2d at 374 ("[T]rial in the Eastern District of Pennsylvania would burden the defendants because they would not be able to implead English third-party defendants here but would be able to do so if the action were filed in the United Kingdom.").

Third, Plaintiffs contend that Defendants "do not" and "cannot" explain how the UK-based entities bear responsibility in this case. (Pls' Supp. Mem. re FNC Discovery at 14.) This assertion is belied by the arguments made in Defendants' filings. In their supplemental FNC memorandum, Defendants indicate that one of their defenses will be that "the cause of the tragedy was the faulty

design and construction of the Grenfell Tower refurbishment in violation of UK building and fire safety regulations." (Defs' Supp. Mem. at 30.) This is relevant because "[u]nder Pennsylvania law, evidence of misuse is generally admissible to defeat causation in a strict liability design defect case." Moyer v. United Dominion Indus., Inc., 473 F.3d 532, 542 (3d Cir. 2007). Additionally, Arconic contends that "under UK regulation, the ability to use ACM PE on a high-rise building like Grenfell Tower depends on the end users (architects and contractors) conducting fire tests or engineering analyses of the *entire cladding system* (cladding panels, insulation, fire breaks, and all), not on the performance of a single component such as Reynobond PE." (Arconic Reply at 14–15.) It would be particularly unfair to require Arconic to defend in this Court where it is very unlikely they would be able to implead the entities who were ultimately responsible for the overall design of the cladding system, of which their cladding was only one part. See Abiaad, 538 F. Supp. at 543 (noting the "potential unfairness" of requiring a company to defend a product liability action with regard to a product it had "no control over once sold," particularly because there was a "strong possibility" the defendant would be unable to implead third-parties).

If Defendants' arguments (that Plaintiffs' injuries were caused not by a defect, but rather by a misuse of Reynobond PE and a faulty design for the Grenfell Tower refurbishment) are supported by the evidence and believed by the factfinder, it is possible that they will be absolved of liability. See, e.g., Piper, 454 U.S. at 259 ("If [the defendants] can show that the accident was caused not by a design defect, but rather by the negligence of [various nonparties including] the pilot, the plane's owners, or the charter company, they will be relieved of all liability."). Presenting all of these issues in one litigation would be more cohesive for the factfinder and more economical for the parties. Because of jurisdictional limitations, this Court can resolve only a small segment of the civil claims related to the Grenfell Tower fire—only the claims against Arconic and

Whirlpool.  That Arconic and Whirlpool will likely pursue claims against UK-based third-parties strongly supports dismissing this case for *forum non conveniens* because Plaintiffs' claims can be resolved along with Defendants' third-party claims in one UK litigation.  See Lacey II, 932 F.2d at 189 (endorsing the district court's conclusion that the foreign forum's "ability to join all parties" favored dismissal under Piper).

### ii.    The Timeline for the Public Inquiry

The timeline for the completion of Phase 2 of the UK's Public Inquiry presents another practical problem that weighs in favor of dismissal.

Initially, it is important to recognize the relevance of the Public Inquiry, in particular Phase 2 of the Inquiry, to this case.  Phase 2 is dedicated to addressing the underlying causes of the Grenfell Tower Fire, "including the decisions made in relation to critical aspects of the design and construction of the cladding system."  (P1R ¶ 1.7.)  Plaintiffs emphasize that there are "numerous issues in this litigation which will not, and indeed cannot be covered by the Grenfell Tower Inquiry," including the extent to which Defendants engaged in culpable conduct in the United States and/or through their foreign subsidiaries, and successor liability issues related to Whirlpool. (ECF 122 at 11; 14.)  But the question of whether the issues in this litigation overlap with the focuses of the Public Inquiry is separate and distinct from the question of whether the Inquiry's findings and conclusions will inform the parties' claims and defenses.  In the Court's view, the latter point is the more salient one.  Defendants have demonstrated that the findings of the Phase 2 report will likely play a role in this case, despite the fact that the Public Inquiry is not concerned with apportioning civil or criminal liability.  See Windt, 529 F.3d at 196 (rejecting the argument that the "investigative nature" of the foreign government's investigation meant that it should not have been considered in the *forum non conveniens* analysis).

Thus, although the Public Inquiry has a different focus, information learned during Phase 2 will be relevant to live issues in this case including the potential liability of third-parties and their respective roles in authorizing the cladding design that was used on the Grenfell Tower.  Because of the "significant expense" that could be saved by waiting to pursue civil claims until after the Inquiry is finished, the parties in this case may reasonably seek to suspend the litigation until Phase 2 concludes.[44]  (Darling Supp. Decl. ¶ 11.)  However, coordinating with the timing of the Public Inquiry would be difficult because Phase 2 is in its early stages and may not be completed for a few years.[45]

More importantly, regardless of the parties' preferences, it is likely that waiting for the conclusion of the Public Inquiry would be necessary for a fair resolution of this case.  As discussed in subsection VII(A)(3)(a)(ii), there is considerable physical evidence from the wreckage of the fire in the possession of UK governmental authorities that would be relevant to Plaintiffs' claims and Defendants' defenses.  This evidence will demonstrate how the fire started, how the fire escaped from the flat to the external cladding, and how the fire spread up and down the Tower.  However, the evidence is currently in the possession of the MPS and it is "unlikely" that the MPS would permit the evidence to be used in civil litigation—let alone civil litigation that is proceeding in the United States—until criminal proceedings have concluded.  (Darling Decl. ¶ 86.)  The MPS

---

[44] Although plaintiffs often choose to wait until the conclusion of inquiries, they are not required to do so—nothing in English law requires the suspension of private litigation pending the completion of government investigations.  (ECF 227-4, Darling Supp. Decl. ¶ 11.)

[45] The parties' experts disagree as to the likelihood that the Phase 2 proceedings will be completed by the end of 2022/early 2023.  Plaintiffs' expert Kaufmann opines that the Phase 2 report likely will not be published before January 2023, (Kaufmann Decl. ¶ 56), while Defendants' expert Darling states that there is some chance the Phase 2 Report will be published by the end of 2022, but it is unlikely the Report will be published later than the summer of 2023.  (Darling Supp. Decl. ¶ 9.)  Under either timeline, the delay would be difficult to manage.

is not likely to recommend criminal charges before the conclusion of the Public Inquiry. (Id. ¶ 32.) Therefore, even assuming that the parties could obtain the MPS evidence for use in this Court, the evidence would not be potentially available for many years—not until the conclusion of criminal proceedings, which will not be initiated before the conclusion of the Public Inquiry, which is unlikely to occur before 2023. That it would likely be necessary to coordinate with the timing of the Public Inquiry and the MPS's prosecutions to obtain evidence presents another complication that favors dismissal.

If civil proceedings in the UK are unlikely to "progress significantly" until the conclusion of the Public Inquiry and the criminal investigation, it makes sense for litigation in this Court to wait too. (Donovan Decl. ¶ 44.) As the Court stated at the hearing, it would be "strongly inclined" to delay moving toward a trial until the Public Inquiry and the criminal investigations have concluded. (Aug. 19, 2020 Hr'g Tr. at 54:24.) But because of the uncertainty surrounding the timeline for the completion of the UK's governmental proceedings and investigations, it would be difficult to coordinate this litigation with Phase 2 of the Public Inquiry and the criminal cases. This is another practical problem that weighs in favor of dismissal. See, e.g., Dahl v. United Techs. Corp., 472 F. Supp. 696, 700 (D. Del. 1979) (identifying the fact that the Norwegian Civil Aviation Administration was conducting an investigation into the cause of the helicopter accident at the same time as the US civil litigation as one factor that pointed in favor of dismissal).

### iii.   Parallel Civil Litigation in the UK

The fact that there is related civil litigation currently pending in the UK courts implicates another practical problem that favors dismissal.

The existence of parallel litigation is not listed as a factor in Gulf Oil. Guidi v. Inter-Cont'l Hotels Corp., 224 F.3d 142, 148 (2d Cir. 2000). However, the Third Circuit has confirmed that

related litigation may be relevant to *forum non conveniens* in certain cases.  See <u>Windt</u>, 529 F.3d at 196–97 (affirming that the district court was permitted to consider related litigation pending in the Netherlands to determine whether retaining the case would be oppressive and vexatious to the defendant); <u>cf.</u> <u>Sinochem</u>, 549 U.S. at 435 ("Judicial economy is disserved by continuing litigation in the Eastern District of Pennsylvania given the proceedings long launched in China."); <u>U.S.O. Corp. v. Mizuho Holding Co.</u>, 547 F.3d 749, 750 (7th Cir. 2008) ("There is no reason for identical suits to be proceeding in different courts in different countries thousands of miles apart.")

In this case, the UK personal injury litigation is undoubtedly germane to the *forum non conveniens* issue.[46]  There are at least nine personal injury lawsuits currently pending in the UK arising out of the Grenfell Tower fire.  (Defs' Supp. Mem. at 12–13.)  Entities including the RBKC, the TMO, AAP SAS, Celotex, Exova, Harley, the London Fire Commissioner, Rydon, and Studio E have been named as defendants in these suits.  (<u>Id.</u>)  It is likely that more lawsuits will be filed because a number of prospective defendants have signed standstill agreements with various plaintiffs (potentially including some of the Plaintiffs in this case).  (<u>Id.</u> at 14.)  Additionally, any insurance coverage actions will likely be arbitrated in London, England.  (ECF 229-4, Excerpts from Arconic's Insurance Policies.)

From the perspective of judicial economy and convenience—two of the hallmarks of the *forum non conveniens* doctrine—it would be most efficient to resolve this case in the UK, which is where other Grenfell Tower tort cases have been and likely will be filed.  Further, litigating Plaintiffs' claims in the UK would avoid the possibility of inconsistent or conflicting rulings,

---

[46] As Plaintiffs note, there is securities litigation that is currently pending against Arconic, Inc. in the Western District of Pennsylvania, <u>Howard v. Arconic, Inc.</u>, 17-1057.  (Pls' Opp'n at 152.)  The claims in <u>Howard</u> arise under federal securities laws and are much different than Plaintiffs' products liability claims.  Because of the dissimilarity between the live legal issues in this case and those in <u>Howard</u>, the Court will not give any weight to the existence of that litigation.

which could raise concerns of international comity.  See Nygard v. DiPaolo, 753 F. App'x 716, 728–29 (11th Cir. 2018) ("[T]he possibility of inconsistent rulings with foreign countries raises international comity concerns that should be considered in the *forum non conveniens* analysis."). The related litigation that will be adjudicated by courts in the UK is not the strongest factor in favor of dismissal, but it is another consideration that implicates practical problems in retaining this case.

### e.      Administrative Difficulties (Public Interest)

This case is complex and will require a significant investment of judicial resources wherever it is litigated.  The Court's administrative and legal obligations do not put it at an advantage or a disadvantage relative to a UK court.  No weight will be given to administrative difficulties flowing from court congestion.

### f.      Local Interest (Public Interest)

There are a number of interests that must be considered and balanced: Pennsylvania's interest; the United States' interest; and the United Kingdom's interest.  Before assessing the balance of the various interests at play, it is necessary to establish what, exactly, the relevant interests are.

**Pennsylvania's Interest.**  The first relevant interest is that of Pennsylvania, which is where Plaintiffs brought their claims and the state that provides the source for Plaintiffs' causes of action. Cf. Windt, 529 F.3d at 191 ("Although the relationship between the United States and a case generally should be considered, this does not mean that the relationship between the local federal [district] court and the case should not.").  Pennsylvania undeniably has an interest in regulating the behavior of Arconic, which has had extensive ties to this state for over one hundred years. Many courts have recognized a state's legitimate interest in policing the conduct of corporations

that operate within its borders, especially in the context of an international accident.  See, e.g.,

Incubadora Mexicana, 116 F. Supp. 3d at 525 ("Pennsylvania has an interest in ensuring that its

corporations do not engage in tortious conduct which causes injury to anyone, regardless of where

those individuals reside."); Harrison v. Wyeth Lab'ys Div. of Am. Home Prods. Corp., 510 F.

Supp. 1, 4 (E.D. Pa. 1980) (Weiner, J.) (recognizing "Pennsylvania's interest in the regulation of

the conduct of drug manufacturers and the safety of drugs produced and distributed within its

borders"); see also Lony I, 886 F.2d at 642 ("Delaware is interested in ensuring that businesses

incorporated or operating within its borders abide by the law").  Pennsylvania also has "legitimate

interests in punishing unlawful conduct and deterring its repetition" through the imposition of

punitive damages when warranted by the facts.  BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568

(1996).  This interest is heightened here because, as discussed in subsection VII(A)(1)(c)(ii),

Plaintiffs likely will not be able to pursue a punitive remedy in the UK.[47]  Whatever interest

Pennsylvania has in regulating and punishing Arconic, Inc., that interest does not apply as strongly

with respect to Whirlpool.  Whirlpool is a Michigan corporation whose only connection to

Pennsylvania is that it is registered to do business here.  The extent of Pennsylvania's interest in

Defendant AAP LLC is not clear; on one hand, AAP LLC is located in Georgia but on the other,

AAP LLC is alleged to be closely connected to Pennsylvania-based Arconic, Inc.

     The relationship between Pennsylvania and this case is also important because the Court

must "consider the locus of the alleged culpable conduct, often a disputed issue, and the connection

of that conduct to plaintiff's chosen forum."  Van Cauwenberghe, 486 U.S. at 528.  Plaintiffs'

---

[47] By allowing Plaintiffs to reinstate this action in this Court if the UK court determines that
Pennsylvania law applies to damages and that one or both Defendants may be liable for punitive
damages (as discussed in subsection VII(A)(1)(C)(ii)), this Court is honoring Pennsylvania's
interest in punishing and deterring unlawful conduct.

central theory is that there was a design defect in Defendants' products that resulted from decisions made in Pennsylvania.  Plaintiffs' "locus" argument is much stronger as to Arconic because they have alleged and presented some evidence supporting their theory that Arconic officials in Pennsylvania and the United States exercised control over AAP SAS's decisionmaking generally and in regard to Reynobond PE in particular.  The evidence regarding the A2 RFA is one example of the type of proof that may support Plaintiffs' theory that the "locus" of the culpable conduct lied with Arconic in Pennsylvania and the United States, not with its subsidiary in France.  If Plaintiffs' theory is supported by facts, that would strengthen Pennsylvania's and the United States' interest in this case.  See Lacey I, 862 F.2d at 48 (recognizing that because Pennsylvania may have been the "locus of the alleged culpable conduct," Pennsylvania had "at least some interest" in the case).  Importantly, however, the "locus" point does not apply to the Whirlpool. The allegedly defective fridge-freezer was manufactured, marketed, and sold over ten years ago by an Italian company that, at the time, had no affiliation with Whirlpool.

**The United States' Interest.**  The second relevant interest is that of the United States in deterring its corporations from engaging in conduct that causes widespread injury.  Numerous courts have acknowledged the national interest in deterring and punishing unlawful corporate behavior, regardless of the location of the injury or the citizenship of the victims.  See, e.g., Windt, 529 F.3d at 193–94 ("[T]he United States has an interest in redressing wrongful conduct engaged in by a U.S. corporation and American executives"); Lewis, 917 F. Supp. 2d at 375 ("The United States has an interest in ensuring that its corporations do not engage in tortious conduct which causes injury to anyone, regardless of where those individuals reside.").  Here, too, the United States has some interest in addressing whether Arconic's and Whirlpool's conduct contributed to

the harm that resulted from the Grenfell Tower fire, regardless of the fact that the harm occurred in England.

**The United Kingdom's Interest.**   The third relevant interest is, of course, that of the United Kingdom.   Put simply, England's interest in this litigation is enormous.   Among other reasons, all of the Plaintiffs here were residents of the UK at the time of the fire.   See Dahl, 632 F.2d at 1032 (holding that Norway had a local public interest because all of the plaintiffs were Norwegian citizens).   Additionally, the Grenfell Tower fire occurred in the UK.   See Jones, 2017 WL 5453497, at *4 ("The Dominican Republic has a stronger interest than Pennsylvania as a forum for this case because it has a compelling interest in resolving disputes arising out of torts occurring within its borders.").   Relatedly, the Grenfell Tower refurbishment was subject to UK building and fire safety regulations, and the fire has resulted in public interest in fire and building safety more broadly.[48]   See Dowling, 727 F.2d at 616 ("When a regulated industry, such as pharmaceuticals in this case and passenger aircraft operations in Piper Aircraft, is involved, the country where the injury occurs has a particularly strong interest in product liability litigation."); Harrison, 510 F. Supp. at 8 (noting that "[q]uestions as to the safety of drugs marketed in a foreign country are properly the concern of that country" and that US courts "are ill-equipped to set a standard of product safety for drugs sold in other countries").   Finally, the Grenfell Tower fire was one of the UK's worst residential fires in modern history.   See Kolawole, 863 F.3d at 1372 (recognizing the "compelling interest in Nigeria of resolving these claims considering that they stem from one of the worst aviation disasters in the country's recent history").

---

[48] In fact, following the fire British Parliament banned the use of combustible materials on the external walls of new high-rise residential buildings.  (Darling Decl. ¶ 91.)

To summarize: three jurisdictions have an "interest" in this case: Pennsylvania and the United States have an interest in deterring Arconic's and Whirlpool's harmful corporate behavior, and the United Kingdom has an interest in resolving claims arising out of a massive tragedy that occurred within its borders and affected its residents. This Court finds that the latter interest is far more substantial, and that the "local interest" factor therefore favors dismissal.

As the Supreme Court has recognized, there is "a local interest in having localized controversies decided *at home*." Gulf Oil, 330 U.S. at 509 (emphasis added). That interest is heightened where, as here, the dispute "touch[es] the affairs of many persons." Id. In addition to the UK residents and citizens who were personally affected, there is a general and widespread public interest in the aftermath of the Grenfell Tower fire, the Public Inquiry, the status of criminal investigations, and developments in civil litigation. The public interest is best served by holding the trial on Plaintiffs' claims in the UK—where it will be in "view and reach" of the persons who were affected by or are interested in the fire, and where it will play out along with the other public and private proceedings connected with determining the liability of responsible individuals and corporations. Id.

Plaintiffs argue that the UK's interests "will not be harmed in the least bit" if this litigation proceeds here. (Pls' Opp'n at 132.) But the relevant test is whether there are local interests in having the case tried at home, *not* the impact on those interests of trying the case somewhere else. The Supreme Court explicitly stated that in a case where there is widespread interest, it is preferable to hold the trial in a location that is accessible to the affected individuals, rather than "in remote parts of the country where they can learn of it by report only." Gulf Oil, 330 U.S. at 509. Here, if the trial on Plaintiffs' claims is held in Pennsylvania, interested individuals would be limited to participating in the trial by following news reports (or, potentially, by watching the

trial via a livestream as a number of interested UK individuals did for the August 19 oral argument). That type of participation is qualitatively different than what would be available if the litigation is conducted in the UK, where the trial will receive a large amount of press coverage and where interested individuals can attend in person or gather nearby to participate in the proceedings.

The UK's overwhelming interest in this case is underscored by the substantial resources that the English government has devoted and continues to devote to the Public Inquiry and to the MPS investigations. The leading counsel to the Grenfell Tower Public Inquiry reports that it is "the largest public inquiry ever established, at least in terms of numbers of [core participants], and the issues are wide-ranging and complex." (Darling Decl. ¶ 25.) During Phase 1, the Public Inquiry sat for 123 days to hear evidence and opening and closing statements, (id.), and published an extensive report detailing the events that occurred on the night of the fire. The MPS has reportedly collected 45 million documents, taken 7,000 witness statements, and secured 14,500 physical exhibits. (Darling Decl. ¶ 30.) The significant resources that have been and will be devoted to the Public Inquiry and to the MPS investigations confirm the UK's intense interest in this case. See Clerides, 534 F.3d at 630 ("Greece and Cyprus have demonstrated interest in the case through their respective criminal investigations into the crash and through Greece's official investigation of the crash."); In re Air Crash Over Mid-Atlantic on June 1, 2009, 760 F. Supp. 2d 832, 846 (N.D. Cal. 2010) ("France's interest is especially obvious here because it is also conducting the official civil investigation and an official criminal investigation."); Torreblanca de Aguilar v. Boeing Co., 806 F. Supp. 139, 144 (E.D. Tex. 1992) (reasoning that Mexico had a greater interest in the dispute because, among other reasons, "[t]he accident investigation was conducted by the Mexican government at considerable expenditure of resources").

The Supreme Court confronted a similar set of interests in Piper, but ultimately found that the foreign country's interest outweighed the American interest in addressing potential corporate wrongdoing.   There, the plaintiffs argued that FNC dismissal was not warranted because "American citizens have an interest in ensuring that American manufacturers are deterred from producing defective products."   454 U.S. at 260.   Similarly here, Plaintiffs argue that "Pennsylvania, and indeed the US, has an interest in regulating the conduct of corporations that operate within its borders and to deter tortious conduct by those corporations."  (Pls' Opp'n at 130.)  Consistent with the Supreme Court's treatment of the plaintiffs' argument in Piper, this Court concludes that the Pennsylvanian/American interest in ensuring Arconic and Whirlpool are appropriately punished cannot come close to the UK's interest in a tragedy that occurred within its borders and injured or killed hundreds of its residents.

In fact, the American interest in this case is arguably less than the American interest in Piper because there, the aircraft was actually manufactured in the United States.  454 U.S. at 239. By contrast here, it is not seriously disputed that AAP SAS manufactured the Reynobond PE that was used on the Grenfell Tower, although that product may have been designed in the United States.  The other case relied on by Plaintiffs in their discussion of the US interest in this case, Lewis, is distinguishable for the same reason.  See 917 F. Supp. 2d at 375 (recognizing the United States' interest in a case where "eleven of its corporations are sued for product liability and negligence claims arising out of the crash of a helicopter which, together with its component parts, was designed and manufactured here").

On one side of the local interest balance is Pennsylvania's and the US' interest in policing the behavior of Arconic and Whirlpool, and on the other side of the local interest balance is the UK's interest in remediating a massive human tragedy that inflicted death and injury on hundreds

of UK residents and allegedly resulted from wrongdoing of American, British, and French

companies operating under UK regulations and guidance.  The interests of Pennsylvania and of

the US simply cannot compare to the UK's enormous interest in holding the culpable actors

responsible for the fire and ensuring that victims are adequately compensated.  See, e.g., Auxer v.

Alcoa, Inc., 406 F. App'x 600, 605 (3d Cir. 2011) (nonprecedential) (holding that it would be an

abuse of discretion to find Pennsylvania's interest exceeded Australia's interest in a mass tort case

arising out of injuries to Australian residents where the "culpable conduct" took place in both

jurisdictions and the injury occurred in Australia).  The "local interest" factor weighs in favor of

FNC dismissal.  But because Pennsylvania and the US have some interest in this case as well, the

Court will not give the local interest factor substantial weight.

### g.      Issues With Regard to Choice of Law (Public Interest)

The next relevant factor is the public interest "in having the trial of a diversity case in a

forum that is at home with the state law that must govern the case, rather than having a court in

some other forum untangle problems in conflict of laws, and in law foreign to itself."  Gulf Oil,

330 U.S. at 509.  If choice of law analysis reveals that the US court will need to apply foreign law,

this factor weighs in favor dismissal.  Piper, 454 U.S. at 259.  However, in this case, because of

the FNC dismissal, the UK court may have to determine what law should apply to both liability

and damages.

A federal court sitting in diversity applies the choice of law regime of the state in which

the court sits.  LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996).  This Court, sitting

in diversity, therefore looks to Pennsylvania's choice of law framework.  Pennsylvania choice of

law rules require a three-step analysis.  First, the district court must determine whether there is an

"*actual* or real conflict between the potentially applicable laws."  Hammersmith v. TIG Ins. Co.,

480 F.3d 220, 230 (3d Cir. 2007).  Second, "[i]f there are relevant differences between the laws, then the court should examine the governmental policies underlying each law, and classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation."  Id.  The third step depends on the type of conflict that exists.

A "true conflict" exists if "the governmental interests of *both* jurisdictions would be impaired if their law were not applied."  Lacey II, 932 F.2d at 187 n.15.  In the event of a true conflict, a "deeper choice of law analysis is necessary."  Hammersmith, 480 F.3d at 230 (internal quotation marks omitted).

A "false conflict" exists if "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law."  Lacey II, 932 F.2d at 187.  In the event of a false conflict, the court should "apply the law of the state whose interests would be harmed if its law were not applied."  Id.

An "unprovided-for" situation exists if "*neither* state's interests would be impaired if its laws were not applied."  Hammersmith, 480 F.3d at 230 n.9.  In the event of an "unprovided-for" situation, the court should apply the traditional, lex locus contractus rule.  Id.

Defendants identify three potential conflicts between Pennsylvania law and English law: (1) differences in the availability of punitive damages for product claims; (2) differences in the definition of "defect" for purposes of strict liability; and (3) differences in the amount of damages available to Plaintiffs for nonpecuniary losses.[49]  (Defs' Rule 12 Mot. to Dismiss at 31–33.)  They

---

[49] Defendants also identified a conflict between the repose periods for strict product liability claims: there is a 10-year stop under the applicable English product liability law, but Pennsylvania does not appear to provide any statute of repose.  (Defs' Rule 12 Mot. to Dismiss at 33.) Defendants argue this is relevant to Whirlpool, because the Complaint alleges that the fridge-freezer was manufactured in October 2008, but Plaintiffs did not file this action until June 6, 2019 (eight months after England's statute of repose would have run).  (Id.)

argue that each of these conflicts is a "true" conflict and that England has a greater interest in having its law applied to the facts of this case.  (Id. at 35–40.)  Plaintiffs respond that each conflict identified by Defendants is false, and that because Pennsylvania's interests would be harmed if English law were applied, Pennsylvania law should govern.  (Pls' Opp'n at 134.)

One other choice of law question is whether the claims Plaintiffs bring against Whirlpool are governed by the law of Michigan, which is the location of Whirlpool's corporate headquarters. The parties allude to this issue but do not address it in detail.[50]  (See Pls' Opp'n at 134 ("[Whirlpool's] liability will be determined under either Pennsylvania or Michigan law" (emphasis added)); Whirlpool Reply at 9 (noting that Plaintiffs are "unsure" whether Pennsylvania law should apply because Michigan law may be more appropriate).)

Clearly, the choice of law questions raised in this case are numerous and complicated.  This case is still in a relatively preliminary posture, and choice of law questions were a very small part of the forum non conveniens briefing and argument.  Further, this Court has not conducted "detailed research into the policies undergirding Pennsylvania and [UK] law."  Lacey II, 932 F.2d at 188.  The analysis that follows simply "consider[s] the impact of choice-of-law problems" for purposes of forum non conveniens; this discussion does not definitively resolve the question of which state's (or country's) law applies to the issues in this case.  Lacey I, 862 F.2d at 48; see also Kisano, 737 F.3d at 879 (finding no abuse of discretion in the district court's decision not to address choice of law issues because they were "potentially complicated").

---

To the extent there is a conflict between the repose periods, the difference is no longer relevant because Whirlpool has agreed to waive all statute of limitations defenses in the UK.  (Aug. 19, 2020 Hr'g Tr. at 57:20–25.)

[50] Arconic's counsel observed that there may also be choice of law issues with respect to Defendant AAP LLC, which is located in Georgia.  (Aug. 19, 2020 Hr'g Tr. at 103:5–10.)  Counsel did not elaborate, and this issue is not covered in the briefing.

Under the Third Circuit's choice of law analysis in <u>Reyno v. Piper Aircraft Co.</u>, 630 F.2d 149 (3d Cir. 1980), it appears likely that Pennsylvania law would apply to issues (1) (the availability of punitive damages) and (3) (the amount of damages available for nonpecuniary losses).[51]  One of the choice of law issues in <u>Reyno</u> was whether Pennsylvania strict liability law or Scottish negligence law should apply.  <u>Id.</u> at 167.  The <u>Reyno</u> court explained that the conflict was between "Scotland's interest in encouraging industry by protecting manufacturers and making it relatively more difficult for consumers to recover" and Pennsylvania's interest in seeking "to make manufacturers more careful in production and design than they would be if held to a negligence standard."  <u>Id.</u>  The court concluded that this conflict was false because "Scotland's interest in encouraging industry within its borders would not be impaired . . . by applying a stricter standard of care on a foreign corporation which ha[d] no industrial operations in Scotland" and because "Scotland would have no interest in denying compensation to its residents for the purpose of benefiting a foreign corporation."  <u>Id.</u> at 168.

<u>Reyno</u>'s reasoning is directly on point here.  Based on the description of the conflicts regarding punitive damages and compensatory/aggravated damages provided in Defendants' Rule 12 Motion, and the discussion in section VII(A)(1)(c)(ii) above, it appears that the damages Plaintiffs would be able to pursue under Pennsylvania law are greater than what they would be able to seek under English law.  As in <u>Reyno</u>, the UK would have no interest in denying its *own residents* access to punitive damages and to greater damages for nonpecuniary losses simply to benefit *American* corporations.  Based on this preliminary analysis, it is likely this Court (and

---

[51] The Third Circuit's decision in <u>Reyno</u> was reversed by the Supreme Court in <u>Piper</u>.  However, the Supreme Court left <u>Reyno</u>'s choice of law analysis intact, and the Third Circuit has confirmed it remains good law.  <u>See</u> <u>Lacey II</u>, 932 F.2d at 187 n.16 ("Although the Supreme Court ultimately found this court's *forum non conveniens* analysis to be erroneous, it did not reject our disposition of the choice of law question.").

possibly the UK court) should and would conclude these two conflicts are false, and therefore would apply Pennsylvania law on damages.[52]  As to conflict (2) (regarding differences in the way Pennsylvania and the UK define "defect" for purposes of strict liability), the Court does not have enough information regarding each jurisdiction's respective policies to assess whether the conflict is true or false.

Based on the foregoing analysis, it appears that on at least two of the identified issues Pennsylvania law would likely apply (at least as to Arconic).  In other words, on these two issues application of English law would not be necessary.  Therefore, the factor considering potential issues in choice of law weighs in favor of retaining jurisdiction and denying FNC dismissal.  See, e.g., Lony II, 935 F.2d at 613 (holding that "the choice of law factor . . . favor[ed] retention of jurisdiction" because Delaware law would have applied).  However, this factor will be given minimal weight because the Court's analysis does not conclusively resolve choice of law questions and it does not address the applicability of Michigan law.[53]  Note, also, that one factor weighing in favor of denying FNC dismissal is not dispositive to the analysis.  See Kisano, 737 F.3d at 879 ("[N]ot every public interest factor need weigh in favor of dismissal.").

### h.    Jury Duty (Public Interest)

The final public interest factor to be considered is whether retaining the case would unfairly burden citizens with jury duty to resolve a dispute that is unrelated to their forum.  As the Supreme

---

[52] This tentative conclusion is significant because, as discussed in subsection VII(A)(1)(c)(ii), England's "exemplary" damages likely would not be available to Plaintiffs if they litigate their claims in the UK.

[53] This preliminary analysis only considers the choice of law issues that were raised in the briefing.  At oral argument, counsel for Arconic alluded to other topics that may implicate English law, but the Court is not making a decision on those questions at this time.  (See Aug. 19, 2020 Hr'g Tr. at 60:25; 61:1–3 (highlighting the issue of "who is a proper beneficiary and who can make claims on behalf [of] an estate" as a live legal issue that "no doubt" will be governed by English law).)

Court has explained, "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." <u>Gulf Oil</u>, 330 U.S. at 508–09.

      In theory, it would not be unfair to ask Pennsylvania residents to serve on a jury to resolve Plaintiffs' claims because Pennsylvania has an interest in this case.  Arconic, Inc. maintains its corporate headquarters in Pittsburgh and Whirlpool is registered to conduct business in this state. <u>See, e.g.</u>, <u>Lewis</u>, 917 F. Supp. 2d at 376 (holding that it would not be unfair for Pennsylvania citizens to serve on a jury in a case where the allegedly defective aircraft engine was designed and manufactured in Pennsylvania and some defendants had offices in the state).  However, as described in subsection VII(A)(3)(f), the dispute in this case is local to the UK—not to Pennsylvania or to the United States.  Without a dispute "local to the community of [Pennsylvania], there is little public interest in subjecting that community to the burdens of jury service." <u>Windt</u>, 529 F.3d at 193.  Further, the eventual trial in this case will likely be lengthy and complex.  Jury duty would impose a substantial burden in terms of time, resources, and energy on those who are empaneled.  Although Pennsylvania has some interest in this case, that interest does not justify the significant burden jury duty would impose on Pennsylvania residents. <u>Cf.</u> <u>Nolan v. Boeing Co.</u>, 919 F.2d 1058, 1069 (5th Cir. 1990) (finding that "onerous jury duty" resulting from a four month trial would be unfair to citizens of a state with "no connection whatsoever" to the controversy).  This factor weighs in favor of dismissal.

### 4.     FNC Discovery In This Court

      The Third Circuit has cautioned that "whenever discovery in a case has proceeded substantially so that the parties already have invested much of the time and resources they will expend before trial, the presumption against dismissal on the grounds of *forum non conveniens* greatly increases." <u>Lony II</u>, 935 F.2d at 614.  This consideration does not fit neatly within the <u>Gulf</u>

<u>Oil</u> rubric of factors; instead, it "goes to both private concerns, because of the parties' investment in time and money in discovery, and public ones, because the district court and court personnel already have expended resources in connection with th[e] litigation." <u>Id.</u> at 613.

The discovery that <u>Lony II</u> found was "substantial" consisted of the production of "several thousand pages" of documents (as well as the translation of many of these documents), the exchange of interrogatories, and the taking of at least five depositions. <u>Id.</u> The volume of discovery that has occurred in this case exceeds the discovery that was exchanged in <u>Lony II</u>— Plaintiffs report that Arconic has produced more than 143,000 pages of documents, both from Arconic US and from AAP SAS through the Hague Convention, and that they have deposed a number of Arconic officials (including Kevin Juedeman, Arconic's corporate representative; Diana Perreiah, the president of Arconic's BCS business unit; Elizabeth Rivera, Arconic's e-discovery specialist; Thomas Blazek, Arconic's 30(b)(6) deponent; and Catherine Parroco, assistant corporate secretary for Arconic, Inc.).[54] (Pls' Supp. Mem. re FNC Discovery at 15.) Because there has been robust discovery on *forum non conveniens*, this Court must consider the effect of that discovery on Defendants' FNC Motion.

Initially, it is important to recognize that <u>Lony II</u> does not preclude discovery on *forum non conveniens* or hold that such discovery is inherently suspect. The Supreme Court and the Third Circuit have both consistently recognized the fact-specific nature of the *forum non conveniens* inquiry and the district court's discretion to develop the necessary facts. <u>See</u> <u>Piper</u>, 454 U.S. at 258 (explaining that while "extensive investigation" into the facts may defeat the purpose of an

---

[54] Plaintiffs have also received discovery from Whirlpool (including taking the deposition of Whirlpool's corporate representative), though the exact volume has not been quantified. However, the volume of discovery from Whirlpool is substantially less than what Plaintiffs have received from Arconic. Plaintiffs' <u>Lony II</u> argument therefore primarily relates to Arconic.

FNC Motion, the court must have "enough information . . . to balance the parties' interests"); Williams, 326 U.S. at 557 ("Each case [raising FNC] turns on its facts."); Lony II, 935 F.2d at 613 (emphasizing the "discretionary nature" of a district court's decision on an FNC motion); see also Carijano v. Occidental Petroleum Corp., 548 F. Supp. 2d 823, 827 (C.D. Cal. 2008) ("[A]lthough in certain cases, the *forum non conveniens* determination will not require significant inquiry into the facts and legal issues presented by a case, other cases may well require some discovery to allow the court to weigh the parties' interests or determine the adequacy of the foreign forum."), rev'd on other grounds, Carijano v. Occidental Petroleum Corp., 643 F.3d 1216 (9th Cir. 2011).  Therefore, the fact that the Court permitted Plaintiffs to seek discovery on *forum non conveniens* does not, in and of itself, suggest that FNC dismissal should be denied.

The error in Lony II was that the district court "fail[ed] to consider the extent of merits activity already completed and underway" in the US litigation.  935 F.2d at 613.  Here, by contrast, this Court is cognizant of its obligation to consider the discovery that was conducted and weigh that activity against the other private and public interest factors.  For the reasons that follow, the Court concludes that the discovery activity does not outweigh the numerous other considerations that heavily favor dismissing this case.

First, in resolving the discovery disputes that arose, the Court was mindful of Lony II and limited discovery to what was relevant to the pending FNC Motion.  (ECF 105 ¶ 2 n.1; ECF 217 at 1.)  Inevitably, because of the nature of *forum non conveniens*, this discovery became somewhat "entangled in the merits of the underlying dispute."   Van Cauwenberghe, 486 U.S. at 528. Nonetheless, the discovery orders were fashioned to develop a record on the facts that were important to FNC—including the identification and location of witnesses who will be relevant to Plaintiffs' claims and Defendants' defenses; the nature of the relationship between the Arconic

Defendants and AAP SAS, specifically the control exercised by Arconic officials in the United States over AAP SAS; the location of evidence on corporate control; and the connection between this dispute and the United States.

By contrast, the discovery that the Third Circuit found problematic in Lony II was on the *merits* of the plaintiffs' claims.  See 935 F.2d at 613 (summarizing "the extent of *merits* activity already completed" (emphasis added)).  Indeed, that case was in a unique procedural posture.  The district court in Lony II initially dismissed the complaint on *forum non conveniens* grounds after permitting limited discovery on this issue.  Id. at 607.  After the Third Circuit remanded the case, the district court allowed six months of discovery on the merits before ultimately dismissing again for FNC.  Id.  On Lony II's second appeal, the Third Circuit again reversed the dismissal because the district court failed to consider how the "substantial merits discovery" affected the balance of FNC factors.  Id. at 615.

Unlike in Lony II, this Court has limited discovery to what is relevant to FNC and has not permitted inquiry into topics that are solely on the merits.  (See, e.g., ECF 144, Feb. 14, 2020 Hr'g Tr. at 36: 1–2 (ruling that certain documents that dealt with "the merits of the case" were "just not relevant to where we are in this case right now"—that is, in the FNC stage of the litigation); id. at 9–13 (noting that another document was "all about the merits of the case" and was "just not discoverable now" but would probably be discoverable when the parties got to the merits); ECF 93-1, Nov. 25, 2019 Hr'g Tr. at 59:15–17 (clarifying for the parties that the discovery the Court intended to permit had "nothing to do with the merits of the fire or who started it or who is responsible or liable for any damages").)  That the discovery in this case has been tailored to *forum non conveniens*—rather than more broadly on the merits—is one way that the Lony II principle can be distinguished.  Cf. Ramgoolie v. Ramgoolie, No. 16-3345, 2018 WL 5619959, at *8

(S.D.N.Y. Aug. 3, 2018) (finding that because "the parties have already completed discovery with respect to liability," the <u>Lony II</u> principle applied and weighed against dismissal); <u>Bank of Crete, S.A. v. Koskotas</u>, No. 88-8412, 1991 WL 280714, at *5 (S.D.N.Y. Dec. 20, 1991) (concluding that "voluminous discovery on the merits" created a "presumption against dismissal [that was] very high").

Second, this case has not advanced beyond the *forum non conveniens* stage of the litigation. The only other major motion that has been decided was Defendants' Rule 12 Motion.  Resolution of Defendants' FNC Motion—which has been pending for approximately one year—was delayed substantially as a result of the global health crisis and the Hague Convention proceedings.  The relatively preliminary procedural posture distinguishes this case from <u>Lony II</u>, where the district court had twice considered FNC and had set a trial date, 935 F.2d at 607; <u>see also id.</u> at 614 (noting the district court's "familiarity with the litigation"), and from other cases that were significantly more progressed at the time of the FNC dismissal, <u>see, e.g.</u>, <u>Gates Learjet Corp. v. Jensen</u>, 743 F.2d 1325, 1335 (9th Cir. 1984) (holding that the district court erred in failing to consider the fact that "the parties were ready for trial when [the court] dismissed the complaint for *forum non conveniens*"); <u>Lacey v. Cessna Aircraft Co.</u>, 849 F. Supp. 394, 398 (W.D. Pa. 1994) (concluding that under <u>Lony II</u>, completion of merits discovery and submission of final pretrial statements favored denial of FNC motion).  The fact that this case is in a relatively early posture mitigates <u>Lony II</u>'s concern about dismissing an action that has developed to the point where the court and the parties are prepared for trial.

Third, because the discovery that was obtained in this Court will be available to Plaintiffs in the UK litigation, the Third Circuit's concern about "judicial efficiency and expediency" is not implicated.  <u>Lony II</u>, 935 F.2d at 614.  As <u>Lony II</u> points out, it would be counterproductive and

inefficient for "the parties [to] waste resources on discovery and trial preparation in a forum that will later decline to exercise its jurisdiction over the case." Id.  However, the resources that were expended on *forum non conveniens* discovery will not be wasted because any discovery that was obtained in this Court will be available to Plaintiffs for use in litigation in the UK.

One of the conditions of this Court's FNC dismissal is that Defendants permit Plaintiffs to use any discovery that they obtained in this case when they pursue their claims in the UK. Defendants themselves acknowledge that "Plaintiffs will be able to use any relevant discovery in a later UK proceeding." (Arconic's Reply at 26 n.16; see also Aug. 19, 2020 Hr'g Tr. at 15:12–17.)  Therefore, the discovery that occurred in this Court was not a wasted effort—it was necessary for the resolution of the FNC motion and will ultimately aid Plaintiffs in pursuing their claims (wherever the claims are litigated).  See Alfadda v. Fenn, 159 F.3d 41, 48 (2d Cir. 1998) (holding that discovery conducted in the US did not require denial of the FNC motion in part because the plaintiffs were "free to use the existing discovery material to whatever extent the French tribunal will permit"); In re Optimal U.S. Litig., 886 F. Supp. 2d 298, 309 (S.D.N.Y. 2012) ("[T]he extensive discovery that has occurred does not counsel against dismissal because defendants have consented to permit such discovery to be used in a Swiss proceeding and dismissal is conditioned on plaintiffs' ability to use discovery already obtained in this case when the case is re-filed in Switzerland.").

In sum, although Plaintiffs have been permitted to collect ample discovery on *forum non conveniens*, that discovery does not defeat Defendants' FNC Motion.  Cf. Windt, 544 F. Supp. 2d at 427 ("It would be indeed anomalous for this Court to allow Plaintiffs to demand and obtain significant discovery just so Plaintiffs would be able to use the very fact of this discovery as a tool to thwart Defendants' Motion.").  The Court recognizes the principle set forth in Lony II but

concludes that it does not require retaining jurisdiction because discovery in this case has been limited to issues that are relevant to *forum non conveniens* (although there has inevitably been overlap with the merits); the litigation is in a relatively preliminary posture; and counsel's efforts related to the discovery motion practice were not wasted as everything that was obtained by Plaintiffs can be used in the UK litigation.  The discovery that was conducted on *forum non conveniens* does not overcome the overwhelming weight of private and public interest factors that favor dismissing this case.

**B.**    **Summary of *Forum Non Conveniens* Analysis**

*Forum non conveniens* dismissal is the appropriate outcome in this case.

First, the UK is available as an adequate alternative forum.  Various conditions have been imposed on the FNC dismissal to ensure that Defendants are amenable to process in the English courts and that Plaintiffs' claims are cognizable in the UK.  Further, because of the severity of the tragedy and the difference between the damages regimes of the UK as compared to Pennsylvania, the Court will permit Plaintiffs to reinstate this action if the UK court determines that Pennsylvania law applies to damages and that one or both Defendants may be liable for punitive damages.

Second, Plaintiffs' choice of forum is accorded a moderate amount of deference.  Although all Plaintiffs are foreign, they have demonstrated that to a degree, litigating here would be convenient.

Third, the balance of private and public interest factors "tips decidedly" in favor of trial in the UK, which overcomes the moderate amount of deference for Plaintiffs' choice of forum.  Lacey II, 932 F.2d at 180.

The following factors weigh heavily in favor of dismissal: (1) ease of access to sources of proof (because of the large volume of evidence available in the UK and relevant to defenses that

would be burdensome to obtain for trial in the US compared to the lesser amount of evidence available in the US that is under the control of the parties and would be obtainable in the UK without much difficulty); (2) the large number of witnesses (both party witnesses and nonparty witnesses) who are located in the UK; and (3) the inability to implead third-party defendants in this Court (in contrast to the ability to implead all of the third-parties in a single UK action).

The following factors weigh in favor of dismissal, though not heavily: (1) practical problems in coordinating this litigation with the Public Inquiry; (2) parallel litigation that is currently pending in the UK courts; (3) the UK's enormous interest in resolving the claims of UK residents (although the strong UK interest is tempered by the Pennsylvania and US interest); and (4) the desire to avoid burdening Pennsylvania residents with jury duty in this case.

The following factors are neutral: view of the premises and administrative difficulties.

The following factor favors retaining jurisdiction: potential choice of law issues.

Adding all of these interests together, it is readily apparent that the overall balance "weigh[s] heavily" in favor of dismissal.  Id.  The interests are not "in equipoise," nor do they "lean only slightly toward dismissal."  Id.  The seven interests that favor dismissal (three of which heavily favor dismissal) overwhelm the lone interest that arguably favors retaining this case. Defendants have satisfied their burden to demonstrate that the relevant private and public interests "strongly favor dismissal."  Lony I, 886 F.2d at 643.

Fourth, consistent with the Third Circuit's instruction in Lony II this Court has considered the impact of the FNC discovery on Defendants' Motion.  The discovery that occurred does not defeat dismissal because it was on FNC (not on the merits), this case is still in a relatively preliminary posture, and the parties' discovery efforts were not wasted as Plaintiffs can use any evidence they obtained here in the UK litigation.

Defendants have carried their burden to show that litigating this case in Pennsylvania would result in "oppressiveness and vexation . . . out of all proportion to [P]laintiff's convenience." Koster, 330 U.S. at 524. They have established that litigating in the UK, by contrast, "will best serve the convenience of the parties and the ends of justice." Id. at 527. Defendants have overcome the Third Circuit's admonition that "dismissal for *forum non conveniens* is the exception rather than the rule" and have demonstrated that dismissal is the appropriate outcome in this case. Lony II, 932 F.2d at 609.

### C. Dismissal Is Consistent with Outcomes in Leading International Accident Cases

The Court's conclusion that this case must be dismissed for *forum non conveniens* is consistent with (1) the Supreme Court's decision in Piper and (2) the outcomes in other leading international accident cases.

#### 1. Piper

Piper is the leading Supreme Court authority on *forum non conveniens* in the context of an international accident (and one of the leading Supreme Court cases on *forum non conveniens* in general). The Supreme Court's *forum non conveniens* analysis in Piper is highly relevant given the uncanny similarity between the facts of that case and those of this one.

The plaintiffs in Piper were the estates of several Scottish citizens who were killed in a plane crash that occurred in Scotland. 454 U.S. at 239. At the time of the crash, the plane, which had been manufactured in Pennsylvania, was owned by a British company and operated by a Scottish air taxi service. Id. The wreckage from the accident was stored in England, and an investigation conducted by the British Department of Trade found that pilot error may have contributed to the crash. Id. The administratrix for the estates of the five passengers brought products liability and negligence claims in the United States and the case was transferred to the

Middle District of Pennsylvania.  Id. at 240.  The survivors of the five passengers who were represented in the Pennsylvania litigation separately filed suit in the United Kingdom against various third-party defendants over whom the United States court lacked jurisdiction.  Id.

The district court dismissed for *forum non conveniens*.  The court first found that an adequate alternative forum existed in Scotland because the defendants agreed to submit to the jurisdiction of the Scottish courts and to waive statute of limitations defenses.  Id. at 242.  The district court then considered how much deference the plaintiffs' choice of forum was entitled to, ultimately concluding that little weight was appropriate because the administratrix-plaintiff was representing foreign citizens.  Id.  In determining that the Gulf Oil private interest factors "strongly pointed towards Scotland," the district court made the following conclusions: the real parties in interest were citizens of Scotland; witnesses who would testify about defenses and damages were in Great Britain (and beyond the compulsory process of a Pennsylvania court); the defendants were unable to implead potential Scottish third-parties; and the survivors had brought separate actions against the potential Scottish third-parties in Scotland.  Id. at 242–43.  The district court reached the same conclusion with respect to the public interest factors, reasoning that the case presented complicated choice of law questions because one of the defendants would be subject to Pennsylvania law and the other to Scottish law; Scotland had a "substantial" interest in the litigation; and it was unfair to burden Pennsylvania citizens with a dispute that lacked a connection to this state.  Id. at 243–44.

The Third Circuit disagreed with the district court and reversed.  Id. at 244–45.  The Court of Appeals concluded that the district court's distinction between domestic and foreign plaintiffs was unjustified and that the district court erred in its balancing of the private and public interest factors.  Id. at 244–46.

The Supreme Court reversed.  One of the elements of the Third Circuit's analysis that the Supreme Court disagreed with was its assessment of the trial court's <u>Gulf Oil</u> analysis.  In terms of the <u>Gulf Oil</u> factors, <u>Piper</u> reached the following conclusions:

- The factor analyzing relative ease of access to sources of proof "point[ed] in both directions" because, on one hand, records relating to the plaintiffs' strict liability and negligence theories (i.e., evidence concerning the design, manufacture and testing of the aircraft) were located in the United States but, on the other, a "large proportion" of the evidence relevant to Defendants' defenses was in Great Britain.  <u>Id.</u> at 257–58.

- The district court correctly determined that the inability to implead potential third-party defendants favored dismissing for FNC and holding the trial in Scotland where the third-parties could be impleaded.  <u>Id.</u> at 259.

- The district court properly found that the defendants would encounter substantial problems in securing the testimony of witnesses if trial were held in the US.  <u>Id.</u> at 258.

- Scotland had a "very strong interest" in the litigation because the accident occurred in Scotland's airspace, all of the decedents were Scottish, and the majority of the potential parties were Scottish or English.  <u>Id.</u> at 260.  The Supreme Court credited the plaintiff's argument that American citizens have an interest in deterring American manufacturers from producing defective products, but concluded that "the incremental deterrence that would be gained if this trial were held in an American court is likely to be insignificant."  <u>Id.</u> at 260–61.

Although there are some differences between this case and <u>Piper</u>,[55] the similarities (of which there are far more) are striking.  Plaintiffs in <u>Behrens</u> have brought strict liability design defect claims for a fire that occurred in England and killed or injured English residents, just as the Scottish plaintiffs in <u>Piper</u> brought strict liability and negligence claims for an airplane crash that occurred in Scotland and killed Scottish citizens.  As in <u>Piper</u>, all of the plaintiffs in this case are

---

[55] One difference that Plaintiffs have seized on is that in <u>Piper</u>, the plaintiffs brought strict liability *and* negligence claims whereas here Plaintiffs have stated claims *only* for strict liability.  (Pls' Opp'n at 147.)  The Court finds no support in <u>Piper</u> for the contention that the Supreme Court's <u>Gulf Oil</u> analysis turned on the fact that both theories of liability were asserted.

foreign (they are either estates of decedents or individuals injured in the fire).  Further, <u>Piper</u> unambiguously recognized that problems with the inability to implead third-party defendants favor dismissal.  This Court therefore properly considered the inefficiencies resulting from the UK-based potential third-party defendants, including that Defendants would have to pursue contribution claims in the UK after the conclusion of this litigation and that many of the third-party defendants have already been sued in the UK.  Moreover, in <u>Piper</u> and in this case, there is evidence in both the US forum and in the UK, but problems associated with procuring witnesses and discovery from the foreign forum favor dismissing the case for *forum non conveniens*.  Finally, <u>Piper</u> acknowledged that Pennsylvania and the US have an interest in deterring the production of defective products by companies that operate within its borders.  As discussed in subsection VII(A)(3)(f), this Court also acknowledges that interest.  But as in <u>Piper</u>, "[t]he American interest in this accident is simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here."  <u>Id.</u> at 261.

### 2.    Other Leading International Accident Cases

Dismissal also aligns with the outcomes in other major accident cases that were brought in the United States against American companies that manufactured or were otherwise involved in the supply of products that caused significant harm abroad.  In cases involving this set of facts, courts commonly defer to the foreign country's interest and dismiss for *forum non conveniens*.  <u>See, e.g.</u>, <u>In re Air Crash</u>, 946 F.3d at 615 (affirming district court's FNC dismissal of case brought by mainly foreign plaintiffs arising out of the disappearance of Malaysia Airlines Flight MH370); <u>Nolan</u>, 919 F.2d at 1068–69 (holding that the district court properly dismissed for FNC where the action centered on the United Kingdom—the home of most of the plaintiffs and the location of the fatal plane crash that killed 47 people and injured dozens more); <u>In re Union Carbide Corp. Gas</u>

Plant Disaster at Bhopal, India in Dec., 1984, 809 F.2d 195, 206 (2d Cir. 1987) (upholding FNC dismissal of litigation brought by foreign plaintiffs arising out of a chemical explosion in India that killed over 2,000 people); Dowling, 727 F.2d at 616 (recognizing that the interest of the United Kingdom was "great" in a case involving a defective drug that caused injuries in England and Scotland to citizens of those countries, and that these facts supported dismissal for FNC); Dahl, 632 F.2d at 1033 (sustaining FNC dismissal of wrongful death actions brought by foreign citizens against the US manufacturer of a helicopter that was involved in a fatal crash in Norway).

Plaintiffs emphasize three accident cases— Lacey I, 862 F.2d 38 (3d Cir. 1988), Lewis v. Lycoming, 917 F. Supp. 2d 366 (E.D. Pa. 2013) (Bartle, J.), and McCafferty ex rel. Estate of Prant v. Raytheon Inc., No. 03-6729, 2004 WL 1858080 (E.D. Pa. Aug. 19, 2004) (Green, J.)—that were not dismissed on *forum non conveniens* grounds.[56]   As discussed below, each of those cases is distinguishable.

Lacey I.  The plaintiff in Lacey I, an Australian citizen, was injured in a plane crash that occurred in British Columbia.  862 F.2d at 39.  He filed a products liability complaint in Pennsylvania federal court against the manufacturer of the aircraft and manufacturers of the aircraft's allegedly defective parts, one of whom was located in Pennsylvania, seeking damages for his personal injuries.  Id.  The district court dismissed for *forum non conveniens*.  Id.  The Third Circuit reversed because the district court failed to consider the parties' access to proof if trial were held in the United States, erroneously accepted the defendants' impleader argument on a record that did not support the liability of the third-party defendants, and did not assess British Columbia's

---

[56] Plaintiffs also emphasize the Third Circuit's decisions in Lony I and Lony II.  Those decisions are relevant in certain ways.  However, because the underlying dispute in Lony was commercial, those cases will not be discussed in this subsection, which focuses on cases involving international accidents.

local interest in resolving a case brought by a plaintiff from Australia (not British Columbia).  Id. at 45–48.  Here, by contrast, the Court has considered the proof that would be available if trial were held in the United States (though ultimately concluded that this proof is outweighed by the significant amount of evidence in the UK), the record supports Defendants' impleader argument, and the UK undeniably has a local interest given that the accident happened in London and affected UK residents.

Lewis v. Lycoming.  The plaintiffs in Lewis represented British decedents who died in a helicopter crash that occurred in England.  917 F. Supp. 2d at 368–69.  The defendants were alleged to have played a role in the design, manufacture, assembly, and/or sale of the defective helicopter. Id. at 369.  Judge Bartle undertook a thorough analysis and concluded that the defendants did not meet their burden to show that the relevant interests favored dismissal, even though the accident occurred in the UK and the plaintiffs were UK citizens at the time of their deaths.  Id. at 377.  One fact "significant" to Judge Bartle's conclusion (but absent here) is that the accident wreckage had been shipped from the UK to Delaware and was available there for testing and inspection.  Id. at 371.  Here, by contrast, the wreckage is in the UK, is controlled by the MPS, and would be difficult or impossible to obtain for a trial in Pennsylvania.  Judge Bartle also concluded that although the "local interest" factor ultimately favored the defendants, it tipped in their favor only slightly because of the US interest in a case where eleven of its corporations were sued in connection with a product that was designed and manufactured here.  Id. at 375.  In this case, US-based Arconic and Whirlpool are only two of many potentially culpable actors, the rest of whom are UK entities. Further, neither Arconic nor Whirlpool *manufactured* the allegedly defective products—Plaintiffs' theory is that they are responsible for a defective design.

McCafferty v. Raytheon Inc.   The plaintiffs in McCafferty represented the estates of individuals who passed away in a plane crash that occurred in Indonesia.  2004 WL 1858080 at *1.  The plaintiffs claimed that the defendants were involved in the manufacture and design of the allegedly defective aircraft and engine.  Id. at *3.  Because the plaintiffs' theory of liability was premised on manufacturing activity and/or design decisions that occurred in the United States, Judge Green found that denying the motion to dismiss for FNC was appropriate.  Id. at *3–4. Three facts that are highly relevant to this Court's FNC analysis did not factor into Judge Green's decision: the inability to implead third-party defendants, the considerable amount of evidence in the foreign forum largely in the possession of third-parties beyond this Court's jurisdiction, and the other country's enormous interest in the case.

In sum, dismissing this case for *forum non conveniens* is consistent with what numerous other courts have done when confronted with allegations of product liability arising out of an accident that caused widespread injury and occurred abroad.  Plaintiffs have identified a few cases that went the other way, but this Court concludes those cases are distinguishable on the facts and that binding precedent, namely the Supreme Court's decision in Piper, requires dismissal here.

### D.    Whirlpool and the Possibility of Severance

Whirlpool is in a much different position than Arconic in this litigation.  Plaintiffs have collected evidence of Arconic's control and decisionmaking in the United States (and in Pennsylvania), but evidence as to Whirlpool activities in the United States is completely lacking. Instead, the evidence regarding Whirlpool concerns its 2014 acquisition of Indesit, the company that manufactured the fridge-freezer.  Further, Plaintiffs devote the vast majority of their briefing to establishing why it is fair and convenient to require Arconic to defend in this Court, but they make few (if any) arguments as to Whirlpool specifically.

At oral argument, Plaintiffs explained that they view Arconic as the primary cause of the harm, and they therefore have pursued a different strategy with respect to Whirlpool.  (Aug. 19, 2020 Hr'g Tr. at 51:3–7.)  The arguments that favor Plaintiffs on FNC—including Pennsylvania's interest in addressing Arconic's alleged bad behavior and the amount of discovery that has been conducted in this Court—simply do not apply (or do not apply as strongly) to Whirlpool.  Even assuming Plaintiffs are correct that FNC dismissal should be denied as to Arconic, there is little reason to require Whirlpool to defend in Pennsylvania—a forum that is decidedly less convenient.  Because of the differences with respect to the strength of Plaintiffs' FNC arguments against Arconic as compared to the strength of Plaintiffs' FNC arguments against Whirlpool, one possibility this Court briefly considered was severing Whirlpool and dismissing only those severed claims.  See, e.g., Warter v. Boston Sec., S.A., 380 F. Supp. 2d 1299, 1307 (S.D. Fla. 2004) ("In cases involving multiple defendants, when dismissal on *forum non conveniens* grounds would further 'the administration of justice,' but venue in the alternative forum is not appropriate for one or more of the defendants, the Court may sever claims against those defendants").

Although Plaintiffs have stronger arguments on FNC as to Arconic than as to Whirlpool, those arguments cannot overcome the significant weight of factors that favor dismissing this case in its entirety.  It is therefore unnecessary to reach a final decision on severance.  However, the Court notes that "judicial efficiency and expediency" are two of the hallmarks of the *forum non conveniens* doctrine, and splitting this case into two, with Arconic defending against Plaintiffs' claims in this Court and Whirlpool defending in the UK, would run directly contrary to these interests.  Lony II, 935 F.2d at 614.

**VIII.  Conclusion**

At its core, this case is about a London residential fire that tragically resulted in the death of seventy-two UK residents and substantial injuries to hundreds more.  This Court has great sympathy for the victims and survivors of the fire, as well as their family and friends.  The Grenfell Tower fire has been, and continues to be, the subject of an extensive inquiry conducted by the UK government and may result in criminal prosecutions.  Defendants Arconic and Whirlpool, which are American companies whose products allegedly contributed to the severity of the fire, are two of many potentially responsible actors.  Defendants have demonstrated that they would be genuinely inconvenienced by having to defend against Plaintiffs' claims in Pennsylvania and have shown that litigating in the UK is significantly more preferable.

After considering all of the *forum non conveniens* factors and applying them to the facts of this case, the Court concludes that dismissal is warranted because the balance of conveniences clearly favors trial in the UK.  Therefore, Defendants' Motion to Dismiss for *Forum Non Conveniens* is **granted** subject to specific conditions and this case is **dismissed** without prejudice.[57]

An appropriate Order follows.

O:\CIVIL 19\19-2664 Behrens v Arconic\19cv2664 Memorandum re Defendants' MTD for FNC

---

[57] As a final coda in my frequent citation of opera metaphors, this case must travel in Plaintiffs' search for justice, just as in Mozart's most treasured "Magic Flute," where the opera's lovers, Tamino and Pamina, as well as the ubiquitous bird catcher Papageno, successfully completed several trials after travelling and Sarastro, a wise mythic hero, declared a happy ending where justice prevailed.